UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF IOWA

# Monitoring Team Report

Dates of Onsite: March 18-21, 2024
Date of Draft Report: April 14, 2024
Date of Final Report: May 6, 2024

Submitted By: James M. Bailey, MCD-CCC-SLP
Court Appointed Lead Monitor
Teri Towe, B.S.
Assistant Lead Monitor

Monitoring Team: Wayne Zwick, M.D
Daphne Glindmeyer, M.D.
Teka Harris, M.A., BCBA
Melanie Reeves-Miller, B.S.
Bonnie Wallington, RN, CCM
Jane Wiemerslage, B.A.
Scott Umbreit M.S

# Table of Contents

Methodology 3
Organization of Report 3
Executive Summary 4
Summary of Compliance 4

Status of Compliance with Settlement Agreement
Section A 6
Section B 8
Section C 13
Section D 76
Section E 85
Section F 92
Section G 93
Section H 100
Section I 124
Section J 125
Section K 128

**Methodology**

To assess the Center's compliance with the Settlement Agreement, the Monitoring Team undertook several activities.

a. Selection of individuals: The Monitoring Team requested various types of information about the individuals who lived at the Center and those who had transitioned to the community. From this information, the Monitoring Team then chose the individuals to be included in the monitoring review. This non-random selection process is necessary for the Monitoring Team to address the Center's compliance with all provisions of the Consent Decree.
b. Onsite review: The Monitoring Team was present onsite at the Center.
c. Review of documents: Prior to the onsite review, the Monitoring Team requested several documents regarding the individuals selected for review, as well as some Center-wide documents. During the week of the review, the Monitoring Team requested and reviewed additional documents.
d. Observations: The Monitoring Team observed individuals in their homes, day/work sites, and other locations at GRC during regularly occurring activities. Specific activities were also scheduled and observed, such as administration of medication, implementation of skill acquisition plans, and mealtimes.
e. Interviews: The Monitoring Team interviewed several staff, individuals, clinicians, and managers.
f. Monitoring Report: The monitoring report details each of the various outcomes and indicators that comprise each section of the Settlement Agreement. A summary paragraph is provided for each section. In this paragraph, the Monitor provides some details about the provisions that comprise the section.

**Organization of Report**

The report is organized to provide an overall summary of Glenwood Resource Center's status as it relates to the Consent Decree. Specifically, for each of the lettered sections of the Consent Decree, the report includes the following sub-sections:

a. The Monitor has provided a summary of the Center's performance on the indicators in the lettered section.
b. Indicators were developed as part of the monitoring plan and tool listed under paragraph 248. These indicators break down the Consent Decree paragraphs into measurable actions and components.
c. Paragraphs and their related indicators were determined to be in:
    a. Substantial compliance (SC) if 80% or greater consistency or presence was noted.
    b. partial compliance (PC) if between 50%-80% consistency or presence was noted.
    c. noncompliance (NC) if <50% consistency or presence was noted.
    d. Less Oversight (LO) if SC was noted during the previous review. These indicators will continue to be reviewed, but detail will only be given if issues are noted (such as a substantial decrease from the previous review)."

d. Throughout this report, reference is made to specific individuals by using a numbering methodology that identified the individuals according to their assigned numbers.

**Executive Summary**

The Monitoring Team wishes to acknowledge and thank the individuals, staff, clinicians, managers, and administrators at Glenwood Resource Center for their openness and responsiveness to the many requests made and the extra activities of the Monitoring Team during the review. The Center Superintendent supported the work of the Monitoring Team and was available and responsive to all questions and concerns. Many other staff were involved in the production of documents and graciously worked with the Monitoring Team; their time and efforts are much appreciated.

Overall, improvement was noted for medical services, declines were seen in psychiatry and psychology, and limited movement was seen with ISPs and overall client protections. The transition process continued to be the primary area of need as well as the supports/assessments leading into the plan.

During the Exit Summary, areas of focus and noncompliance were shared with Center and State leadership. Since that summary, it should be noted that the State has taken considerable actions to increase both the safety and appropriateness of future transitions. This included but was not limited to:

1. Contracting with a Transition Specialist, who began his work on April 3, 2024, to oversee all future transition plans and to assist the Center in developing appropriate follow-up post transition.
2. Contracting for dedicated psychiatry assistance to provide psychiatric leadership.
3, Implementing procedures for improving communication between Center psychiatrists and community psychiatrists, including warm hand-offs.
4. Implementing procedures for improved psychiatry involvement throughout the transition process.
5. Implementing a transition plan review process using the Monitor's Transition Audit tool.
6. Ensuring review and requiring approval of transition plans by the Community Integration manager.
7. Dedicating two targeted case managers to full-time support of the CIM as a bridge to hiring four regional CIMS.
8. Creating a Strike Team composed of clinicians to provide pre-transition support (including provider training), community provider support, and post-transition support.
9. Contracting with a professional to provide training focused on center and community-based staff administration of enteral nutrition.

The Monitor appreciates and acknowledges the great amount of work that has been accomplished in the few short weeks since the onsite review, but it should also be noted that many issues and subsequent recommendations had been noted since the baseline review.

**Summary of Compliance**

The following sections below were identified as being either in substantial, partial, or noncompliance with the Consent Decree. Sections that were in substantial compliance may exit if present for two consecutive reviews. . This was noted for Section A: Research.

| Section | Substantial Compliance | Partial Compliance | Non-Compliance |
|---|---|---|---|
| A | 41-47 (Exit) | | |
| B | 53,54,55, 179 | | 48,49,50,51,52,56,57 |
| C | 58,,60,,62,, 68, 69,70, 71,72, 73,74,75,76,77,82,, 84,85,86, 88, 89, 92, 94, 95, 96, 100, 101, 102, 106,107,108, 109, 110, 111, 112, 116,118,122 | 52,56, 59, 61, 63, 6478,79,83, 87,90, 93, ,105,121 | ,,,65,66,67, , 80, 81,91, 97, 98,99,103,104,113, 114,115, 117, 119, 120 |
| D | 126,127,128,131, 132, 133, 138, 141,142,143,144,145,146,147, 148,149,150, 151,152, 154 | 123,127,129,130, | 124,125,134,135, 136, 137, 139, 140, 153 |
| E | 156 | 155,157,159 | 158,160,161,162,163 |
| F | 166 | 164,165 | |
| G | 169 | 167,168 | 170,171,172,173,174, 175,176 |
| H | 177,178,179,180,183,190,198 | 201, 202, 205 206,207, 209, 211 | 181,181,184,185,186, 187, 188, 189, 191,192, 193, 194,195,196, 197, 199, 200,203, 204, ,208 |
| I | 213, 214, 221 | 212,214,215 | |
| J | 216, 217, 218,219,220,227,228 | 223,225,226 | 224 |
| K | 102, 232, 233 | 229,230,231 | |

**Section A: Research (41-47)**

Summary:
This Section was found previously to be in substantial compliance. A Research policy existed that would ensure informed consent by the individual and/or guardian and guide the center in ensuring all levels of safety were in place. Per interview, there was no research currently taking place at GRC nor was there an intent to have any in the future. Additionally, all staff of all levels had been provided with training regarding the Research policy.

| # | Indicator | Overall Score |
|---|---|---|
| 1 | If an individual participates in research, the<br>a. resident or guardian has provided written Informed Consent for such research.<br>b. Research has been independently reviewed.<br>(par. 41, 47) | LO |
| 2 | GRC with confirmation by the IRB will ensure any risks associated with the research are minimized and reasonable (par. 42) | LO |
| 3 | Residents involved in research will be monitored by a staff with experience in research to ensure safety. (par. 43) | LO |
| 4 | All residents subject to Research were free to cease participation in such Research at any time and for any reason without perceived or actual repercussion or other negative impact to the resident. (par. 41) | LO |
| 5 | Only trained staff conduct research. (par. 45) | LO |
| 6 | Policies and Procedures regarding Research are consistent with the provisions of this Section and with current, generally accepted professional standards regarding the conduct of research. (par. 45) | LO |
| 7 | State shall conduct effective oversight throughout the implementation of this Agreement to detect noncompliance with the requirements of Section IV. A | |

Comments:
Individuals were not subjected to any form of research based upon the review of policies, procedures, documentation, and interview. Per interview with the GRC Director and HHS, research of any kind will not occur at GRC.

| **Section B: Integrated Interdisciplinary Care and Services (48-57)** | | |
|---|---|---|
| Summary:<br>All individuals had a current ISP. For the most part, individuals attended planning meetings and monthly review meetings. A majority of the guardians did not attend annual meetings.<br><br>In all cases, significant relevant assessments were not submitted prior to the annual ISP meeting for review by the IDT and to ensure inclusion of recommendations in the ISP. Most supports were reviewed monthly, and data were typically included in review documentation. ISPs did not include a full range of personal goals. For goals that were included, action plans were not developed to support achievement of goals, so it was difficult to determine how staff were supporting individuals to achieve their goals. The status of personal goals was not summarized monthly. | | |
| # | Indicator | Overall Score |
| 1 | Every GRC resident shall receive, consistent with current, generally accepted professional standards of care: person-centered planning, and individualized protections, services, supports, and treatments. (par. 48) | NC |
| 2 | Every resident's protections, planning, services, supports, and treatments are documented in the ISP. (49,51,183) | NC |
| 3 | The ISP was updated annually, and when the resident's service needs and preferences change (par. 49,51,179) | SC |
| 4 | ch resident and their LAR had the opportunity to participate in service planning meetings about their services and had the portunity to provide input to each of their service plans and/or revision of that plan. (par. 49,51,183b) | NC |
| 5 | A reason for non-participation in the documentation, when applicable. (par. 49,51,183b) | NC |
| 6 | The ISP includes goals and objectives that align with and support the resident's wishes and preferences regarding developing skills, working, daily routines, and engagement with their community, including community-based living options. (par. 50) | NC |
| 7 | Protections, planning, services, supports, and treatments are based on reliable comprehensive assessments, conducted routinely and in response to significant changes in the resident's life. (par. 52) | LO |
| 8 | The individual and/or guardian provided informed consent confirmed in writing following disclosure and understanding of all benefits and risks of supports and services and appropriate strategies, if any, to mitigate the risks. (par. 53) | LO |
| 9 | IDT members are knowledgeable regarding ISP outcomes, supports and services for individuals. (par. 54) | LO |
| 10 | Individuals and their guardians are informed of changes in treatment, supports and services. (par. 55) | LO |
| 11 | The responsible IDT member(s) for each program or support included in the ISP reviewed and analyzed the data and other information necessary to assess the resident's physical and behavioral health status progress and the effectiveness of current interventions at least monthly but more often if needed. (par 56) | NC |
| 12 | Monthly reviews include reviewing data for any emerging risks. When emerging risks are identified, an At-Risk Plan shall be developed and implemented (par. 56a, 78, 79) | NC |
| 13 | There was reliable and valid data to determine if the individual met, or is making progress towards achieving, his/her overall personal goals. (par. 56c) | NC |
| 14 | The individual met or is making progress towards achieving his/her overall personal outcomes. | N/A |

| | | |
|---|---|---|
| | (par. 56d) | |
| 15 | If personal outcomes were met, the IDT met and updated or made new personal outcomes (par. 56e) | N/A |
| 16 | If the individual was not making progress, activity and/or revisions were made (par. 56f) | N/A |
| 17 | If there was disagreement among team members, the issue was resolved through the State resolution process including external clinical consultations, when appropriate. (par. 57) | N/A |

Comments:

1. The Center involved individuals and their guardians in the ISP process by inviting them to attend annual ISP meetings, other IDT meetings, and monthly review meetings. The ISP did not document how individuals participated in the meetings or what support, education, and training was offered to individuals to support meaningful participation and self-advocacy.

   To review this section of the Settlement Agreement, a sample of ISPs was reviewed. Five of the seven individuals attended their annual ISP meeting and two of the seven guardians attended.
   - Individual #5 and her guardian did not attend her ISP meeting.
   - Individual #101 attended her ISP meeting, however, her guardian did not participate.
   - Individual #102 attended his ISP meeting but his guardian did not attend.
   - Individual #68 and his guardian attended his annual ISP meeting.
   - Individual #76 attended his ISP meeting, however, his guardian did not attend.
   - Individual #73 and his guardian attended his ISP meeting.

   Person centered planning should be used to identify individual's preferences in areas, such as recreation, relationship, housing, vocational preferences, and/or other meaningful day activities. ISPs did not consider support, services, and training focused on helping the individual achieve their vision for what their life might look like in a less restrictive setting. GRC's ISP process was centered around activities available at the facility and identification of living options that might be available to support the person's needs without consideration of other important parts of the individual's life.

2. The ISP documented various assessment findings and recommendations, including supports needed, but that information was not integrated into one comprehensive plan that was based on the individual's vision and goals for the future including preferences for living options, working, daily routines, opportunities for community integration, and building relationships.

   For all individuals, multiple assessments were not submitted at least five days prior to the annual ISP meeting, so those support needs and recommendations were not able to be integrated into the ISP. When they were available, they were oftentimes pasted into the ISP document with no evidence of discussion.

3. Each individual had an ISP that was updated at least annually. Changes were made throughout the ISP year when warranted within the monthly integrated review process.

4. For two of seven individuals, both the individual and their guardian participated in service planning meetings about their services and had the opportunity to provide input to each of their service plans and/or revision of that plan. Individual #68 and

Individual #73 attended their annual ISP meeting with their guardian present, as well. Other opportunities for participation/input were not documented.

5. For the two individuals and five guardians that did not attend annual ISP meetings, a reason for non-participation was not found in the documentation.

6. ISPs did not provide opportunities for individuals to explore new activities, particularly related to work and day programming. Individuals spent most of the day in their homes with limited opportunities for engagement or exposure to new activities. All were scheduled to attend day programming less than two hours per day. Most ISPs included a generic goal to attend outings in the community. There were no plans developed to ensure those outings would lead towards meaningful engagement or integration.
    - Individual #5 had a personal goal to continue to take part in activities in the community without specific strategies to support her goal. She had attended day programming 15 days in the past six months. She had been on eight community outings in the same period.
    - Individual #101's personal goals did not support meaningful engagement at GRC or in the community. She had not attended day programming in the past six months. She had been on only one community outing.
    - Individual #54 had a personal goal to go out in the community more often, but with no related staff instructions or habilitation plans. None of her goals or action plans supported functional day training opportunities. She had attended day programming 20 times in the past six months. She had been on 13 community outings over the past six months.
    - Individual #102's ISP did not offer other opportunities for engagement and training during the day. The IDT had not identified his preferences for day programming, and he did not have a related personal goal. His vocational assessment indicated that he was scheduled to work at the recycling center, but often refused. There was no indication that he had opportunities to explore other types of work to determine his preferences. He had been on 12 community outings over the past six months. He attended day programming 42 days over the past six months. He was scheduled to attend programming 30 minutes per day.
    - Individual #68 did not have a personal goal related to work or day programming. His vocational assessment noted that he was scheduled to work at the recycling center one hour per day. The assessment noted that he often refused to go to work and recommended assessing his interest in other jobs. Opportunities for job exploration were not addressed in his ISP. He did not have any personal goals related to community exploration or integration. He attended day programming 21 days over the past six months. He had been on 17 community outings over the past six months.
    - Individual #76's vocational assessment noted that he was scheduled to work at the recycling center 30 minutes per day, but often refused to go to work. The assessment noted that his job at the recycling center was appropriate for him, and no further job exploration was recommended. He did not have any personal goals related to work, day programming, community exploration, or integration. He had participated in day programming one time over the past six months. He had been on 17 community outings.
    - Individual #73 had a broadly stated personal goal to participate more and do more activities. It did not identify his preferences. He had a habilitation plan to increase his mobility in the community, however, other action plans were not developed to support meaningful engagement in the community. He attended day programming 29 days over the past six months. He attended 12 community outings.

None of the ISPs offered opportunities to explore community-based activities or engage in functional activities in the community such as banking, going to church, participating in retirement programs, joining community groups, attending classes, volunteering, etc., so that individuals were better able to make informed choices regarding what they wanted to do during the day and where they wanted to live. For the most part, outings consisted of van rides, going to parks, and attending events in the community. There was no focus on skill building while in the community and no formal process for documenting individual's interest when out in the community.

11. The monthly integrated review process was the process in place to review the status of all services and supports at least monthly. Monthly reviews basically consisted of a cut and paste of data without adequate analysis of the data or discussion regarding the effectiveness of supports. For example:
    - Individual #5's November 2023 monthly review indicated that criteria were decreased for objectives when no progress had been made. There was no indication that the IDT addressed barriers to progress. The December 2023 Monthly Integrated Review (MIR) documented she was below baseline on data related to habilitation plans with a comment to continue objective. Again, there was no discussion of barriers to progress. The review indicated she did not have a PBSP and there were no behavioral issues associated with transition to the community not already addressed in a PBSP, though her ISP noted multiple behaviors that would impact her transition and subsequent care. The monthly review listed her medical appointments and consultations, including a hospitalization, without commenting on her declining health or additional support needed. An IDT meeting on 11/20/23 noted that nursing home placement was probably the best option due to her increasing medical needs and decreased mental status. The MIR was not reflective of this increase in needed support. Nursing notes continued to note that her health status was worse, but the plan was to continue the same.
    - For Individual #76, data and appointment notes were cut and pasted into the monthly review with no analysis of data and no summary. In many cases, it was noted that data were not available, continue supports, or continued to monitor.
    - Individual #54's January 2024 monthly review included weight data showing she had steadily gained weight since October 2023 with a total gain of 28 lbs. Weights were listed without any commentary on how her weight gain was being addressed. She had a consultation with nephrology along with an EKG and lab work in January 2024. Appointment dates were listed without any findings or recommendations.

12. Monthly reviews for all individuals included a process for reviewing data for any emerging risks. When emerging risks were identified, a plan was to be developed and tracked for implementation. However, it was not always evident that data were shared with the IDT so that plans were revised when needed or if data were presented, documentation did not include action taken. See details regarding the assessment of risks and data collection in section C.iv.3

13-16. Indicators were not scored since data was found not to be reliable for determining progress towards overall goals (indicator #13). In most cases, personal goals were not measurable, so it was not possible to determine if the goal had been achieved. For example,

- Individual #54's personal goals were to have as many blankets as she possibly could, go out in the community more often, spend more time with preferred staff, and continue to advocate for herself. None of these goals were written in measurable terms so that staff could identify when the outcome was met. She had a number of action plans that staff were commenting

on in her MIR, however, it wasn't clear how progress on those action steps related to achievement of her personal goals and the IDT did not comment on progress towards the overall goal.

- Individual #102 had personal goals to drink pop and eat burritos all day, live in the community with few demands, and go on more outings. His MIR included data for a number of action plans including exercise, managing personal belongings, mopping, and aggression, however, there was no summary of overall progress on his personal goals.

17. There was no documented evidence of disagreement among team members to review.

| **Section C: Clinical Care (58-67)** | | |
|---|---|---|
| Summary:<br>The annual medical reviews were performed on a regular basis. Periodic medical reviews were at times not completed on a quarterly basis and the content of the periodic medical review was incomplete in several cases. Timely appropriate treatments, supports, and interventions occurred for acute illness events, which were resolved on campus, as well as those needing emergency department/hospital care. Acute care treatment was one of the strengths of the medical department.<br><br>Morning medical meetings reviewed ongoing issues with other clinical departments represented, providing responses to concerns and questions brought up by the medical director. The medical director also completed periodic chart reviews on individuals with high-risk conditions, either acute or chronic, providing guidance to the medical team and the other clinical departments. However, long-term monitoring needed further review. There were a number of aspiration pneumonias/pneumonias that occurred in the population at GRC. The pneumonia committee met sporadically. The content of the meetings did not reflect a critical review of all areas for each individual discussed with pneumonia. Important information was not recorded, such as date of last MBSS, whether a textured diet or thickened liquid was monitored with frequency of monitoring to ensure the individual was provided the correct prescribed diet, the last SLP monitoring of a meal, medication review for side effects of dysphagia, a review of anticholinergic burden of the prescribed medication, oral health status (degree of periodontitis or gingivitis), data as to the presence or severity of GERD was present, a discussion of the benefit/risk of a fundoplication or j-tube placement, whether emesis preceded the pneumonia, the completion of any gastroparesis study, medications used to resolve gastroparesis, whether there was a diagnosis of COPD or asthma, whether the individual smoked, whether there were unsafe eating habits and whether verbal cues were given and whether they were effective or needed further review, among other areas. For each individual with pneumonia, a template with these areas of contribution, among others should be meticulously completed to reflect quality monitoring of this high-risk health area. Follow-up pneumonia committee meetings should include updates on the prior individuals discussed and the findings, current status of any procedures, tests, or treatments.<br><br>The GRC Quality Council meeting listed numerous indicators which were tracked, but there were few actions taken, despite ongoing areas of concern for many of these areas in the GRC population. When there are many such areas in which no actions were needed, then there should be a revision of the list to include those areas of concern which are current at GRC, often reflected in the reason for a hospitalization or emergency department visit.<br><br>The GRC Quality Council meeting data also did not address seizures (one of the original 'fatal five' diagnoses common to the IDD population), which was concerning, as there were at least two individuals with challenging seizure disorders at GRC. Additionally, the GRC Quality Council meeting minutes reflected a focus on individual specific concerns, rather than a systems approach in creating processes or protocols, monitoring, or training of specific clinical departments to ensure these events are not repeated. | | |
| # | Indicator | Overall Score |

| | | |
|---|---|---|
| 1 | GRC residents shall receive quality integrated preventative, chronic, and acute clinical care, and services, including psychiatric, psychological, medical, nursing, pharmaceutical, pain management, seizure management, and habilitation therapy services, consistent with current, generally accepted professional standards of care. (To meet criteria with this indicator, all the indicators for Section C must be met.) | PC |
| 2 | Assessments shall be performed on a regular basis and in response to developments or changes in a resident's medical, behavioral, or functional status to ensure the timely detection of and response to residents' needs. (par. 59,74,82) | PC |
| 3 | Diagnoses shall be clinically appropriate and consistent with the current Diagnostic and Statistical Manual of Mental Disorders and the International Statistical Classification of Diseases and Related Health Problems. (par. 60) | LO |
| 4 | Treatments, supports, and interventions shall be timely and clinically appropriate based upon assessments and diagnoses. Clinicians shall conduct direct assessments consistent with current, generally accepted professional standards of care. (par. 61,74,76,106,111) | SC |
| 5 | Clinical indicators of the effectiveness of treatments, supports, and interventions shall be determined in a clinically justified manner. (par, 62,84,96) | SC |
| 6 | Clinical indicators of the effectiveness of treatments, supports, and interventions shall be effectively monitored. (par. 63,84,97) | NC |
| 7 | Treatments, supports, and interventions shall be modified in response to the results of monitoring of clinical indicators. (par. 64) | NC |
| 8 | GRC shall routinely collect, analyze, and act on valid and reliable data sufficient to ensure that the clinical care and services provided to GRC residents are consistent with current, generally accepted professional standards and implemented in an appropriate manner. Where such data show that clinical care and services, or their implementation, do not meet such standards, GRC clinical staff shall appropriately address the deficiency. (par, 65) | NC |
| 9 | GRC's quality management system shall include processes to ensure that the provision of clinical care and services at GRC are consistent with current, generally accepted professional standards and implemented in an appropriate manner. The State shall ensure data related to the provision of clinical care and services is shared with GRC's Quality Management program and that the data is valid, analyzed, and utilized for GRC's quality improvement, pursuant to the processes set forth in Section IV.K. (par.66) | NC |
| 10 | Whenever problems are identified under the processes set forth in Paragraphs 65-66, GRC shall develop and implement plans to remediate the problems. (par. 67) | NC |

Comments:

1. See below.

2. Assessments were performed on a regular basis at the time of the annual review as well as interval (quarterly) medical reviews for four of seven individuals. Individuals for whom regular quarterly medical reviews were not documented included Indvidual#101, Individual #76, and Individual #73. Compliance with routine periodic interval medical reviews was 57%.

3. Compliance achieved in prior review.

4. The medical department demonstrated that treatments, supports, and interventions were timely and clinically appropriate for those acute illness events that were resolved on campus. There were 11 acute illnesses that received timely acute medical care on campus

that resolved uneventfully. Compliance was 11/11 for acute medical issues resolved on campus. There were also 11 acute medically complex issues that required transfer to the Emergency Department for emergency treatment and/or admission to the hospital. For 11/11, the medical department demonstrated the individual received timely treatment and/or interventions for the acute illness prior to transfer to the ED or hospitalization. Seven of these were evaluated in a timely manner prior to transfer to the ED or hospitalization by the PCP. For four of the transfers, the timing occurred after hours. In 11/11 transfers, timely treatment and interventions occurred prior to the transfer. Compliance was 100%.

5. Six of the 11 needed follow-up, which was conducted in a timely manner until resolution of the concern. The clinical direct assessments were consistent with current, generally accepted professional standards of care in all instances. For those treated in the ED or hospitalized, appropriate post hospital follow-up occurred for 10 of 11. For the hospitalization on 8/20/23 for Individual #54, on return to the facility after hospitalization, two synchronous days of follow-up reflected in IPNs did not occur upon readmission to the facility. Compliance was 91%.

6. The morning medical meeting reviewed ongoing clinical concerns, including those that returned from a hospitalization or following ED visit, as well as acute illness resolved on campus. Clinical departments were represented and gave responses to questions and concerns brought up by the medical director. The medical director also completed periodic chart reviews of individuals, focusing on an acute problem which often led to hospitalization in the past or chronic illness instability. This provided ongoing monitoring of oversight and clinical guidance to the PCPs. Separately, periodic (quarterly) routine monitoring of the individuals was demonstrated for four of seven individuals. However, for long term monitoring, there was lack of documentation of thorough evaluation of individuals (such as with pneumonia based on the pneumonia committee minutes, as well as ongoing evaluation and monitoring of seizures) (see #8).

7. Treatments, supports, and interventions were reviewed by the medical director during documented periodic chart reviews of individuals. Modification of treatment, supports, and interventions occurred if needed, based on the clinical guidance of the medical director working with the PCPs and other clinical departments to resolve specific clinical challenges. Rationale was included in the decision-making process. At times, this led to clinical determination of potential terminal conditions or futile treatments, and palliative care consultation was sought in selected cases. Depending on the consultation findings, if the individual was considered terminal by the objective review of the palliative care consultant, then this allowed time for guardianship to be obtained by family members, if not already done so, allowing ‘best interest’ decision of care in future critical medical events. However, for other areas of monitoring of clinical care, there was lack of documentation of thorough evaluation of individuals (such as with pneumonia based on the pneumonia committee minutes, as well as ongoing evaluation and monitoring of seizures) (see #8).

8. There were monthly meetings of the Medical Quality Council. Meeting dates and content were as follows:

| Indicator | 11/13/23 | 12/14/23 | 1/18/24 | 2/13/24 |
|---|---|---|---|---|
| Infection control | 9 healthcare related infections (increased from 6), aspiration pneumonia 2 | Aspiration pneumonia 3, skin breakdown 2 | Aspiration pneumonia 3, skin breakdown 1 | Aspiration pneumonia 0, pneumonia 2, skin breakdown 0 |
| Falls | 10 falls, 5 falls with injuries | 12 | 13 falls, 2 falls with injuries | 9 falls, 1 fall with injury |

| | | | | |
|---|---|---|---|---|
| Lacerations requiring sutures or Dermabond | 0 | 0 | 1 | 0 |
| Fractures | 0 | 0 | 0 | 0 |
| ER visits | 2 | 5 | 1 | 0 |
| Hospitalizations | 3 | 4 | 0 | 5 |
| Infirmary/quarantine | 0 | 0 | 0 | 0 |
| Bowel obstruction | 0 | 0 | 0 | 0 |
| Dehydration | 0 | 0 | 0 | 0 |
| Off campus consults reviewed (final) | 62 | 58 | 39 | 45 |
| Medication variance | 31 | 32 | 27 | 12 |
| Seizures | NR | NR | NR | NR |
| Chemical restraints | 0 | NR | 0 | 0 |

Action steps recorded included: retraining of nursing staff on medication record protocol to reduce medication variances and training for stand pivot transfer process/technique to direct care staff. Recurrent aspiration pneumonias and pneumonias were reviewed at an interdisciplinary pneumonia committee. To prevent aspiration from reflux, a protocol change was made to keep the individual upright 60 minutes after meals and snacks (the prior interval was 30 minutes).

Additionally, data were included in a chart with a rolling 12-month period to determine any trends in the above category.

On review of the pneumonia committee minutes of 9/6/23, through 3/7/24, the information recorded was too brief to determine whether there was interdisciplinary contribution in all areas of potential risk, nor evidence documented leading the committee to determine if an infection was considered an aspiration pneumonia, bronchitis, viral pneumonia, etc. Additionally, there were follow-up steps listed for the 10/23/23 and 3/7/24 pneumonia audit committee, but the action step was not listed under the recommendation/action section, nor was a responsible party listed with follow-up date or resolution for all cases. There was no documentation of discussion that each main risk area was discussed, such as date of last MBSS, whether a textured diet or thickened liquid was monitored, last SLP monitoring of a meal, a review of medication to determine if any had a side effect of dysphagia, or a review of anticholinergic burden of the prescribed medications (this was different than the QDRR review of identified side effects). There was no mention of oral health to review degree of periodontitis or gingivitis. There was no information as to whether GERD was present, nor degree of GERD, and whether the individual would benefit from a fundoplication or j-tube. Data concerning any episodes of emesis temporally related to respiratory distress was not documented. There was no evidence whether gastroparesis was ruled out, and if present, medications prescribed to improve gastric emptying. There was no mention of whether the individual had a component of asthma or COPD. There was also no mention if the individual had unsafe eating habits (rapid eater, taking large portions, laughing, and distracted while eating), whether verbal cues were given, and whether they were effective. There were many areas to consider with a few listed here that should be reviewed and documented for each individual in the agenda of the pneumonia meeting as an oversight committee. Also submitted was a peer-to-peer pneumonia audit on 12/20/23 that reviewed two individuals. Some areas of risk were discussed. Some areas were dismissed as a contributing etiology without documentation of the

rationale for this decision. There may have been robust discussions at these meetings, but there was little to no documentation of critical evaluation for each clinical discipline.

In reviewing the indicators tracked by the medical department, at a minimum, focus on the 'fatal five' would be expected to be monitored closely. It was problematic that seizures were not tracked. The medical director could not provide rationale for this gap. There were two individuals on campus considered to have challenging seizure disorders. One of the individuals was prescribed Epidiolex. The facility was able to query the electronic record for individuals with a seizure disorder. Information for each seizure included length of seizure, whether there was cyanosis, tremors, loss of consciousness, use of Diastat, whether sent to the hospital, and a description of the seizure completed by the nurse. There was lack of update in some cases, as some had prn use of Nayzilam rather than Diastat, but the data summary sheet for each individual only listed Diastat. Despite this rich source of information, there was no database for all this information and no analysis of trends. Data collection and monitoring of seizures needed further review and information included in the Medical Quality Council meetings.

9. GRC Quality Council meetings included data reviewed by the Medical Quality Council meetings.

| Indicator | 8/15/23 | 9/19/23 | 10/17/23 | 11/28/23 | 12/19/23 | 1/23/24 |
|---|---|---|---|---|---|---|
| Aspiration pneumonia | No action | One action step concerning hospital bed and refusal to sleep in it. | No action | No action | No action | No action |
| Dehydration | No action | No action | No action | No action | No action | No action |
| Bowel obstruction/ileus | No action | No action | No action | No action | No action | No action |
| URI | No action | Discuss in medical QI meetings trends for last year of infections, and skin breakdown and all areas of infection. | No action | No action | No action | No action |
| UTI | No action | No action | No action | No action | No action | No action |
| Bronchitis | No action | NR | No action | No action | No action | No action |
| Oral/dental | No action | NR | No action | No action | No action | No action |
| Ophthalmologic | No action | NR | No action | No action | No action | No action |
| Otic | No action | No action | No action | No action | No action | No action |
| Stoma | No action | NR | No action | No action | No action | No action |
| Foot | No action | NR | No action | No action | No action | No action |
| Skin | No action | No action | No action | No action | No action | No action |

| GI system | No action | NR | No action | No action | No action | No action |
|---|---|---|---|---|---|---|
| Reproductive system | No action | NR | No action | No action | No action | No action |
| Hematologic | No action | NR | No action | No action | No action | No action |
| Surgical wound | No action | NR | No action | No action | No action | No action |
| Infestation | No action | NR | No action | No action | No action | No action |
| Other | No action | NR | No action | No action | No action | No action |
| Wound site | No action | NR | No action | No action | No action | No action |
| MRSA/VRE | No action | NR | No action | No action | No action | No action |
| HIV/AIDS | No action | NR | No action | No action | No action | No action |
| Hepatitis | No action | NR | No action | No action | No action | No action |
| ER visits | No action | No action | No action | No action | No action | No action |
| On campus transfers | No action | No action | No action | No action | No action | No action |
| Hospitalizations | No action | No action | No action | No action | No action | No action |
| Skin breakdown | No action | Review documentation and complete skin breakdown IR | No action | Nursing to complete IR for Individual #54 and Individual #68 from August 2023 | No action | No action |
| Lacerations requiring sutures or Dermabond | No action | No action | No action | No action | No action | No action |
| Underweight | No action | No action | No action | No action | No action | No action |
| Obese | No action | No action | No action | No action | No action | No action |
| Unplanned significant weight change | No action | No action | No action | No action | No action | No action |
| Pharmacy | Verify names of individuals on dual purpose medications | Add if changes were due to discharge or readmission and which individuals. | No action | No action | No action | No action |
| Medication variances | No action | Further discussion regarding | No action | No action | No action | No action |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | medication variances and disciplinary actions. | | | | |
| Injuries | No action | NR | No action | No action | No action | No action |
| Individuals with 5+ Irs in month | No action | Speak with nurses on filling out assessments and coding incidents correctly. | No action | Increase activities for Individual #32 | No action | No action |
| Unknown incidents | No action | NR | No action | No action | No action | No action |
| Falls | No action | Falls committee will cover the number of falls, and nursing assessments. | No action | No action | No action | No action |
| Peer to peer IR | No action | NR | No action | No action | No action | No action |
| Fractures | No action | NA | No action | No action | No action | No action |
| Staff injuries | No action | NR | No action | No action | No action | No action |
| MH support services | No action | NA | No action | No action | Psychologist to look into counseling Individual #104 | No action |
| Restrictive interventions | No action | NA | No action | No action | No action | No action |
| Restraints | No action | NA | No action | No action | No action | No action |
| Facility Practices | No action | NA | No action | No action | No action | No action |
| Independence and social belonging | No action | Collect data on who is declining outings and why, so we can see the trends, since this can be a barrier to placement. | No action | No action | No action | No action |
| HHS oversight questions or concerns | No action | No action | No action | No action | No action | No action |

The GRC Quality Council likewise did not address data collection and monitoring of seizures. Despite the large numbers of clinical indicators reviewed, there appeared to be few actions based on this rich database. According to the medical director, given the small numbers in any category, it was difficult to determine any trend.

10. On review of the GRC Quality Council meeting minutes, there appeared to be recommendations for specific individuals in several areas, but there were few if any recommendations that focused on enhancement of care for a specific indicator for all individuals with that clinical concern. There was need for further development of the QM process in creating recommendations at the policy and procedure level to ensure optimal care, based on national standards. Evidence of updated policies and procedures would be expected for ongoing problematic areas, in addition to resolving individual concerns. These policy and procedure updates may benefit from consultants for additional guidance in specific clinical areas, along with the medical director adapting these policy/procedures in the context of availability of options at GRC and in local hospitals.

**Section C.i – Supervision and Management of Clinical Services (68-72)**

Summary:

Although there were occasional external peer reviews, there was lack of a structured process for regular peer to peer review for the medical team. It was noted that the Quality Management meetings did not recommend medical peer to peer reviews, which would be an essential component of quality management. The reason for the lack of such recommendation was not clear.

There was one death recorded during the time period reviewed. The mortality review occurred beyond the 21-day cut off time period for review. Due to the recent timing of the death, recommendations would not be expected to have follow-up. Nursing and administration had recommendations. The GRC medical director, who completed the professional peer review, had no recommendations.

| # | Indicator | Overall Score |
|---|---|---|
| 1 | Appropriate and competent supervision and management of clinical services by individuals with appropriate training and credentials. (par. 68) | LO |
| 2 | GRC shall employ adequate numbers of clinical staff with appropriate training, credentials, competence, and expertise to provide the clinical services identified herein to a reasonable caseload of individuals with IDD consistent with generally accepted professional standards of care (par. 69) | LO |
| 3 | Clinical staff shall demonstrate maintenance of the requisite training, credentials, competence, and expertise throughout their period of employment. (par. 70) | LO |
| 4 | The State shall regularly have board-certified clinicians, who do not have a professional or personal relationship with GRC clinicians or GRC Leadership, assess the adequacy of clinical services in the clinical areas for which they are board-certified, including, at a minimum, all medical staff. The assessment findings shall be written and shared with the clinician whose work was the subject of the review and the clinician's supervisor. (par. 71) | NC |
| 5 | Action steps to remediate identified issues shall be developed, as necessary. The findings, action steps, and rationale for not acting steps shall be provided to and reviewed by the Superintendent and HHS Central Office as part of a comprehensive oversight process. (par. 71) | NC |
| 6 | Clinical services shall engage in and be subject to Quality Management, including appropriate peer review and appropriate mortality reviews. (par. 72) | NC |
| 7 | For an individual who has died, the clinical death review is completed within 21 days of the death unless the Facility Director approves an extension with justification, and the administrative death review is completed within 14 days of the clinical death review. Pre –Clinical peer review, then post peer review. (par. 72) | NC |
| 8 | Based on the findings of the death review(s), necessary clinical recommendations identify areas across disciplines that require improvement. (par. 72) | SC |
| 9 | Based on the findings of the death review(s), necessary training/education/in-service recommendations identify areas across disciplines that require improvement. (par. 72) | SC |
| 10 | Based on the findings of the death review(s), necessary administrative/documentation recommendations identify areas across disciplines that require improvement. (par 72) | SC |
| | Comments: | |

4. There was one external peer to peer pneumonia audit conducted on 12/20/23 in which two individuals were reviewed. There was a recommendation for one of the two (Individual #78). On 11/6/23, there was one external medical peer to peer review of Individual #76. There did not appear to be a recommendation from the peer reviewer. No other external peer to peer reviews were submitted. This did not meet the criteria as there was a lack of regular peer-to-peer review for the medical team.

5. There were no regular peer to peer reviews in which action steps/recommendations would be determined.

6. Quality Management meetings did not recommend medical peer to peer reviews. As already mentioned, regular peer to peer review for the medical team, such as a monthly meeting of a review of one or more challenging cases, did not occur. For mortality cases, an external peer review was completed. There was one death at GRC during the period of the Monitoring Team review, which occurred on 2/7/24 (Individual #60). The Professional Peer Review GRC form was completed by the GRC medical director, not an outside peer reviewer. However, an external peer review was pending at the time of the Monitoring Team visit.

7. Individual #60 died on 2/7/24. The GRC mortality review occurred 3/6/24. This was beyond the 21-day time period for review.

8. The internal medical peer reviewer did not have recommendations. The nursing peer review recommendation included developing a procedure for pica. Committee recommendations also included review of all individuals BSPs with pica and compare it to their ID sheets and diagnosis and updating the Assessment/Reassessment Guidelines to address GI assessments and respiratory assessments following a pica event.

9. The internal medical peer reviewer did not have recommendations. The nursing peer review recommendations would require training on pica and additional/revised guidelines. Committee recommendations also included training/retraining all staff and nurses that work in homes on all three shifts on the trigger cards and have them sign off on the training sheet.

10. The internal medical peer reviewer did not have recommendations. The nursing peer review recommendation included revision of the nursing assessment-reassessment guidelines to establish a timeline for follow-up on those who have pica events. Given the death occurred in February 2024 and the mortality review committee occurred in March 2024, evidence of completion and closure of the recommendations was not yet expected.

| **Section C.ii. Medical Services (73-76)** | | |
|---|---|---|
| Summary:<br>Clinical documentation by the medical team was much improved for many areas of clinical care. All annual medical assessments were current, and most within 365 days of the prior. There remained need for a review and summarization of important clinical information (labs, consults, ER/hospital visits, changes in medications, number of seizures, prn use of constipation meds, acute care visits treated on campus, etc., every three months). There were periodic reviews, but often not quarterly, and the content was variable and at times deficient in needed content. Using a template would assist the medical team in completing such documents with the important information each quarter. The annual medical assessment had numerous components, but only one included all components. However, it was noted that there was marked Improvement in content for most of the components compared to prior Monitoring Team visits.<br><br>Preventive care was up to date in areas reviewed except for occasional immunization concerns. However, there was marked improvement in updating the immunization status of the individuals reviewed.<br><br>Acute care either treated on campus or referred to the ER, as well as post hospital care was considered appropriate, demonstrating quality clinical care in this area. Consultation follow-up notes by the PCPs at times did not include the necessary components expected as part of a review by the PCP, including whether a referral to the IDT was needed or not.<br><br>Lab and x-ray results were reviewed in a timely manner by the medical team. There was a mechanism in place for critical lab values to be called to the PCP or on call medical team member.<br><br>Overall, the medical team showed marked improvement in this area of documenting the clinical evaluation, diagnosis and treatment of individuals compared to prior Monitoring Team visits in which documentation was often not reflecting the clinical care given. | | |
| # | Indicator | Overall Score |
| 1 | Medical Director at GRC is board certified and has the expertise to lead the Center forward. (par. 73) | |
| 2 | Individual has an annual medical assessment (AMA) that is: (par. 61)<br>i. Completed within 365 days of prior annual assessment; <u>and</u><br>ii. No older than 365 days | SC |
| 3 | The Individual has timely periodic medical reviews, based on their individualized needs, but no less than every three months or within 30 days of planned discharge. For individuals with all areas of defined risk that are considered stable for the prior year, the medical director may determine a periodic review of every 6 months is clinically appropriate. This decision should be recorded in the AMA POC at the beginning of the POC section. If an area of risk changes and requires a change of medications, non-routine consultations, change of supervision level, etc., then the periodic review reverts to every 3 months. (par. 61) | PC |
| 4 | Individual receives quality AMA, including:<br>i. Prenatal history<br>ii. Family history | NC |

| | | |
|---|---|---|
| | iii. Social/Smoking/Alcohol/Drug use<br>iv. Childhood illness<br>v. Past medical history<br>vi. Interval history<br>vii. Allergies<br>viii. List of meds<br>ix. Physical exam with vitals<br>x. Laboratory information<br>xi. Active Problem List<br>xii. Plan of Care for each medical issues (as appropriate)<br>xiii. Plan for monitoring.<br>(par. 58-64) | |
| 5 | Individual receives timely preventative care including:<br>i. Immunizations<br>ii. Colorectal screening<br>iii. Breast cancer<br>iv. Hearing and Vision<br>v. Osteoporosis<br>vi. Cervical caner<br>(par. 61,74) | SC |
| 6 | If the individual experiences an acute medical issue that is addressed at the Facility, the PCP or other provider assesses it according to accepted clinical practice, including:<br>i. Timely assessment based upon the clinical needs.<br>ii. Review of the history of the problem.<br>iii. Source of the information<br>iv. Focused PE including documentation of all positive and relevant negative findings.<br>v. Review/summary of most recent diagnostic or lab tests/results, including documentation of relevant normal or negative results.<br>vi. A definitive or differential diagnosis that clinically fits the corresponding evaluation or assessment,<br>vii. Plan for further evaluation and monitoring by PCP and related staff.<br>(par. 58-64, 74) | SC |
| 7 | If the individual receives treatment for the acute medical issue at the Facility, there is evidence the PCP conducted follow-up assessments and documentation at a frequency consistent with the individual's status and the presenting problem until the acute problem resolves or stabilizes. (par. 58-64, 74) | SC |
| 8 | If the individual requires hospitalization, an ED visit, then, the individual receives timely evaluation by the PCP or a provider prior to the transfer, <u>or</u> if unable to assess prior to transfer, within one business day, the PCP or a provider provides an IPN with a summary of events leading up to the acute event and the disposition. (par. 74) | SC |
| 9 | As appropriate, prior to the hospitalization, ED visit, or Infirmary admission, the individual has a quality assessment documented in the PCP progress note, including: | SC |

| | | |
|---|---|---|
| | i. Vitals<br>ii. Review of most recent s/s (up to 5 days)<br>iii. Assessment including pertinent history, physical findings, lab tests, and pending consults/tests.<br>iv. Working diagnosis<br>v. At time of transfer, reason for sending person to ED.<br>(par 74) | |
| 10 | Prior to the transfer to the hospital or ED, the individual receives timely treatment and/or interventions for the acute illness. (par. 74) | SC |
| 11 | If individual is transferred to the hospital, PCP or nurse communicates necessary clinical information with hospital staff. (par. 74) | SC |
| 12 | The individual has a post-hospital IDT mtg that addresses follow-up medical, and healthcare supports to reduce risks and early recognition, as appropriate. (par. 74) | SC |
| 13 | Upon the individual's return to the Facility, there is evidence the PCP conducted follow-up assessments and documentation at a frequency consistent with the individual's status and the presenting problem with documentation of resolution of acute illness. (par. 74) | SC |
| 14 | If the Individual needs a consultation, one is ordered in a timely manner. (par. 75a) | SC |
| 15 | The consultant is provided with the needed background and history to provide an informed assessment and the desired question to be answered. (par. 75b,75c) | SC |
| 16 | If the individual has non-Facility consultations that impact medical care, the PCP indicates agreement or disagreement with recommendations. (par. 75d) | PC |
| 17 | PCP completes review within five business days, or sooner if clinically indicated. (par. 75e) | SC |
| 18 | The PCP writes an IPN that explains the reason for the consultation, the significance of the results, agreement, or disagreement with the recommendation(s), and whether there is a need for referral to the IDT. (par. 75e) | PC |
| 19 | If PCP agrees with consultation recommendation(s), there is evidence it was ordered. (par. 75e) | SC |
| 20 | The PCP, in consultation with appropriate IDT members, documents the basis for agreeing or disagreeing with the consultant's recommendations, the actions taken in response (including obt1aining a second opinion), or the basis for taking no action. (par. 75f) | PC |
| 21 | GRC will ensure:<br>i. Timely initiation of laboratory and diagnostic testing.<br>ii. Urgent notification of critical results<br>iii. Review of all results by the resident's PCP, along with other IDT members as appropriate under the circumstances,<br>(par. 76a,76b,76c) | SC |

Comments:

1. Compliance established previously,

2.i. For six of seven (86%), the annual medical assessment was completed within 365 days of the prior annual assessment. For Individual #101, this did not occur.

2.ii. All annual medical assessments were no older than 365 days. Compliance for this aspect was 100%.

3. Interval medical reviews (IMRs) at three-month intervals or more frequently were completed for Individual #5, Individual #54, Individual #102, and Individual #68 (4/7=57%). Quality content of the interval medical reviews varied from extensive notes to a few brief lines. Interval medical reviews were scored based on quality and completeness of content of information from the prior three months (consults, ER/hospital brief summaries, significant lab, changes in medication, # of seizures, # of falls, etc.).

   Based on this information, 13 of 21 IMRs were considered complete: Individual #5 on 10/4/23 and 12/19/23; Individual #101 on 2/8/24, Individual #54 on 9/19/23 and 11/1/23; Individual #102 on 9/20/23. 10/3/23, and 2/28/24; Individual #68 10/24/23 and 2/26/24; Individual #76 on 10/16/23; Individual #73 on 11/2/23 and 1/11/24.

   IMRs considered incomplete included Individual #5 on 9/18/23 and 2/7/24; Individual #101 on 9/20/23; Individual #54 on 1/16/24; Individual #68 on 12/4/23 and 1/17/24; and Individual #76 on 11/6/23 and 2/8/24.

   Compliance for quality of the interval medical reviews was 62%. It is recommended that a template be created to ensure all pertinent data is recorded consistently when completing the interval medical reviews. So as not to duplicate work, an annual medical assessment usually suffices for a quarterly interval medical review; hence, a quarterly medical review is not needed for the quarter in which the annual medical assessment is completed.

4. The annual medical assessment required numerous components to be completed. All annual medical assessments included the past medical history, interval history (since the last annual assessment), allergies or severe side effects to medication, list of medications with dosages at time of AMA, complete physical examination including vital signs, and pertinent lab information.

   The following were gaps in documentation in the annual medical assessment: Individual #5, no family history, no social/smoking history, active problem list not updated (dementia still documented as mild), and subsequently no plan of monitoring and plan of care reflecting aspects of worsening dementia. For Individual #101, the annual medical assessment did not include a family history or social/smoking history. The annual medical assessment of Individual #54 did not include a social/smoking history. The annual medical assessment of Individual #102 did not include a social/smoking history. The annual medical assessment of Individual #68 did not include a prenatal history nor a social/smoking history. The annual medical assessment of Individual #76 did not include a social/smoking history. The annual medical assessment of Individual #73 did not include the date the family history was obtained. In summary, 0/7 had a complete annual medical assessment.

5. For preventive care, two individuals needed review of immunization status: Individual #101 and Individual #54.
   - Individual #101 did not receive a flu vaccine as there was a concern for egg allergy. The manufacturer was unable to produce a non-egg-based flu vaccine for the fall of 2023. However, the annual medical assessment described a local reaction at the injection site and no systemic reaction. Further review of the accuracy of egg allergy was needed, with referral to an allergist if needed for clarification. There was no documentation of a next step in determining the accuracy of an egg allergy history, which placed her at increased risk of getting the flu and potential complications.
   - For Individual #54, there was no documentation of shared clinical decision making with the family/guardian for consideration of Prevnar 20 administration.
   - Compliance for immunizations was 5/7.

For the other areas of prevention, the following was found on review of the medical record:

- colorectal cancer screening 6/6,
- breast cancer screening 3/3,
- vision screening 7/7,
- hearing screening 7/7,
- osteoporosis screening 7/7, and
- cervical cancer screening 3/3.

In combining all areas of prevention reviewed, overall compliance was 38/40 (95%).

6. The following acute care concerns addressed at the facility were reviewed:
   - Individual #101 on 12/11/23 left ankle trauma, and on 1/23/24 fatigue,
   - Individual #54 on 11/5/23 urinary retention and on 11/16/23 leaning to the right side,
   - Individual #102 on 1/22/24 facial puffiness, and on 9/16/23 coccyx skin breakdown,
   - Individual #68 on 11/20/23 cerumen impaction and abdominal incision erythema,
   - Individual #76 on 12/6/23 low grade fever and on 11/20/23 constipation, and
   - Individual # 73 2/23/24 lethargy.

   Overall compliance was 66/70 (94%) Compliance for the following components was found:
   - timely assessment 11/11,
   - review of the history of the problem 11/11,
   - documentation of the source of the information 8/11,
   - focused physical exam 10/11.
   - review of most recent diagnostic tests 4/4,
   - a definitive or differential diagnosis that clinically fits the corresponding evaluation or assessments 11/11, and
   - plan for further evaluation, treatment, and monitoring 11/11.

7. There was evidence of indicated follow-up of acute medical issues at the Facility until resolution for 6/6 (100%).

8. The following hospitalizations/emergency dept visits were reviewed. A timely transfer note was completed for all 11.
   - Individual #5, hospitalization 9/6-25/23 for abdominal wall cellulitis and pneumonia and ED visit 11/28/23 for abdominal pain,
   - Individual #101, ED visit 11/9/23 for abnormal lab/risk of bleeding, and hospitalization 11/13-20/23 for tachycardia and weakness,
   - Individual #54, hospitalization 8/20-23/23 for UTI and acute kidney injury,
   - Individual #102, ED visit for choking with abdominal thrusts,

- Individual #68, ED visit 1/31/24 for abdominal distention, and ED visit 1/3/24 for wound dehiscence x2, with ileus and constipation,
- Individual #76, hospitalization 10/10-12/23 for respiratory distress and heart failure, and
- Individual #73, hospitalization 1/24/24 for cellulitis, acute kidney injury and UTI

9. For the seven individuals, there were seven transfers to the hospital/emergency department during regular business hours. All seven PCP IPNs included vital signs, review of recent signs and symptoms, pertinent history, physical findings, lab tests, initial/differential diagnosis, and reason for sending the individual to the emergency department. Compliance was 7/7 (100%).

10. Timely treatment and/or interventions prior to transfer to the hospital occurred for 11/11 (100%) of the transfers.

11. A report was given to the ED staff on 10/11 transfers (91%). The exception was for Individual #5's hospital transfer on 9/6/23.

12. The individual had a post hospital IDT meeting that addressed needed supports to reduce risks and early recognition of the event in 5/5 (100%) transfers.

13. There was PCP follow-up assessment post ED or hospitalization until resolution of acute illness for 10/11 (91%) transfers. For the hospitalization 8/20-23/23 for Individual #54, follow up documentation was missing for 8/24/23.

14. For consultation review, two consults were selected for each of seven individuals. All were ordered in a timely manner.
    - Individual #5 on 8/21/23 neurology and on 10/11/23 interventional radiology,
    - Individual #101 on 10/3/23 palliative care and on 11/15/23 hematology,
    - Individual #54 on 10/23/23 nephrology and on 9/27/23 dermatology,
    - Individual #102 on 12/19/23 hematology and on 8/15/23 endocrinology,
    - Individual #68 on 10/23/23 speech language pathology and on 1/22/24 neurosurgery,
    - Individual #76 on 9/26/23 palliative care and on 7/26/23 dentistry, and
    - Individual #73 on 11/6/23 gastroenterology and on 10/25/23 urology.

15. The consultant was provided with the needed background and history to provide an informed assessment and the desired question to be answered for 14/14. The background information was provided on the consultation form and/or accompanied the consultation form or was forwarded to the consultant, or was available to the consultant electronically.

16. If the individual had non-Facility consultations that impacted medical care, the PCP indicated agreement or disagreement with recommendations for 10/14 (71%). The following did not meet this indicator: Individual #102 on 12/19/23 hematology, Individual #68 on 1/22/24 neurosurgery, Individual #76 on 9/26/23 palliative care consult, and Individual #76 for dentistry.

17. The PCP completed the consultation report review within five business days for 12/14 (86%). For Individual #101, on 10/3/23 palliative care consultation, it was unclear when the report was received by the facility. For Individual #102 on 8/15/23 endocrinology consultation, there were two PCP IPNs, but both were past five business days.

18. The required components of the PCP IPN reviewing the consultation report occurred on 8/14 (57%). A complete note did not occur for Individual #5's 8/21/23 neurology consultation, Individual #102's 12/19/23 hematology consultation, Individual #102's 8/15/23 endocrinology consultation, Individual #68's 1/22/24 neurosurgery consultation, Individual #76's 9/26/23 palliative care consultation, and Individual #76's 7/26/23 dentistry visit.

19. When there were recommendations to be followed, there was evidence it was ordered on 11/11 (100%). For three consultations, there were no recommendations to be followed.

20. The PCP IPN reviewing the consultation indicated referral to the IDT was needed in five cases. For four cases, the IDT meeting was determined to be not necessary. For five consultations, the PCP IPN did not document whether a referral to the IDT team was indicated or not as a component of the PCP IPN reviewing and responding to the consultant report. These included Individual #5's 8/21/23 neurology consultation, Individual #102's 8/15/23 endocrinology consultation, Individual #68's 1/22/24 neurosurgery consultation, Individual #76's 9/26/23 palliative care consultation, and Individual #76's 7/26/23 dentistry appointment, Compliance was 5/10 (50%).

21.i. Review of timeliness of lab testing and diagnostic testing appeared appropriate for 11/11 (100%) acute illness events treated at the Center and 11/11 (100%) events referred for emergency care to the hospital setting.

21.ii. There was a mechanism in place for urgent lab test results to be reported to the PCP. For the seven individuals reviewed in the Tier II group, there were two critical values. A critical lab value was called to the PCP on 1/16/24 for Individual #101. A critical lab value was called to the PCP on 2/9/24 for Individual #101.

21.iii. Evidence of review by the PCP was determined by whether an IPN was written concerning submitted lab test results, or the submitted actual test report was initialed by the PCP. For all submitted lab/test results, there was evidence of PCP review for 402/408 (99%)

- For Individual #5, 68/68 lab/test results included evidence of review by the PCP.
- For Individual #101, 64/65 lab/test results included evidence of review by the PCP.
- For Individual #54, 74/74 lab/test results included evidence of review by the PCP.
- For Individual #102, 80/82 lab/test results included evidence of review by the PCP.
- For Individual #68, 51/54 lab/test results included evidence of review by the PCP.
- For Individual #76, 22/22 lab/test results included evidence of review by the PCP.
- For Individual #73, 43/43 lab/test results included evidence of review by the PCP.

| **Section C.iii Residents at Risk of Harm (77-81)** | | |
|---|---|---|
| Summary:<br>The GRC PNMT clinicians and designated nurses assessed individuals no less than annually, and when the individual experienced a change of status, such as a hospitalization or acute illness, which impacted their risk plan. Risk screening tools were referenced in addition to individualized clinical history and data in order to identify and categorize the level of risk, which was to guide the interventions and strategies to reduce health risks to the extent possible through an At-Risk plan that was integrated into their ISP.<br><br>Most of the risks had an accurate risk level assigned, a documented IDT meeting, were assessed as indicated and had documentation of review and update to their plans including their PNMP, by the PNMT accordingly following a change or trigger (hospitalization or ER visit). While nursing assessed individuals, there were gaps in documentation of addressing the HSSP in a timely manner to ensure that risks were being mitigated to the extent possible. | | |
| # | Indicator | Overall Score |
| 1 | The individuals risk rating is accurate.<br>i. IDT uses clinical data.<br>ii. Any risk guidelines are used.<br>iii. Justification provided when variance occurs.<br>(par. 77) | SC<br>79%<br>11/13 |
| 2 | Risks are identified timely, including:<br>i. Risks are reviewed and updated min annually.<br>ii. No more than 5 days post CoS<br>(par. 78,56) | PC<br>64%<br>9/14 |
| 3 | Risks are responded to in a timely manner.<br>i. IDT mtg within 5 days to revise POC.<br>ii. Assessments as indicated.<br>(par. 78,56) | NC<br>57%<br>8/14 |
| 4 | The individual's At-Risk Plan sufficiently addresses the chronic or at-risk condition in accordance with applicable guidelines, or other current standards of practice consistent with risk-benefit considerations.<br>i. include preventative interventions to minimize the chronic/at-risk condition.<br>ii. incorporates measurable objectives to address the chronic/at-risk condition to allow the team to track progress in achieving the plan's goals.<br>iii. action steps support the goal/objective.<br>iv. identifies and supports the specific clinical indicators to be monitored (e.g., oxygen saturation measurements).<br>(par. 79) | NC<br>57%<br>8/14 |
| 5 | The individual's At-Risk Plan should be reviewed and approved by the IDT. (par. 80,81) | NC |
| Comments:<br>1. The majority of risks (11 of 14) were accurate, based on the individuals' clinical picture, and in alignment with the risk screening tools when available. | | |

2. Risks were identified timely for the annual update and no more than five days post change of status for nine of 14 situations.

3. Risks were responded to in a timely manner with assessments as indicated when there were triggers/signs or symptoms warranting revisions to the plan for eight of 14 situations.

4. The individual's At-Risk plan sufficiently addressed the chronic or at-risk condition in accordance with standards of practice, including preventative measures, identifying measurable goals and action plans, and clinical indicators for eight of 14 risks.

5. The HSSPs had a designated area to identify the monitor of the plan with the name of the nurse followed by developers followed by the individual's residence number and IDT. Some had the actual names of the staff, but did not include their credentials/ discipline or a signature page to document approval of the risk plan. There was no area to document a discussion by the IDT.

Specific information regarding the above indicators included:

- Individual #5 was identified previously as being high risk for aspiration. On 2/28/23, post hospitalization, she had an enteral feeding tube placed, documentation reflected she was reassessed, and her PNM risk was increased to critical risk level per addendum 4/20/23 with retraining of staff on the PNMP on 4/21/23. Nursing assigned her at risk for constipation 3/8/23, which was accurate at that time. However, following her hospitalization with gall bladder surgery and placement of the enteral feeding tube 4/12/23, there was documentation within five days of her discharge that the IDT met to discuss the hospitalization. The HSSP was documented as updated on 9/27/23 when she returned from hospital to include orders from 9/5/23 for rectal tube PRN by the nurse, added abdominal pain in the list of triggers but in addition to the HSSP goal "(individual) will not have any constipation issues and will not develop a bowel obstruction" a second goal to address her comfort level/pain was needed but not added until 2/15/24.

- For Individual #101, there was no fall risk assessment submitted with her annual nursing assessment. It was positive that the Fall Risk screening was completed, this risk screening tool should have been submitted with the nursing assessments for review.
- The HSSP for her risk of multiple falls, injury, and seizure did not correlate to addressing the risk of falls and there were no preventative interventions. The goal lacked measurability and clinical indicators, therefore, was insufficient. The IDT did document meeting post hospitalizations in a timely manner, which was positive to see. For her PNM Critical Risk level, the PNMT reviewed her risks following her aspiration pneumonia hospitalization 11/12-20/23 and concluded she would remain at critical risk. Her PNMP addressed preventative positioning with documentation of follow-up in the monthly reviews.

- For individual #54, nursing identified her as at risk for UTI, due to bladder retention and indwelling Foley catheter, however, the UTI Risk screening tool had a completion date of 1/19/24 with no score or comments (left blank by the

nurse). The HSSP for UTI dated 11/6/23 did not include preventative interventions or the size of her Foley catheter but did have signs and symptoms that staff should report. When the individual had a change in her skin due to an improper fitting of her ostomy appliance on 10/7/23, there was no evidence that the IDT met within five days to discuss the impaired skin.

- In some instances, the nurses were not identifying the risk factors on the actual tool (form itself), but are documenting elsewhere, which appears as what occurred. The document submitted related to impaired skin documents that the IDT discussion was (3/14/24 late entry for) 2/26/24. The impaired skin on her abdomen from improper fitting of her ostomy appliance was documented as reported to nursing on 10/7/23. This indicates a second similar episode occurred in February 2024.

- The HSSP for UTI dated 11/6/23 did not include preventative interventions or the size of her Foley catheter, but did have signs and symptoms that staff should report. When the individual had a change in her skin due to an improper fitting of her ostomy appliance, there was no evidence that the IDT met within five days to discuss the impaired skin.

- Individual #102 was risked at high for Diabetes and was over the age of 40 and had a diagnosis of DM II, however, his A1C was normal, with no medication taken for diabetes. Cardiac screening risk level 11/29/23 was deemed as high and noted that this was due to his current diagnosis of DM II, however, none of the risk factors on the screening form supported this. He had no cardiac medications. He had a diagnosis of thrombocytopenia, but this was not considered in the high-risk level assigned.

  It was accurate that he was at risk related to fluid imbalance with HSSP in place to address both fluid imbalance and DMII risks. He had a HSSP that mentioned falls, however, there was no fall risk assessment included with his annual nursing assessments. There was documentation that the IDT met within five days for a choking incident on 1/31/24 where the nurse provided abdominal thrust and successfully dislodged part of a hamburger.

- For individual #76, the GRC Nursing report stated he was at high risk for falls and injury, however, there was no fall risk assessment or analysis/supporting data regarding actual falls in the nursing documentation (such as in the HSSP). Several of his falls were noted on the Fall Prevention Committee monthly tracking, however, the reviews in that document did not appear to be correlated. For example, an individual had a fall when he was post-hospital status and not feeling well. It was recommended for him to use a wheelchair and be assessed upon illness/hospitalization, however, the HSSP with a goal to be free from complications from falls and free of major injuries on 8/4/23 did not include this individualized information. Additionally, a preventative goal such as encouraging physical exercise was too vague and needed to be customized to meet his needs and recommended activity level/type of exercise, frequency, etc. The HSSP dated 6/15/23 addressed constipation and fluid imbalance risks in one plan and did include baseline of his elimination pattern and monitoring every shift. Documentation of IDT meeting was present for 5/30/23 that included discussing bowel protocols following his discharge back to the center after GI hospitalization on 5/25/23.

| **Section C.iv – Nursing (82-87)** | | |
|---|---|---|
| Summary:<br>The annual record review format currently utilized for nursing is referred to as the GRC Nursing Report, which is a summary of the individuals' health risks and status by system and does not require inclusion of family medical history, social/smoking/substance abuse history, or allergies or medication side effects. Information found in the ISP included medical history and active problem list, MAR, immunization record, medication list, procedure history and the Monthly Integrated Review (MIR). | | |
| # | Indicator | Overall Score |
| 1 | Individual receives a quality annual nursing record review, including:<br>i. Diagnosis/Active problem list<br>ii. Procedure History<br>iii. Family medical history<br>iv. Social/Smoking/Substance abuse history<br>v. Allergies or medication side effects<br>vi. List of current medications<br>vii. Pain<br>viii. Immunizations<br>ix. Tertiary Care<br>x. Consultation summary<br>xi. Lab and Diagnostic testing results<br>(par. 52,58,59,61,64,81,82,83,84) | NC<br>43%<br>3/7 |
| 2 | Individual receives quality annual nursing physical assessment, including, as applicable to the individual:<br>i. Functional status<br>ii. Review of each body system.<br>iii. Vital signs; including oxygen saturation level, lung sounds,<br>iv. Height and Weight<br>v. Pain scale and score<br>vi. elimination pattern/status<br>vii. Braden scale score; skin condition<br>viii. Fall risk score and supporting details.<br>ix. Follow up for any abnormalities found during the physical assessment.<br>(par. 52,58,59,61,64,82,83,86) | NC<br>29%<br>2/7 |
| 3 | For the annual ISP, nursing assessments completed to address the individual's at-risk conditions are sufficient to assist the team in developing a plan responsive to the level of risk, including:<br>i. status updates of the current medical and behavioral/mental health risks.<br>ii. an analysis of the chronic conditions, including high/medium health risks as compared to the previous quarter or year, progression, or regression. | PC<br>43%<br>3/7 |

| | | |
|---|---|---|
| | iii. a nursing review of effectiveness of current health care plan supports/interventions, to identify updates/revisions indicated.<br>iv. Recommendations to the IDT to individualize and enhance the new health support plan, with preventative, individualized interventions as appropriate to address the chronic conditions and promote amelioration of the at-risk condition to the extent possible.<br>(par. 52,58-64,81,82,84) | |
| 4 | Individual receives a quality quarterly nursing record review, including:<br>i. Diagnosis/Active problem list<br>ii. Procedure History<br>iii. Family medical history<br>iv. Social/Smoking/Substance abuse history<br>v. Allergies or medication side effects<br>vi. List of current medications<br>vii. Pain<br>viii. Immunizations<br>ix. Tertiary Care<br>x. Consultation summary<br>xi. Lab and Diagnostic testing results<br>(par. 52,58,59,64,84) | N/A |
| 5 | Individual receives quality quarterly nursing physical assessment, including, as applicable to the individual:<br>i. Functional status<br>ii. Review of each body system.<br>iii. Vital signs; including oxygen saturation level, lung sounds,<br>iv. Height and Weight<br>v. Pain scale and score<br>vi. elimination pattern/status<br>vii. Braden scale score; skin condition<br>viii. Fall risk score and supporting details.<br>ix. Follow-up for any abnormalities found during the physical assessment.<br>(par. 52,58,59,64,82,83,86) | PC<br>43%<br>3/7 |
| 6 | On a quarterly basis, nursing assessments completed to address the individual's at-risk conditions are sufficient to assist the team in maintaining a plan responsive to the level of risk, including:<br>i. status updates of the current medical and behavioral/mental health risks.<br>ii. an analysis of the chronic conditions, including high/medium health risks as compared to the previous quarter or year, progression, or regression.<br>iii. a nursing review of effectiveness of current health care plan supports/interventions, to identify updates/revisions indicated. | NC<br>29%<br>2/7 |

| | | |
|---|---|---|
| | iv. Recommendations to the IDT to individualize and enhance the new health support plan, with preventative, individualized interventions as appropriate to address the chronic conditions and promote amelioration of the at-risk condition to the extent possible<br>(par. 52,58-64,81,82,84) | |
| 7 | If the individual has a change in status that requires a nursing assessment, a nursing assessment is completed in accordance with nursing protocols or current standards of practice. This includes active communication with the PCP regarding health status and changes. (par. 59,78,79,81-84) | PC<br>77%<br>10/13 |
| 8 | Nurses shall routinely assess residents for symptoms of pain, in response to changes in client condition when one would reasonably expect pain to result, and when other relevant staff communicate the suspicion of resident pain in the event the resident is not able to verbalize pain. The nurse shall attend to and treat the residents' pain in a timely manner, communicating with the PCP or on-call provider as needed.<br>(par. 59,78,79,81-84) | PC<br>51%<br>5/7 |
| 9 | Ensure residents are appropriately protected from infection. GRC shall establish and maintain an effective infection control committee and ensure ongoing access to and consultation with experts in infection control and infectious diseases. (par. 82,85) | SC |
| 10 | Ensure residents maintain maximum skin integrity. (par. 82,86) | SC |
| 11 | Ensure residents receive medications and treatments as prescribed. (par. 87) | See 31-36 |

Comments:

1. Two of seven individuals received a quality annual nursing record review as the others were missing components.
   - For Individual #5, the annual GRC Nursing Report was signed on 3/10/23, which was greater than 30 days prior to her ISP on 4/19/23 contrasting with the nursing policy. The report included a brief system review, consultations, diagnostic and laboratory testing over the prior year including DEXA scan (osteoporosis) and abnormal ECG, and a partial list of related medications to each system but did not include a full current medication list. The assessment indicated she was stable over the prior ISP year reporting period and had one episode of infection (covid 7/18/22) that did not include details of her treatment other than being isolated until her symptoms resolved. Her ISP included a list of diagnoses, but neither the ISP or the Nursing Report included family history, allergies, or a description of how she expressed pain, though she was taking NSAID (celecoxib) to treat mild to moderate pain/relieve symptoms of arthritis.
   - For Individual #101, the annual GRC Nursing Report was signed on 10/5/23 for her ISP 10/26/23 and, therefore, was timely according to nursing policy. The report provided an overview by system that documented significant hospitalizations for respiratory concerns, including Aspiration PNA in July 2023 and placement of a feeding tube on 7/8/23 following a MBSS that showed aspiration with all liquids and penetration with puree. On 7/13/23, she was again hospitalized with respiratory failure and returned to GRC on 7/17/23. As of the assessment date in October 2023, she was titrated off continuous supplemental oxygen and managed with PRN oxygen and nebulizer treatments. The report also included consultations and significant laboratory results. Her ISP included her diagnosis, medication allergies, drug reactions, and medical alerts. There was, however, no full list of her current medications or family history included. The report mentioned under musculoskeletal system that she had a diagnosis of osteoarthritis and used PRN Voltaren gel and Tylenol for pain.
   - For Individual #54, the annual GRC Nursing Report dated 10/4/23 for her ISP 10/10/23 was timely according to the GRC nursing guidelines. The report provided a brief and incomplete overview of status by system, noted that she was seen by the nephrologist regularly (but did not give date of last consult), and that she had stage IV kidney failure and was hospitalized during the review period for urinary retention with sepsis and with an indwelling urinary catheter placed (missing details,

such as date of the UTI, outcome, catheter size and care). She had a colostomy that was changed regularly by direct care staff and took MiraLAX, Linzess, Senna, and lactulose to aid in a regular bowel pattern. Under endocrine system, it stated that she had hypothyroidism and took Synthroid daily (no dosage). Her labs were monitored periodically (no dates or last labs were included for this condition) and there was no complete medication list included.

- For Individual #102, the annual GRC Nursing Report was signed on 11/29/23, which was less than five days prior to the annual ISP on 11/30/23 contrasting with the nursing policy. Included was a brief overview of his status by system. He was noted as being at risk for GI with a diagnosis of slow transit constipation. Reported he has drooling, which is a common side effect of a medication he was taking. His DEXA scan in November 2023 showed osteoporosis, but did not include his treatment plan. He had a seizure disorder with last seizure activity on 10/24/22 and prior to that no seizures since 2016. He was seen by neurology on 5/18/23 with recommended follow-up yearly. The summary did not include that the seizure in 2016 was clozapine-induced as occurred when his dose of clonazepam was decreased and resulted in a hospitalization. He was not taking any anti-seizure medications. He was high risk for diabetes due to current diagnosis of DM II. Last Hgb A1C was normal at 4.3 and was last seen by endocrinology on 8/15/23 due to drinking over 8000 ml of water a day. It was determined this was not diabetes insipidus, rather polydipsia attributed to his lithium and psychotropic medications. Labs for electrolytes were done on a regular basis to ensure within normal limits, but the report did not identify the frequency/dates/last levels.
- For Individual #73, the GRC annual Nursing Report was signed 12/22/23 and was timely as per nursing policy for ISP on 1/3/24. The report included systems review and notes the individual was legally blind with age related cataracts bilaterally. His last eye exam was 12/9/22. His integumentary system noted he was at risk for skin integrity due to Braden scale of 14, which conflicted with the Braden scale that was submitted that had a score of 12 and was high risk. There were significant respiratory and cardiovascular concerns over the prior year, with hospitalizations 10/9/23 for hypoxia. While at the hospital, he was newly diagnosed with atrial fibrillation (A-fib) in addition to his hypertension and mitral valve prolapse. Th35ospitalal discharged him back to GRC on 10/10/23, however, he was not stable upon his arrival (02 saturation of 79% upon nursing post hospital assessment) and was readmitted to the hospital via 911. On 12/6/23, he was positive for covid and was treated with Paxlovid without serious complications according to the assessment. Nursing noted he had a diagnosis of seizure disorder that was well controlled with medication, but did not provide the name of the seizure medication or any related lab levels.

2. The annual nursing physical assessments showed partial presence of including the needed quality indicators.
    - For Individual #5, the most recent annual nursing physical assessment dated 3/8/23 was done greater than 30 days prior to her ISP on 4/19/23 contrasting with nursing policy. The assessment included most of the required components. The physical exam did not include her weight or urine characteristics.
    - For Individual #101, the most recent annual physical assessment of 10/13/23 was timely and included vital signs. Her blood pressure reading was 94/55 (low) with no comment regarding her normal range. The reproductive system was not assessed and stated not indicated while cardiac system noted that pedal pulse was not assessed because shoes were on, therefore, the exam did not meet standards of care for nursing. Also missing from neurological findings was the date of last seizure. The assessment did not include weight and the summary did not address the abnormal findings for low blood pressure or any planned actions related to cerumen impaction (which was important for this individual as according to the GRC infection control report in February 2024, the individual required antibiotic treatment for R otitis media with effusion).

- For Individual #54, the annual physical assessment dated 9/7/23 was greater than 30 days before her ISP on 10/10/23 conflicting with the nursing policy. Vital signs include oxygen saturation of 96% on room air, lungs clear, and no cough. Breasts were not examined stating the individual declined. There was no exam of ears, but it was noted that she would not allow exam of ears, nose, or mouth to be examined. Missing were pedal pulses and indication of any present edema.
- For Individual #102, the annual physical assessment dated 10/4/23 was greater than 30 days prior to his ISP on 11/30/23 contrasting with nursing guidelines. Most of the required components were included. The last seizure date was 10/24/22. The assessment did not include pedal pulse and male breast / genitalia sections as stated deferred without any explanation.
- For Individual #68, the annual physical exam 12/6/23 for ISP on 1/11/24 was more than 30 days prior to his ISP conflicting with GRC guidelines. The physical exam was thorough with notes to individualize and explain his condition. Individual refused genitalia exam, however, did not mention refusal of (male) breast exam, but was marked as not done.
- For Individual #73, the annual physical exam dated 12/6/23 was thorough and included vital signs and other needed information, but lacked a current weight.

3. The majority of the annual nursing assessments were not sufficient in addressing the individual's at-risk conditions to assist the team in developing a responsive plan.
   - For Individual #5, the annual GRC Nursing Report 3/10/23 for her ISP 4/19/23 was not timely nor current, therefore, insufficient in determining or addressing the individual's needs as it was not updated upon a significant change of her health status occurring near or on the ISP meeting date. The individual was hospitalized 4/12/23 with cholelithiasis, which resulted in open approach to surgery due to peritonitis and subsequently, due to her anorexia, the hospital placed a feeding tube. Due to the timing of the significant changes at the beginning of her ISP date, Nursing should have updated her risk assessments and revised the GRC Nursing Report accordingly upon her return to GRC.
   - For Individual #101, the annual GRC Nursing Report 10/5/23 for her ISP 10/26/23 did provide a status update by body system, however, the Integumentary System noted that she was at risk for skin breakdown. There was no analysis or attempt to identify preventative interventions relating to skin. There was no analysis of her falls, how they occurred, or recommendations as to how to prevent falls. There was no analysis of her comfort level, no description as to how often or how she communicated when she was uncomfortable, what pain scale was appropriate to utilize for her, or any nursing recommendations relating to ensuring her comfort.
   - For Individual #54, the annual GRC Nursing Report 10/4/23 for her ISP 10/10/23 identified that she was at high risk for fluid imbalance due to her stage IV chronic kidney disease. She was seen regularly by nephrologists and was encouraged to drink four liters a day. During the prior ISP year review, she was hospitalized for urinary retention with sepsis and an indwelling catheter was placed. The summary did not include analysis of fluid intake to determine if her supports were effective and there were no recommendations by the nurse. For her history of lower back pain and moderate degenerative joint disease in her knees and spine, she was seen 6/21/23 by orthopedics. Both knees were injected with lidocaine and Depo-Medrol to alleviate discomfort. Occasionally, she would request PRN Tylenol for back pain, especially if she were seated for a long period of time. There was no analysis of how often she reported pain, whether she would be getting the injections again, or clear definitions or follow-up recommendations to ensure she was not sitting for a long period of time.
   - For Individual #102, the annual GRC Nursing Report 11/29/23 for the ISP 11/30/23 did provide a status update, but was missing individualization and analysis, such as results of bowel tracking/to identify a clear baseline, whether he required

any PRN bowel medications, or whether the multiple labs being obtained had any results that were abnormal. There were also no recommendations by the nurse to the IDT.

4. N/A*:* There was not currently a quarterly GRC Nursing Report required by the facility, therefore, this indicator was deemed as not applicable. Note that the indicators for an updated status and review of risks were done monthly, which is addressed in item 6 below.

5. The majority of the individuals did not receive quality quarterly physical assessments due to components missing from the exam.

- For Individual #5, the most recent quarterly nursing physical assessment provided dated 12/6/23 included vital signs, 02 sat, lungs clear, pain level 5 acute with notes that pain was relieved by PRN medication Tramadol. Systems review included g/j-tube present, but no information regarding g-tube residual. Also missing were data under the seizure section. Braden risk scale was not included. It should have been reviewed and rescored in April 2023 upon her return from the hospital as her condition changed, yet notes indicated the Braden risk scale was not updated until 1/19/24, which was greater than 30 days after the quarter 3 physical. Missing weight in the assessment section, but included an attached weight log that documented her height of 58 inches and that in December 2023 her weight was 143.9, January 2024 was 145, and February 2024 152, indicating a gain of seven pounds in one month for which there were no actions, such as a re-check of the weight for accuracy or a referral to dietician.
- For Individual #102, the physical assessment dated 1/3/24 showed vital signs, oxygen saturation at 98%, and lung sounds clear with no cough/symptoms. The section for seizures stated no, then in comments stated last episode was 10/24/22. Systems review was missing reproductive system, skin color, temperature, moisture, turgor, and skin integrity.
- For Individual #68, the physical assessment dated 11/16/23 included vital signs. The individual refused genital exam and the summary noted that the exam was limited due to him being uncooperative, but no pain noted, though agitated with the assessment. Staff reported he was eating and drinking well and had no skin alterations. The weight graphs showed a gain of about five lbs. per month since the last quarterly assessment in August 2023, with a total gain over the year of 28 lbs.–-147.8 in January 2023 and 176 in January 2024, however, this was not noted in the nursing summary. Current weight should be included in nursing assessments and the GRC assessment form being utilized included a designated field for the weight to be entered, which was not consistently noted. For Individual #76, the quarterly nursing physical assessment dated 12/19/23 was reviewed and included weight graph. Also absent was the appearance of urine as it stated only voiding and "incontinent. The comments section described ears with dry yellow/brown cerumen and that individual had been skipping meals, but was taking a replacement or supplement. There was no evidence of any follow-up for the abnormal findings. For Individual #73 the quarterly physical assessment dated 11/3/23 was thorough as it included vital signs, on oxygen at 1 lpm with saturation at 93%, no edema, pedal pulses normal, last BM information, last seizure on 9/12/08, suprapubic catheter in place yellow, clear output good oral hygiene, lungs clear, and skin intact. Deemed as stable, the exam was missing weight, however, a weight graph was attached and stated weight was 139/no change from prior month.

6. Status updates, risk review, data analysis and nursing recommendations were not present within documentation by nursing in the monthly integrated reviews (MIR).
   - For Individual #5, the monthly integrated reviews (MIR) for October, November, and December 2023 were reviewed. The reviews documented an ED visit on 9/6/23 for cellulitis, for which she received antibiotics, however, did not include pneumonia for which it appeared she was hospitalized through 9/25/23. Under GI risk, the review noted that an enteral tube was being maintained with current interventions, but without details as to what the current interventions were. There was no medication list (section left blank). The MIR reviews did not address her pain, nor include a proper summary of GI status that included if PRN constipation medications were necessary.
   - For Individual #101, the monthly integrated review (MIR) for November and December 2023 did not include accurate status updates and there was no analysis or recommendations by nursing to address her health risks. The HSSP goal for her to be free of complication from infection or enteral tube documents in SOAP note format that (she had) no signs of infection this past month, data reviewed, stable. This conflicted with the individual being hospitalized for pneumonia from 11/13-20/23.
   - For Individual #54, the monthly integrated review for October 2023 was documented on 11/20/23. Nursing input on her goal to have no complications related to UTI stated there were no reports of complications, data reviewed, and analysis was better, and HSSP appeared to be effective with no changes needed. The nurse did not include any information to the team regarding the removal of her indwelling catheter on 10/10/23 and new orders for bladder scans TID to monitor for urine retention. There was no documented information to the care team at the meeting regarding signs and symptoms of urinary retention to watch out for, as on 10/19/23 she did have high residual and required catheterization that morning. Due to increasing problems with retention, on 11/5/24 the catheter was reinserted and was to remain. There was no reference to the skin issue caused by her colostomy belt being too tight in early October 2023. The November 2023 review on 12/21/24 noted she had an x-ray on 11/8/23, but the nursing review did not note what type of x-ray, reason, or results. None of the MIRs included her elimination pattern(s), whether she had any pain, and no review of PRN medications during the month.
   - For Individual #102, the monthly integrated review (MIR) for January 2024 dated 2/16/24 under GI did note that a PRN MOM dose was given for three days without BM and was effective. For fluid imbalance risk, the nurse noted that no concerns were reported, and fluid intake continued with a change of maximum of 3000 ml daily. This status did not include January 2024 clinical documentation related to edema (facial) reported 1/22/24 to his PCP when he woke up with a puffy face that did not resolve. ARNP ordered TSH level to r/o acute hypothyroidism and ordered application of cold compress. There was also no discussion or documentation by nursing regarding concern of his decreased appetite on 1/30/24. While the assessment 1/30/24 documented that nursing was aware of his lack of appetite at that moment in time, there was no weight entered into the designated field in the actual assessment with a comparison as to trends, and the summary noted that he had a sandwich, a bottle of soda and a snack, and concluded he appears to have regained his appetite, and is stable. Missing was documented follow up by nursing as to the ongoing concern with recommendations, and a referral to the dietician/IDT.
   - The resulting SOAP note indicated he had a sandwich and bottle of soda and was eating another snack as the nurse was leaving the house, and a conclusion that he regained his appetite. There was no review of his weight graph or a referral to the dietitian. Dietician noted a January weight of 158.2 lbs., which was a decrease of 2.8 lbs. in the past month, with his weight and BMI of 22 still within his suggested range and noted that the DAR indicated that he did not finish 23 meals with

noted intake decreased from his typical. This situation warranted a thorough discussion at the MIR meeting with a follow-up plan.For Individual #68, the monthly integrated review (MIR) for January 2024 noted he had no falls, no constipation, and no bowel obstruction, but then indicated he had one instance of going to day three. The PRN was effective, but no date was provided. They started Motegrity on 1/9/24 with the analysis stating status was "worse" but the plan was to continue with HSSP. On 2/14/24 an updated HSSP for GI was implemented. If the individual was deemed as worse, it is unclear why his plan was not reviewed and updated sooner.

- For Individual #73, the monthly MIR reports did not fully meet monitoring indicators for quarterly status updates. While there were brief updates and an analysis of some risks, there were no recommendations by nursing other than to continue the current HSSPs. Report 12/11/23 for November 2023 noted that on 11/6/23 the individual had a GI consultation for possible g-tube placement. Notes from the IDT meeting on 11/13/23 documented that he was scheduled for an outpatient GT placement, however, when he became ill and was hospitalized, the plan was changed to do it while inpatient at hospital. The MIR dated 1/17/24 for December 2023 noted a discussion of oxygen instructions and that he was tested as negative for covid on 12/22/23 and he had an x-ray for a swollen and bruised R hand that was negative for fracture and that for constipation, UTI, and fluid balance there were no concerns. MIR nursing report for the meeting 2/19/24 included current medication list, status of changes/tertiary care, and that he transferred to ER and was admitted for cellulitis. It was also noted that he was treated with IV antibiotics and that a PEG tube was placed on 1/31/24. There was a lack of related updates for constipation, skin risks and recommendations from nursing regarding update to his HSSP to reflect his feeding tube/stoma site.

7. Individuals were assessed by nursing upon a change of status, but did not all include thorough documentation of communications with the PCP regarding the changes, several did not comply with adherence to the GRC Nursing minimum follow-up frequency of assessments.
   - For Individual #5, a change of her condition requiring hospitalization occurred on 8/23/23 when she was sent to the ER and admitted with hydronephrosis, nausea, abdominal pain, and distension. The nursing assessments from 8/17/23–-8/23/23 prior to the transfer described she was experiencing significant pain that was not fully addressed.

     On 8/18/23 at 9:10 pm, when the staff notified the nurse her abdomen was worse than normal, the nurse assessed pain as acute and rated at 2, described that her abdomen as distended with slight asymmetrical distension more prevalent on right side. GT vented and PRN rectal tube applied without relief. The note indicated the APRN was contacted, however, details of that notification, such as what orders or instructions were received and if/what pain medication was administered were not documented.

     On 8/21/23 at 7:00 am, her pain was noted as 5, with an increase in agitation and yelling. PRN Tramadol was administered. The nursing policy for pain requires reassessment within 60 minutes, however, the next assessment was not until 3:20 pm.

     On 8/23/23 at 1:00, her pain was documented at acute, abdominal, pain rating of 6. Staff reported crying and moaning, nurse assessed as abdomen grossly distended, firm, and guarded. The PCP was notified, and Tramadol was documented as

given at 1:30 pm. The PCP ordered an abdominal x-ray that showed colonic dilation with possible ileus, and she was transferred at that time to ER and admitted.

The individual returned to GRC on 9/5/23. The post hospital assessments were documented by nursing in accordance with GRC Nursing guidelines. The individual had worsening abdominal distention, increased pain, and new respiratory changes. Nurses notified the PCP who ordered x-rays and upon getting results, transferred her back to the hospital on 9/6/23, she was readmitted with left lower lobe pneumonia, abdominal distention, and cellulitis of g-tube tract.

The individual experienced obvious pain that appeared as intermittent. The overall finding was that her pain was not **fully** addressed (inferring it was partially addressed) was due to the lack of documented efforts to prevent pain with a clear, concise plan (HSSP) for pain management. Even though the documentation in some cases indicated no pain (such as ) on 8/22/23 at 6:13 am, nursing note includes that the individual was yelling and pushing away from the nurse during (assessment) which may have been an indication she was not comfortable and was experiencing some level of pain. Proper pain management for individuals including those that are not able to clearly communicate how they are feeling /what they are experiencing would include nurses assessing more often than 1 x a shift or BID, tracking effectiveness to determine pattern of breakthrough pain and being proactive by reporting trends to medical and advocating for a schedule of dosing pain medications such as Tylenol and Tramadol in addition to the use of the rectal tube / venting of G-tube.

- For Individual #101, changes in her status resulting in tertiary care occurred in November 2023. Enteral assessments relating to her feeding tube were documented twice per day on 11/5/23, 11/6/23, 11/7/23, 11/8/23, and 11/9/23, however, three of the 10 did not include date/type and amount of last BM required to meet the GRC nursing guidelines. On 11/9/23, individual was sent to the ER due to critical lab abnormality. The ER performed repeat labs and found ranges were normal and released her back to GRC.

  For Individual #101, on 2/1/24 at 6:30 pm, the nurses assessed the individual for a witnessed fall that occurred with impact to her right hip and arm. The nurse did not find any evidence of injury. During the onsite review, the Monitoring Team asked the PT if the cause of this fall was determined, as part of the Fall Review Committee. Minutes from the fall committee meeting on 3/11/24 noted that post hospital, the individual was to be in a wheelchair, which was reflected in her PNMP, so she should not have been walking with use of her walker (as she was doing when the fall occurred). Action taken was for the QIDP to remind staff. There was no discussion of her hypotension, which was ongoing and could cause dizziness. Falls were deemed at risk, but there was no intervention included to address hypotension.

- For Individual #54, skin impairment on the individual's abdomen related to her stoma was reported to nursing on 10/7/23. The initial assessment was completed that morning at 9:45 and included vital signs, pain (none), normal skin temperature, and turgor with a reddened area on left side of abdomen measuring 1.2 x 0.4 cm with a small clear fluid filled blister just above ostomy wafer, a red line across her abdomen from her ostomy belt measuring 13 x 0.5 cm. Nurse documented she spoke with APRN regarding this area and she requested we protect this area with a foam dressing and contact the wound nurse for evaluation for possible alternative to using this ½ elastic belt. Plan was to continue skin assessments until healed

and for staff to report any new concerns. The follow-up assessment was documented on 10/8/23 at 8:00 am (unchanged). Assessment on 10/9/23 at 7:30 am. The summary stated no complaints of discomfort and described the blister as drying up and very small in size with no redness and the redness to the right side as gone. Missing was further discussion of the issue in the October MIR held 11/20/23, documentation of training to staff on proper application of her ostomy appliance, and an update to her HSSP for skin/ostomy care. The transition plan submitted was incomplete, so was not updated.

On 5/24/23 at 3:20 am, Individual #76 lost his balance when getting up to use the restroom and fell to the floor/impact to his back/buttocks/or hips. The nurse assessed him with no injuries, and he was assisted to stand position and ambulating per his normal range. The fall/neuro assessment was negative; however, he was sleeping. On 5/24/23 at 750 am, post hospital assessment SOAP note indicated that staff reported difficulty getting him to eat but the CMA was able to get his meds down him with yogurt and encouragement. It was noted that he appeared lethargic, leaning to the right, with head hanging down when PT brought him to the med room, in a wheelchair, and he was placed in a recliner due to needing to be upright for 60 minutes. The next assessment was not documented until 5/24/23 at 7:50 PM (12 hours later). Symptoms again of hypoactive bowel sounds and distended abdomen. SOAP note indicated he was upset about being NPO due to absent bowel sounds, but cooperative with a full assessment in his room.

8. Five of seven individuals were assessed for pain routinely as part of the annual and quarterly and post hospital nursing assessments. In response to changes in condition when one would reasonably expect pain to result, there was an identified gap in addressing pain.
   - For Individual #5, nursing assessment documentation for August 2023 through February 2024 was reviewed by the Monitoring Team. It appeared that following abdominal surgery for peritonitis, gall bladder removal, and placement of feeding tube 4/19/23, the individual was experiencing significant discomfort/pain intermittently exacerbated by bloating, palpation of her abdomen, and accompanied by abnormal bowel sounds (hypo or hyperactive). Pain relief medication Tramadol was ordered PRN. Nursing documentation did not always comply with the GRC protocols for pain as it did not include when her last pain medication was given or the effectiveness of PRN within 60 minutes. Upon a review of her MIR (monthly integrated reviews) by the IDT, an ISP service objective that was tracked had a goal that during personal care, will cooperate (not yell and/or move) for at least 28% of trials. This was a possible indicator that the individual was communicating discomfort that was not properly assessed by the IDT. There was also no comprehensive health care plan put into place to address her pain, even when she was started on schedule II pain medication Fentanyl on 12/19/23. Her HSSP was not modified until 2/24/24, to add a pain related goal to her GI/constipation existing care plan, with no documentation of an analysis to determine details, such as length of effectiveness.
   - For Individual #54, according to her MARs for November 2023, December 2023, January 2024, and February 2024, there were no PRN Tylenol doses administered. Her Nursing report indicated that she had a history of arthritis pain especially in her knees and back and in 2022 had steroid injections to both knees. The individual could verbalize when she hurt, which did not appear to occur often. Assessments indicated she had no pain except for one instance on 10/12/23 12:15 pm when during an assessment of wound healing, the nurse documented she did verbalize that it hurt, however, there was not a documented pain level assessment nor PRN Tylenol offered to her.

9. In efforts to ensure individuals are appropriately protected from infection. GRC did establish and maintain an effective infection control committee and had access to consultation with experts in infection control and infectious diseases.
   - A review of the related documentation, as well as observation of the March 2024 Quality Council meeting onsite evidenced that the Center had a designated infection control/wound registered nurse monitoring infections and skin breakdown, which reported to the Quality Council committee monthly with a breakdown by type of infections and for pressure related skin injuries. Recently a new score was added, for detecting sepsis, in addition to the resource being utilized with McGeer criteria that was put into place as of the previous review. Preventative vaccinations were administered in December 2023 (covid Spikevax) as well as for flu vaccine with 81% of individuals vaccinated. In January 2024 there were two pneumonia/ respiratory infections. Both of the individuals went to the ER and were admitted for IV antibiotics. In February 2024, there were no covid infections on campus.
   - Nurses were observed with adequate hand hygiene and use of gloves when appropriate during medication administration.

10. There was substantial evidence that the facility ensured that residents maintained maximum skin integrity.

11. Please refer to details in the Medication Section (Indicators 31-36).

| **Section C.v Psychiatric Services (88-91)** | | |
|---|---|---|
| Summary:<br>There were multiple issues related to psychiatry at the facility. Specifically, there were issues with data reliability, such that psychiatric clinicians could not make data driven medication decisions. Psychiatry was not participating in ISP meetings. Psychiatry was not participating in transition planning. There is a need to immediately address the lack of psychiatry input into transition planning, so that individuals transitioning to the community or to other residential settings would have continuity of care. | | |
| # | Indicator | Overall Score |
| 1 | GRC psychiatrists are board certified or eligible. (par. 88) | NC<br>50%<br>1/2 |
| 2 | The individual has a CPE. (par. 88) | NC<br>0%<br>0/6 |
| 3 | CPE content is comprehensive.<br>i. Identifying information<br>ii. History of present illness<br>iii. Past psychiatric history<br>iv. Substance Use History<br>v. Family History<br>vi. Medical history<br>vii. Developmental history<br>viii. Social history<br>ix. Physical exam<br>x. Labs<br>xi. Mental Status<br>xii. Diagnostic assessment<br>xiii. Bio-psychosocial formulation<br>xiv. Recommendations<br>(par. 58-64, 88) | NC<br>0%<br>0/6 |
| 4 | Status and treatment document was updated within past 12 months. (par. 88) | SC<br>100%<br>6/6 |

| | | |
|---|---|---|
| 5 | Documentation prepared by psychiatry for the annual ISP was complete and includes:<br>i. Demographic<br>ii. Psychiatric diagnosis<br>iii. Symptoms of Diagnosis<br>iv. Target symptoms monitored.<br>v. Derivation of symptoms<br>vi. Psychological assessment or BH assessment<br>vii. Combined BH review /formulation<br>viii. Psychoactive medication<br>ix. Each psych med prescribed has an identified diagnosis /symptom.<br>x. Each med corresponds with the diagnosis.<br>xi. Risk of meds<br>xii. Risk of illness<br>xiii. Non-pharmacological treatment<br>xiv. Risk/Benefit. Analysis<br>xv. Past Pharmacotherapy<br>xvi. Future plans<br>xvii. This should include other consultations performed over the course of the year. (par. 52,88-90) | NC<br>0%<br>0/6 |
| 6 | Psychiatry documentation for annual /transition plan was submitted to the ISP team at least 10 days prior to the ISP and was no older than three months. (par. 61,88) | NC<br>17%<br>1/6 |
| 7 | The psychiatrist or member of the psychiatric team attended the individual's ISP meeting. (par. 88, 89) | NC |
| 8 | Psychiatric documentation references the behavioral health target behaviors, <u>and</u> the functional behavior assessment discusses the role of the psychiatric disorder upon the presentation of the target behaviors. (par. 58,59,89) | NC |
| 9 | The psychiatrist participated in the development of the PBSP. (par. 89) | NC |
| 10 | Daily medications indicate dosages not so excessive as to suggest goal of sedation. (par. 89) | SC |
| 11 | There is no indication of medication being used as a punishment, for staff convenience, or as a substitute for treatment. (par. 89) | SC |
| 12 | There is a treatment program in the record of individual who receives psychiatric medication. (par. 89) | SC<br>100%<br>6/6 |
| 13 | Documentation of Chemical Restraint: Consult and Review was completed within 10 days post restraint. (par. 90) | N/A |
| 14 | Multiple medications were not used during chemical restraint unless there is proper justification. (par. 90) | N/A |
| 15 | Psychiatry follow-up occurred following chemical restraint. (par. 90) | N/A |

| 16 | The final ISP/Transition document included the following essential elements and showed evidence of the psychiatrist's active participation in the meeting.<br>i. The rationale for determining that the proposed psychiatric treatments represented the least intrusive and most positive interventions.<br>ii. Integration of behavioral and psychiatric approaches.<br>iii. The signs and symptoms monitored to ensure that the interventions are effective, and the incorporation of data into the discussion would support the conclusions of these discussions.<br>iv. A discussion of both the potential and realized side effects of the medication, in addition to the benefits (i.e., risk benefit analysis).<br>(par. 91) | NC |
|---|---|---|

Comments:

1. One of the two psychiatrists providing contracted psychiatric services at the facility was board certified. The second psychiatrist, although residency trained, was not board certified. Given the time that had lapsed since he completed his residency, he was no longer eligible to take the board examinations.

   During the Monitoring Team visit, psychiatry clinic was observed with one psychiatrist for one individual who was not part of the review group. The psychiatry clinic was well attended by the IDT members, including the individual who was being reviewed.

   As noted in the previous monitoring report, for most psychiatric clinical encounters, the individual was not in attendance. This needs to improve. The individual needs to be a participant in the clinical encounter. Additionally, as seen in prior clinical observations, there was a paucity of communication by the team members. One or two staff members, generally the QIDPs, were the most informative. Data presented was anecdotal, and the behavioral health data were not reliable or valid. As such, the psychiatrists were still making decisions regarding psychotropic medications in the absence of data.

   Psychology submitted a list of scales they had access to that are normed for this population, some of which could be used to obtain reliable and valid data. But psychiatry was not using these data points to inform their clinical decision making. This highlighted the lack of integration and collaboration between psychiatry and behavioral health/psychology at the facility. Psychiatry should be aware of what data psychology can provide, how these data can be reported, and how they can use the data in decision making.

2. One individual in the review group, Individual #73, was not receiving psychiatric services. As such, he was scored N/A for this indicator, having an initial Comprehensive Psychiatric Evaluation [CPE]. The remaining six individuals did not have a Comprehensive Psychiatric Evaluation.

3. No individuals in the review group had a Comprehensive Psychiatric Evaluation.

4. Annual evaluations were required for six individuals. All had an annual evaluation completed within the previous 12 months.

5. None of the annual evaluations included all of the required elements. The evaluations were missing anywhere from six to 14 elements. The evaluations were brief and devoid of detail. They did not summarize the individual's progress or challenges over the previous year, nor did they include information allowing the reader to discern the rationale for the prescribed treatment.

   While documentation indicated that individuals were typically reviewed on a quarterly basis, one individual, Individual #5, was only reviewed annually. Reportedly, as her dementia diagnosis progressed, medications were discontinued, and psychiatry reviewed her case on an annual basis. Even so, Individual #5 was on the psychiatric caseload, therefore, she must be reviewed quarterly.

6. Psychiatric documentation for the annual ISP/transition plan was not submitted to the IDT team in a timely manner, specifically 10 days prior to the ISP with information no older than three months.
   - Individual #5's annual psychiatric evaluation was dated 9/20/23 with an ISP date of 4/19/23, so the evaluation was over 90 days old.
   - Individual #54's annual psychiatric evaluation was dated 11/8/23 with an ISP date of 10/10/23, so the evaluation was performed after the ISP date.
   - Individual #68's annual psychiatric evaluation was dated 9/27/23 with an ISP date of 1/11/24, so the evaluation was over 90 days old.
   - Individual #76's annual psychiatric evaluation was dated 4/11/23 with an ISP date of 4/20/23, so it could not have been submitted 10 days prior to the meeting.
   - Individual #101's annual psychiatric evaluation was dated 11/21/23 with an ISP date of 10/26/23, so the evaluation was performed after the ISP date.
   - Individual #102's annual psychiatric evaluation was dated 10/11/23 with an annual ISP date of 11/30/23. This was the only evaluation that could have been submitted to the IDT in a timely manner.

7. Per a review of the ISP documentation and interviews with the facility psychiatrists, psychiatrists did not participate in the ISP meetings at the facility. If the psychiatrist does not participate in the ISP meeting, there needs to be some documentation that the psychiatrist participated in the decision to not be required to attend the ISP meeting. The presence of the psychiatrist always allows for richer discussion during the ISP with regard to the integration/inclusion of psychiatric data (e.g., diagnoses, symptom presentation, psychotropic medication, related medical concerns).

8. The psychiatric documentation generally referenced the behavioral health target behaviors via listing the indicators. There was no detailed documentation of a review of the associated data. Given the lack of reliable data, this was not surprising. When reviewing the behavioral health documentation, the Functional Behavioral Assessment did not include information regarding the individual's psychiatric diagnoses. This, when documented, was included in the Behavioral Health Assessment. Overall, this indicator is attempting to address the documentation of integrated care between psychiatry and behavioral health. Based on document review, staff interviews, and observation of psychiatry clinical encounters, the disciplines were not integrated, and the individual's psychiatric diagnoses were not appropriately considered in the context of behavioral challenges.

9. Per staff interviews and document review, psychiatry did not participate in the development of the Behavior Support Plan.

10. Based on a review of the psychiatric documentation and the medication administration record for the individuals in the review group receiving psychiatric services, daily medication dosages were not excessive to suggest the goal of sedating individuals.

11. There was no indication of medication being used as a punishment, for staff convenience, or as a substitute for treatment.

12. Each of the six individuals in the review group prescribed psychotropic medications had a Behavioral Support Plan in effect.

13. There were no chemical restraint events reported.

14. There were no chemical restraint events reported.

15. There were no chemical restraint events reported.

16. Psychiatrists did not participate in the Individual Support Plan (ISP) or Transition Planning meetings. Therefore, the documents generated as a result of these meetings did not include evidence of psychiatric participation nor did the documents include the integration of psychiatric clinical information. As one psychiatrist was contracted for one day per week and the other a half day per week, it was not surprising that they were not at the table for transition planning, but there needs to be a work around. In general, psychiatrists have a great deal of historical information about individuals and know them well. They know what has been trialed and what has failed.

    The individual's psychiatrist must participate in transition planning. While their participation in the IDT process would be ideal, due to resource limitations this may not be possible. As such, a written transition plan or treatment summary in conjunction with a consultative telephone call or videoconference to communicate this information to the individual's community psychiatric treatment provider could suffice. The necessary information to transmit to the next IDT/psychiatrist would include:

    - A summary of the individual's psychiatric treatment during their time at the facility that communicates the individual's psychiatric treatment history (e.g., diagnosis, medication history, what works, what does not).
    - The individual's current psychiatric treatment regimen.
    - The current treatment goals and justification regarding current medication regiment (e.g., is a medication taper in progress or planned).
    - What the individual's psychiatric indicators are (e.g., what behaviors/symptoms should be tracked in the community) and what the individual's baseline is. The community providers need to know what to expect as far as behavior/symptoms and what behavioral health decompensation looks like for this specific individual.
    - What can be tracked in the community to monitor psychiatric status (e.g., sleep logs, appetite, scales including the DASH-II, mood/anxiety scales or picture identification of mood).
    - What side effects the individual has experienced and how to monitor for them. Specifically, what should staff look for (e.g., drowsiness, gait changes, constipation, diarrhea, confusion, abnormal movements).
    - The need for consultative services for related medical conditions or dual-purpose medications (e.g., neurology, cardiology, gastroenterology, endocrinology).

**Section C.vi: Medications (92-102)**

Summary:
The contract pharmacy continued to review new medication orders for allergies, significant side effects, and drug interactions. Alternate medications were suggested when there were safety or cost concerns. Dosage adjustments were recommended when dosage of new orders was high, or the dosage range was exceeded. Except for required periodic CBC reports for those prescribed Clozapine, the system did not allow for access to lab reports as they had no access to the electronic medical record.

QDRRs appeared to be completed in a timely manner. The content of the QDRR varied depending on the clinical pharmacist completing the review. A standardized template for all QDRRs was not utilized. Some QDRRs did not list the medications and dosages at the time of the review, which was problematic. When reviewing past QDRRs, this essential information was needed to understand the information in the review. As the medications and dosages changed over time, there was inability to determine the medication list and dosage at the time of the QDRR completion, unless the medication list was included.

The QDRR did not uniformly state in all reports whether polypharmacy existed, and whether there was benzodiazepine use, which was problematic when no medication list was included in the report. The anticholinergic burden was reviewed from the perspective of reported side effects. However, it would be important clinically for the PCP to know the anticholinergic burden rating of the medications prescribed (low/medium/high), in order to determine if any medications that were added to the anticholinergic burden could be reduced. Additionally, if an individual had constipation and was on several medications with adequate results, this side effect may be missed in the current scoring used in the QDRR.

PCPs were reviewing the QDRR within a 28-day time period of receipt of the QDRR. Psychiatry was deficient in this area, reviewing only 40% of the reports during this 28-day time period for those with psychotropic medication use.

Drug Utilization Reviews were not completed.

The P&T Committee meeting minutes reflected considerable data on psychotropic medication use. However, there were no data concerning individuals prescribed two or more anti-epileptic medications or other neurological medications from the same class or three or more neurological medications.

The P&T Committee attendance rosters documented a lack of the pharmacy director presence for one third of the meetings. There was not an alternate designee for pharmacy. Dual purpose medications were documented and reviewed in the P&T Committee, but information provided in the minutes documented those individuals who were considered no longer on dual diagnosis medications, or may never had a dual diagnosis medication after clarification from psychiatry, were never taken off the roster when discussing this topic. The P&T Committee did review adverse drug reactions with a mechanism to list the medication as an allergy on the MAR. However, there was no committee deliberation whether the ADR should have been reported to MedWatch.

| # | Indicator | Overall Score |
|---|---|---|
| 1 | Individuals' medications have a justifying diagnosis. (par. 92) | LO |
| 2 | If the individual has new medications, the pharmacy completes a new order review prior to dispensing the medication. This includes:<br>i. Interactions, side effects, allergies, adverse reactions<br>ii. Review of clinically relevant lab<br>iii. Need for additional lab work.<br>iv. Potential to use alternate medications.<br>v. Need to consider dose adjustments.<br>(par. 93) | PC |
| 3 | If an intervention is necessary, the pharmacy notifies the prescribing practitioner. (par. 93) | LO |
| 4 | QDRRs are completed quarterly by the pharmacist. (par. 94) | SC |
| 5 | The pharmacist addresses laboratory results, and other issues in the QDRRs, noting any irregularities, the significance of the irregularities, and makes recommendations to the prescribers in relation to:<br>i. Laboratory results, including sub-therapeutic medication values.<br>ii. Benzodiazepine use.<br>iii. Medication polypharmacy.<br>iv. New generation antipsychotic use; and Anticholinergic burden.<br>(par. 94) | NC |
| 6 | The PCP and/or psychiatrist document agreement/disagreement with the recommendations of the pharmacist with clinical justification for disagreement:<br>i. The PCP reviews and signs QDRRs within 28 days, or sooner depending on clinical need.<br>ii. When the individual receives psychotropic medications, the psychiatrist reviews and signs QDRRs within 28 days, or sooner depending on clinical need.<br>(par. 61,95) | NC |
| 7 | Records document that prescribers implement the recommendations agreed upon from QDRRs. (par. 95) | SC |
| 8 | If a review of a new order by pharmacy indicates the need for a change in order and the prescriber agrees, then a follow-up order shows that the prescriber made the change in a timely manner. (par. 95) | SC |
| 9 | Monitoring of any first-generation antipsychotic medication, two or more psychiatric or neurological medications from the same general class (e.g., two antipsychotics) to the same resident, and the prescription of three or more psychiatric or neurological medications, regardless of class, to the same resident, to ensure that the use of such medications is clinically justified and that medications that are not clinically justified are eliminated. (par. 96) | NC |
| 10 | Monitoring shall be conducted by the Pharmacy and Therapeutics Committee, which shall include: the Medical Director; the Pharmacy Director or PharmD (clinical pharmacist); one PCP, if available, who is not the resident's treating physician; and other appropriate staff. (par. 96) | SC |
| 11 | Before a prescriber initiates treatment with a medication that would render a person subject to the monthly review described above (e.g., by prescribing a third psychiatric or neurological medication to a resident already prescribed two such | SC |

| | | |
|---|---|---|
| | medications), the person's IDT shall meet to consider the recommended medication and alternative nonpharmacological interventions and shall document the rationale for the selected decision. (par. 96) | |
| 12 | GRC residents receiving psychiatric or neurologic medications shall be monitored accordingly. (par. 97) | NC |
| 13 | Clinically significant DUEs are completed in a timely manner based on the determined frequency but no less than quarterly. (par. 98,99) | NC |
| 14 | There is evidence of follow-up to closure of any recommendations generated by the DUE. (par. 98,99) | NC |
| 15 | GRC shall identify all medications prescribed for dual purposes, and for all medications so identified, ensure ongoing collaboration between relevant disciplines (e.g., psychiatry, neurology) regarding their continued use. Collaboration among necessary disciplines regarding use of the dual-use medication shall be coordinated by the resident's PCP. (par 100) | SC |
| 16 | Within three months of the Effective Date of this agreement, GRC shall conduct an external clinical review to verify the continuing propriety of the resident's prescriptions with respect to every resident who falls into the following categories, and shall then implement the recommendation arising from that review:<br><br>A. Residents who are prescribed Dilantin, Valproic Acid, Thorazine, Loxapine, Fluphenazine, Perphenazine, Haloperidol, Primidone, and Phenobarbital.<br>B. Residents who are prescribed oral bisphosphonates and have esophageal motility disorders, have GERD, are at increased risk of aspiration, or who are unable to stand or sit upright for at least 30 minutes after dose administration. (par. 100) | LO |
| 17 | ADRs are reported immediately. (par. 101) | SC |
| 18 | Clinical follow-up action is completed, as necessary, with the individual. (par. 101) | SC |
| 19 | The Pharmacy and Therapeutics Committee thoroughly discusses the ADR. (par. 101) | NC |
| 20 | Individual receives prescribed medications in accordance with applicable standards of care. (par. 87,102a) | LO |
| 21 | Medications that are not administered or the individual does not accept are explained. (par. 102a) | LO |
| 22 | The individual receives medications in accordance with the eight (8) rights (right patient (individual), right medication, right dosage, right route, right time, right documentation, right reason, and right response), and their PNMP as applicable. (par. 87, 102a) | LO |
| 23 | To ensure nurses and CMAs administer medications safely: For individuals who exhibit signs and symptoms of respiratory issues and /or aspiration during medication administration, the nurse or CMA will immediately stop the medication administration and notify nurse to/or complete an assessment which will include lung sounds and may include a full set of vital signs, pulse oximetry, etc. as indicated at the time of the assessment. (par. 102a) | LO |
| 24 | If the individual receives pro re nata (PRN, or as needed)/STAT medication or one time dose, documentation reflects adherence to GRC policy as to nurse assessment prior to, reason for and individual's response/effectiveness post administration. (par. 102a) | SC |
| 25 | Individual's PNMP plan is followed during medication administration. (par. 102a) | LO |
| 26 | Instructions are provided to the individual and staff regarding new orders or when orders change. (par. 102a) | SC |
| 27 | Nurses and CMAs administering medications are knowledgeable of the individuals needs and preferences and are competent to follow the facility medication administration policies and procedures (par. 102b) | LO |

| | | |
|---|---|---|
| 28 | When a new medication is initiated, when there is a change in dosage, and after discontinuing a medication, documentation shows the individual is monitored for possible adverse drug reactions. (par. 102a) | SC |
| 29 | If an ADR occurs, the individual's reactions are reported in the Progress notes. (par. 102c) | SC |
| 30 | If an ADR occurs, documentation shows that orders/instructions are followed, and any untoward change in status is immediately reported to the practitioner /physician. (par. 102c) | SC |
| 31 | If the individual is subject to a medication variance, there is proper reporting of the variance (par. 102c) | SC |
| 32 | If a medication variance occurs, documentation shows that orders/instructions are followed, and any untoward change in status is immediately reported to the practitioner/physician. (par. 102c) | LO |
| 33 | Actual medication variances (Level 3 - 9) and potential medication variances (Level 1-2) are documented per the Medication Variance Policy. (par. 102c) | SC |
| 34 | Variance and potential variance data are reviewed monthly to aid in identifying systemic issues. (par. 102c) | SC |
| 35 | Corrective actions are planned to address any identified issues or predisposing factors. (par. 102c) | SC |
| 36 | Corrective action items are followed-up to closure. (par. 102c) | PC |

Comments:

1. Compliance was established previously.

2. The facility contracted with an off-site private pharmacy for medication dispensing and delivery to GRC. They had no access to the medical record at GRC and did not review labs, except for Clozaril, ensuring they received the required periodic CBCs for continuation of that medication. They checked allergies, significant side effect history, and drug interactions. They suggested alternate medications when there was a significant safety concern or if there were insurance concerns, such as high costs. They would recommend dosage adjustments when there was an order for a new medication prescribed at a high dosage, or if the dosage range were exceeded. The system of review did not allow for most labs to be sent to the contract pharmacy for review. The score is partial compliance due to this factor. Other areas of review were not demonstrated to be in place.

3. Compliance was established previously.

4. See table under #5 for dates of QDRRs. QDRRs were completed quarterly or in some instances more frequently for 7/7 individuals.

5. QDRR content was as follows:

| QDRR | Meds/doses listed | Lab review | Benzo use | Polypharmacy | New generation antipsychotic use | Anticholinergic burden SE score |
|---|---|---|---|---|---|---|
| Individual #5 10/19/23 | no | yes | Did not document if benzos were used or not. Prescribed Nayzilam prn | Stated therapeutic duplication for constipation medications | None, but document did not state this fact. As there were no medication listed, there was need to review | score 0 |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | medication list in a separate document | |
| Individual #5 1/19/24 | no | yes | Did not document if benzos were used or not. Prescribed Nayzilam prn | Stated therapeutic duplication for constipation medications | None, but the document did not state this fact. As there was no medication listed, there was need to review medication list in a separate document. | score of 2 |
| Individual #101 10/13/23 | yes | yes | Does not verify if benzos are used or not. No benzo on medication list provided. | Did not document whether there was polypharmacy. | prescribed Risperidone | Did not provide any information as to whether there was any ACB. |
| Individual #101 1/24/24 | no | yes | Did not document if benzos were used or not. | Documents no therapeutic duplications. | prescribed Risperidone | score of 0 |
| Individual #54 10/10/23 | yes | yes | None from medication list, but did not verify if benzos were used or not | Did not mention polypharmacy for constipation medications. | yes, clozapine | no score documented on QDRR; there was notation of 'Possible Side effects: see attachment' but this was not part of submitted QDRR |
| Individual #54 1/10/24 | no | yes | Did not document if benzos were used or not. | Documents polypharmacy for constipation medications. | Yes, clozapine | score 1 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Individual #102 10/4/23 | no | yes | Did not document if benzos were used or not. | Yes, for psychotropics | Yes, clozapine | score 0 |
| Individual #102 11/28/23 | yes | yes | None in medication list | Does not comment on polypharmacy | Yes, clozapine | score O but receives atropine drops |
| Individual #68 11/15/23 | no | yes | Did not document if benzos were used or not. | Yes, for psychotropics | Yes, Quetiapine, Olanzapine | Did not mention anticholinergic burden. |
| Individual #68 1/11/24 | yes | yes | Did not verify if benzos were used or not, none listed in medication list. | Does not document presence or not of polypharmacy. | Yes, Quetiapine and Olanzapine | score 0 |
| Individual #76 10/20/23 | no | yes | Benzo was prescribed but not reviewed for SE or long-term plan. | Yes, for psychotropic and constipation medications. | Yes, Ziprasidone | score 0 |
| Individual #76 1/19/24 | no | yes | Yes, documented use of benzo. | Yes, for psychotropic and constipation medications. | Yes, Ziprasidone | score 0 |
| Individual #73 11/7/23 | no | yes | Did not document if benzos were used. | Documented polypharmacy for hypertension, hyperlipidemia. | None | Not documented if ACB SE |
| Individual #73 12/28/23 | yes | yes | Benzo is listed (for seizures) but not reviewed for SE or long-term plan. | Polypharmacy for hypertension, heart failure, and hyperlipidemia, but did not document/confirm polypharmacy. | None | Score information for quarter not listed, listed several prior quarterly scores. |

The content of the QDRR varied depending on the clinical pharmacist. A standardized template was not used for all QDRRs. Some QDRRs did not list medications and doses at time of QDRR review, making it difficult to determine if benzodiazepine use

was present and the level of anticholinergic burden at the time the QDRR was completed. There was no succinct statement in all QDDRs if benzodiazepine use was present or not (the reader should not have to go back to a medication list to determine if a benzodiazepine was ordered; this information should be verified in a brief narrative entry), whether polypharmacy was present or not in all QDRRs, and there were no total anticholinergic burden rating for any QDRR. The anticholinergic burden score focused on current side effects that were potentially from medication with known anticholinergic side effects, and although important, did not allow for further medication adjustments based on level of anticholinergic burden. Additionally, if constipation was treated successfully with one or more medications, the anticholinergic side effect score may not have captured that the side effect was present. It was unclear if constipation or other treated side effects of anticholinergic side effects were not captured in the side effect score listed. For this section, none of the QDRRs had all the required components.

6. QDRR review by PCP and psychiatrist.

| QDRR | Medical director/PCP date of initials/signature | Within 28 days | Psychiatry date of initials/ signature | Within 28 days |
|---|---|---|---|---|
| Individual #5 10/19/23 | 10/4/23 (note predates QDRR) | yes | N/A not on psychotropics | no |
| Individual #5 1/19/24 | 2/7/24 | yes | 2/23/24 | no |
| Individual #101 10/13/23 | 10/17/23 | yes | No information to indicate review | no |
| Individual #101 1/24/24 | 2/8/24 | yes | 2/20/24 | yes |
| Individual #54 10/10/23 | 10/17/23 | yes | No information to indicate review | no |
| Individual #54 1/10/24 | 1/16/24 | yes | 1/17/24 | yes |
| Individual #102 10/4/23 | 9/12/23 (note predates QDRR) and 10/4/23 | yes | No information to indicate review | no |
| Individual #102 11/28/23 | 12/18/23 and 1/17/24 | yes | 1/17/24 | no |
| Individual #68 11/15/23 | 12/4/23 | yes | 12/6/23 | yes |
| Individual #68 1/11/24 | 1/17/24 | yes | 1/24/24 | yes |
| Individual #76 10/20/23 | 10/16/23 | yes | No information | no |
| Individual #76 1/19/24 | 2/8/24 | yes | 2/20/24 | no |
| Individual #73 11/7/23 | 11/2/23 (note predated QDRR) | yes | N/A not on psycho tropics | NA |

| Individual #73 12/28/23 | 1/11/24 | yes | N/A not on psychotropics | NA |
|---|---|---|---|---|

For 14 QDRRs, the PCP reviewed 14/14 documents within 28 days. For 10 QDRRs for individuals with psychotropic medication, the psychiatrist reviewed 4/10 (40%) of documents within 28 days. Individual #5 and Individual #73 were not prescribed antipsychotic medication.

7. For QDRR recommendations, PCP followed the recommendations or documented disagreement for: Individual #5, Individual #101, Individual #54, Individual #102, Individual #68, Individual #76, and Individual #73.

| Date of P&T | 9/13/23 | 10/11/23 | 11/8/23 | 12/13/23 | 1/17/24 | 2/14/24 |
|---|---|---|---|---|---|---|
| #individuals onsite | 71 | 71 | 62 | 65 | 62 | 59 |
| #individuals prescribed psychotropics | 67 | 67 | 57 | 60 | 57 | 50 |
| #individuals prescribed polypharmacy | 27 | 27 | 23 | 24 | 24 | 24 |
| # individuals prescribed psychotropic interclass polypharmacy | 17 | 17 | 19 | 16 | 19 | 17 |
| #individuals prescribed intraclass polypharmacy | 2 | 2 | 1 | 1 | 2 | 2 |
| # individuals prescribed three or more psychotropics | 27 | 26 | 23 | 24 | 24 | 22 |
| # individuals prescribed mixed class psychotropics | 4 | 17 | 7 | 8 | 3 | NR |
| # individuals prescribed first generation antipsychotics | 6 | 6 | 6 | 6 | 4 | 0 but later in document stated Individual#78 on Haldol |

8. The contract pharmacy provided evidence of review of new medications with focus on drug-drug interactions, side effects, allergies, adverse reactions, potential to use alternate medications/prior authorization/therapeutic duplication, and need to consider dose adjustments, with PCP contact if needed to clarify orders. The following were submitted as examples of completion of this process: Individual #5 new orders for Viokace, Cephalexin, Docusate, Metoclopramide, and Cholestyramine. The packet for Cholestyramine was initiated at 4:00 pm to minimize risk of absorption interaction with other medication, Individual #101 new order for Vit D, and Lisinopril, Individual #54 new order for Keflex, Individual #102 Desmopressin, Individual #68 Linzess, Motegrity. There was communication from the dispensing pharmacy with the PCP concerning date of stopping Linzess and starting Motegrity due to therapeutic duplication, Individual #76 Motegrity. There was communication from the dispensing pharmacy with the PCP concerning transition date from Linzess to Motegrity due to therapeutic duplication. Individual #73 new order for Gemfibrozil and Farxiga. There was pharmacy review of new medications for the above clinical areas for 7/7.

   Two orders generated communication between the pharmacy and PCP.
   - For Individual #68, in December 2023/January 2024, there was communication concerning orders for Linzess and Motegrity at the same time. The PCP indicated that Linzess would be discontinued when Motegrity arrived. The November 2023, December 2023 MAR, and January MAR listed administration of Linzess through the month, The December 2023 MAR indicated Motegrity was to start 1/9/24. This was initiated on 1/9/24 according to the January 2024 MAR. The February 2024 MAR documented administration for both Motegrity and Linzess. There were other medications to treat constipation as well and these were continued. The addition of Motegrity rather than replacement for Linzess appeared to be helpful with lack of need for prn medication. These two medications were indicated to treat his severe bowel hypomotility as further information was available after the pharmacy-PCP communication.
   - For Individual #76 in September 2023, there was communication concerning orders for Linzess and Motegrity at the same time. The PCP indicated to pharmacy that the Linzess would be discontinued once Motegrity arrived. Motegrity was ordered 10/6/23. From the November 2023 MAR, Motegrity was administered at least by 11/15/23. This individual required prn laxative suppositories on 11/18/23 and 11/24/23. Linzess had been prescribed at least since 7/24/23 and continued to be administered. Subsequently, the MAR of December 2023, January 2024, and February 2024 for Individual #76 documented both medications were given over those two months. The QDRR of 1/19/24 indicated therapeutic duplication of several constipation medications, including Linzess and Motegrity. These two medications were indicated to treat his severe bowel hypomotility as further information was available after the pharmacy-PCP communication.

9. P&T Committee meeting data
   - For individuals with a seizure disorder, information was not included in the P&T meeting concerning the number of individuals prescribed two or more neurological medications from same class or three or more neurological medications. This information was provided for psychiatric medication.

10. P&T attendance roster for meetings September 2023 through January 2024.

| Attendance | 9/13/23 | 10/11/23 | 11/8/23 | 12/13/23 | 1/17/24 | 2/14/24 |
|---|---|---|---|---|---|---|
| Medical director | X | X | X | X | X | X |
| ARNP | X | X | X | X | - | X |
| psychiatry | X | - | X | X | X | X |
| AON | X | X | X | X | X | X |
| Infection control nurse | X | X | X | - | - | - |
| DQM | X | - | X | X | X | X |
| Pharmacy director | X | X | X | X | X | - |
| Facility admin | X | X | X | X | X | X |
| QIDP | X | - | X | - | X | X |

- X indicates was an attendee at the meeting. The medical director attended each meeting. The pharmacy director attended 5/6. There did not appear to be a pharmacy designated alternate. Requirements for attendance included the medical director and pharmacy director or clinical pharmacist. Compliance was 5/6 (83%).

11. The process at GRC was provided by the ARNP. At each of the psychiatry consultations, the IDT was in attendance. Recommendations from that consult were agreed to by the IDT at that meeting.

12. See #9 above.

13. No DUEs submitted.

14. No DUEs submitted.

15. The P&T meeting minutes documented monitoring of individuals with dual purpose medications that were prescribed:

| | 9/13/23 | 10/11/23 | 11/8/23 | 12/13/23 | 1/17/24 | 2/14/24 |
|---|---|---|---|---|---|---|
| Individual #102 | Confirmed by Medical Director and ARNP | Medical Director determined only for psychotropic not neurology medications. | Uses Divalproex for psychiatric purposes only. | Prescribed Divalproex for psychiatric diagnosis only, removed from dual purpose list. | Remained on list for dual purpose medication use. | Remained on list |
| Individual #36 | Neurology follows | No additional information | No additional information | No additional information (Divalproex) | No additional information | No additional information |
| Individual #31 | No additional information | No additional information | Prescribed Divalproex | No additional information (Divalproex) | No additional information | No additional information |
| Individual #50 | Followed by neurology. Confirmed dual purpose by psychiatry and Medical Director. | No additional information | No additional information. | No additional information (Divalproex) | No additional information | Not listed at this meeting |

- For Individual #102, confirmed that prescribed medication was not dual purpose by 5/9/23 psychiatric consultation report, 8/16/23 psychiatric consultation report, 10/11/23 psychiatric consultation report, and 12/21/23 psychiatric consultation report, signed 2/14/24. It was unclear the reason for continuing to list this individual as having dual purpose medication when the psychiatrist repeated over several months this did not occur.
- For Individual #36, confirmed that prescribed medication (Divalproex) was dual purpose by 11/29/23 psychiatric consultation report.
- Individual #31 confirmed that prescribed medication (Divalproex) was dual purpose by 1/10/24 psychiatric consultation report.

17. There was one adverse drug reaction reported during the time period of this review. It occurred for Individual #73. There was prompt evaluation on 7/9/23, with transfer to the ED for further evaluation of the rash on 7/10/23. Treatment was prompt at GRC with oral and topical medication.

18. Clinical follow-up occurred until resolution of the drug reaction.

19. The drug reaction to Fluconazole was reviewed at the P&T committee meeting of 8/16/23. A listing of allergy to the medication was added to the face sheet on 7/18/23. According to the P&T committee minutes, it was added to AVATAR and the MAR. There was no information that the P&TC deliberated whether to report the ADR to MedWatch.

24. If the individual received pro re nata (PRN)/STAT medication or one time dose, documentation reflected adherence to GRC policy as to nurse assessment prior to, reason for and individual's response/effectiveness post administration.

26. Instructions were provided to the individual and staff regarding new orders or when orders change.

28. When a new medication was initiated, when there was a change in dosage, and after discontinuing a medication, documentation shows the individual was monitored for possible adverse drug reactions.

29. If an ADR occurred, the individual's reactions were reported in the progress notes.

30. If an ADR occurred, documentation showed that orders/instructions were followed, and any untoward change in status was immediately reported to the practitioner /physician.

31. If the individual was subject to a medication variance, there was proper reporting of the variance.

33. Actual medication variances (Level 3-9) and potential medication variances (Level 1-2) were documented per the MV Policy.

34. Variance and potential variance data were reviewed monthly to aid in identifying systemic issues.

35. Corrective actions were planned to address any identified issues or predisposing factors.

36. Corrective action items were not consistently followed-up to closure. The follow-up actions planned in response to two medication variances discovered on 11/20/23 for Individual #76. Follow-up with the involved nurse was due by 2/22/24 according to the Med Variance Tracking, but were highlighted as not completed. The same nurses' medication audit dated 1/3/24 was noted to score 100% for documentation compliance.

Provider Training: individualized medication observations

To enhance the chance of success and reduce the chance of transition distress for the residents living at GRC, an appropriate, detailed effort to train the caregivers that will soon be providing care to support them in different settings has yet to be put in place. Multiple individuals were noted as having very detailed specific medication administration plans that would require multiple opportunities to observe and demonstrate competency. During discussions with nurses while onsite, all of the seasoned nurses voiced that they were hoping to become more involved in training providers. It is recommended that nursing be diligent in identifying the individuals that would benefit from focused provider shadowing of nurses at medication administration, schedule it as soon as possible, and document all training completed to promote successful transitions.

**Section C.vii : Psychological Services (103-122)**

Summary:
The functional behavioral assessment was a component of the Comprehensive Psychological Assessment and included current clinical and behavioral data as well as graphs that displayed behavioral trends. The assessments also included a detailed summary of previous treatment and documented modifications that were made to behavioral programming. Behavioral functions were determined by a variety of indirect assessment methods, but resultant functional hypotheses were not supported by direct observations of behavior.

Behavior plans offered guidance for responding to maladaptive behaviors. As written, they did not include information about functionally equivalent alternatives to maladaptive behaviors. Behavior plans also did not describe prosocial behaviors and skills, and staff were not adequately supported to recognize, teach, or reinforce desired behaviors.

Behavioral health staff were credentialed and had the training and expertise to meet the behavioral needs of the individuals at GRC. Behavioral health staff included two master-level psychologists, three full-time BCBAs, and the Director.. The behavioral health team worked together to provide individualized services and supports to the residents of GRC. The behavioral health team was no longer responsible for developing behavioral reduction IIPs or replacement behavior and skill-development programs. After the previous (August of 2023) monitoring visit, the development of these programs became the responsibility of the Treatment Program Manager.

The Monitoring Team was able to find a policy or formal system outlining the expectations for data collection. Behavioral and skill-acquisition data were collected on each shift. Data were compiled monthly and annually by behavioral health staff. Data were not reviewed by other members of the IDT or the Quality Management team and were not used to identify trends and inform services and supports.

Training was an area that needed more focus and attention. Staff reported a lack of training to understand their roles and responsibilities. Training formats were not standardized, and staff were not developing consistent competencies. Program Implementation and Monitoring evaluated staff's ability to implement programs. While it was good to see that staff were provided immediate feedback and direction, it seemed that staff across shifts were not implementing plans and programs consistently and reliably.

| # | Indicator | Overall Score |
|---|---|---|
| 1 | GRC shall review its psychological assessment protocols to ensure they are consistent with current, generally accepted professional standards of care, and revise them as warranted. The assessment protocols shall:<br>i. Include protocols for a functional behavioral assessment to identify target behaviors and the function of each target behavior.<br>ii. Identify medical, psychiatric, environmental, diagnostic, or other reasons for target behaviors; and<br>iii. Identify other psychological and mental health needs that may require intervention, including history of trauma. | LO |

| | iv. (par. 58-64,103) | |
|---|---|---|
| 2 | GRC shall ensure that its suicide assessment protocol is consistent with current, generally accepted professional standards of care and shall revise it as needed. (par. 104) | N/A |
| 3 | staff members responsible for administering suicide assessments have training in assessing suicide risk for people with IDD and are demonstrably competent to assess such risk. (par. 104) | N/A |
| 4 | Within the later of 12 months from the Effective Date or one month from the resident's admission, and thereafter as often as needed, the State shall ensure that a GRC Behavioral Health Professional completes a psychological assessment of each GRC resident, which shall include a functional behavioral assessment for at least those residents with behavioral needs. (par. 58-64, 105, 122) | SC<br>100%<br>7/7 |
| 5 | The functional assessment is current (within the past 12 months). Those residents needing psychological services other than BSPs shall receive such services in a documented manner enabling progress to be measured in a reliable manner to determine the effectiveness of treatment. (par. 105,122_ | SC<br>100%<br>5/5 |
| 6 | The functional assessment is complete.<br>a. an acceptable direct assessment<br>b. an acceptable indirect assessment<br>c. identified antecedents of the target behaviors<br>d. identified consequences of the target behaviors<br>e. The findings are summarized based on the hypothesized antecedent and consequent conditions that affect the target behavior.<br>f. ensure individuals receive the needed counseling and other therapeutic interventions recommended from these assessments.<br>(par. 52,106,122) | NC<br>0%<br>0/7 |
| 7 | If the individual exhibits behaviors that constitute a risk to the health or safety of the individual/others, and/or engages in behaviors that impede his or her growth and development, the individual has a BSP. (par. 107) | NC<br>0%<br>0/7 |
| 8 | The individual has goals/objectives related to psychological/behavioral health services, such as regarding the reduction of problem behaviors, and an increase in replacement/alternative behaviors.<br>• The goals are measurable.<br>• The goals are based upon the assessment.<br>• Reliable data is available that supports/summarizes status/progress.<br>(par. 107) | NC<br>0%<br>0/7 |
| 9 | The individual is making expected progress. (par. 107) | NC |
| 10 | Progress/lack of progress is responded to appropriately. (par. 107) | NC<br>0%<br>0/7 |
| 11 | There was documentation that the BSP was implemented within 14 days of attaining all the necessary consents/approval. (par. 61,107) | NC<br>0%<br>0/5 |

| | | |
|---|---|---|
| 12 | The BSP was current (within the past 12 months). (par. 59,107) | SC<br>100%<br>5/5 |
| 13 | The BSP was complete.<br>i. acceptable operational definitions of target behaviors<br>ii. acceptable operational definitions of replacement behaviors<br>iii. the use of positive reinforcement in a manner that is likely to be effective.<br>iv. antecedent strategies for weakening undesired behaviors.<br>v. consequent strategies for weakening undesired behaviors.<br>vi. the training/reinforcement of replacement behaviors<br>vii. sufficient opportunities for replacement behaviors to occur/be trained.<br>viii. If the replacement behaviors require the acquisition of new skills, they are in a skill acquisition plan format.<br>ix. the replacement behaviors should be functional, when possible<br>x. treatment objectives clear, precise, interventions based on the results of the functional assessment.<br>(par. 58,107) | NC |
| 14 | Each resident with behavioral health needs as determined by the assessment process set forth in Paragraphs 103-106 shall be assigned a Behavioral Health Professional whose caseload and expertise are sufficient to meet the resident's behavioral health needs. Any resident with severe behavioral health needs that present risk to health and safety shall be assigned a Behavioral Health Professional who is a Board-Certified Behavior Analyst. (par. 108) | LO |
| 15 | Caseloads and assigned BH progressions will be commensurate with the variety of needs of the residents on their caseload. (par. 109) | LO |
| 16 | GRC shall retain enough Behavioral Health Professionals who are Board Certified Behavioral Analysts to meet the behavioral health needs of GRC's residents. (par. 68,110) | LO |
| 17 | GRC shall provide residents requiring a BSP with individualized services and comprehensive programs. (par 68,111) | NC |
| 18 | GRC shall employ a qualified Director of Psychology who is responsible for maintaining a consistent level of psychological care throughout the GRC, (par. 68,112) | LO |
| 19 | GRC shall conduct reliable reviews to assess the quality of behavioral assessments and BSPs of each Behavioral Health Professional at least semi-annually. (par. 113) | NC |
| 20 | GRC will have a policy in place outlining the acquisition and analysis of data as it relates to the individual's behavior support plans. (par. 114) | |
| 21 | The individual's progress towards behavioral goals is documented in a way that demonstrates the frequency and variability of behavioral incidents, as well as the effectiveness of treatment. (par. 114,115) | NC |
| 22 | Behavioral Graphs are:<br>i. Simple and easy to interpret.<br>ii. Graphed at intervals that best demonstrate response to treatment.<br>iii. Include phase change lines, with axes labeled appropriately.<br>(par. 114,115) | NC |

| | | |
|---|---|---|
| 23 | There is evidence that the IDT met to review the individual's behavioral data, and that the data was used to make appropriate treatment decisions. (par. 114,115) | NC |
| 24 | If the individual has been presented in peer review, there is evidence of documentation of follow-up and/or implementation of recommendations made in peer review. (par. 114,115) | NC |
| 25 | If the individual has a BSP, the data collection system adequately measures his/her target behaviors across all treatment sites. (par. 115) | NC |
| 26 | If the individual has a BSP, the data collection system adequately measures his/her replacement behaviors across all treatment sites. (par. 115) | NC |
| 27 | If the individual has a BSP, there are established acceptable measures of:<br>a. data collection timeliness<br>b. IOA<br>c. treatment integrity.<br>(par. 115) | NC |
| 28 | If the individual has a BSP, there are established goal frequencies (how often it is measured) and levels (how high it should be) of:<br>a. data collection timeliness<br>b. IOA<br>c. treatment integrity.<br>(par. 115) | NC |
| 29 | If the individual has a BSP, goal frequencies and levels are achieved of<br>a. data collection timeliness<br>b. IOA<br>c. treatment integrity.<br>(par. 115) | NC |
| 30 | If the Individual has a BSP, it is written so that it can be easily understood and implemented by Direct Care Staff. (par. 116) | SC |
| 31 | BSPs are consistently implemented by staff. Any significant deviations in implementation are immediately reported to the assigned Behavioral Health Professional or psychology assistant, and to the GRC administration so that appropriate action can be taken. (par. 117) | NC |
| 32 | All Behavioral Health Professionals and psychology assistants shall successfully complete annual competency-based training in providing trauma-informed behavioral services to individuals who have IDD and challenging behaviors. (par. 118) | SC |
| 33 | Staff monitoring the implementation of behavioral programming has been deemed competent to implement programming and shall be monitored by Behavioral Health Professionals. (par. 119) | NC |
| 34 | All direct contact staff and their supervisors shall successfully complete competency-based training on severe behavioral needs, the co-occurrence of mental health needs and IDD, and the principles of applied behavioral analysis at least annually. (par. 120) | NC |
| 35 | GRC has a monitoring schedule developed that ensures ongoing review of BSP implementation. (par. 121) | NC |
| 36 | GRC's Psychology Department shall routinely collect, analyze, and act on valid and reliable data sufficient to ensure that the use of restrictive procedures at GRC is consistent with current, generally accepted professional standards and implemented in an appropriate manner. (par. 125) | NC |
| Comments: | | |

1. The Comprehensive Psychological Assessment (CPA) was required to include a functional behavioral assessment that identified what motivated and maintained the individual's challenging behaviors. CPAs were also required to include information about medical, psychiatric, environmental, diagnostic, and other reasons for target behaviors, as well as supports that were trauma-informed and addressed the individual's psychological and mental health needs. CPAs at GRC remained in compliance with these requirements.
2. Suicide assessments were not reviewed during the Monitoring Team visit. The seven individuals in the review group did not exhibit suicidal ideation that necessitated assessment or support.

3. Suicide assessments were not reviewed during the Monitoring visit. The seven individuals in the review group did not exhibit suicidal ideation that necessitated assessment or support.

4. For all seven individuals in the review group, Comprehensive Psychological Assessments (CPAs) had been updated within the past 12 months. For Individual #73, the assessment lacked required components as per policy, including information about his strengths, communication abilities and history. For those requiring behavioral supports, CPAs included a functional behavioral assessment component that identified antecedents, consequences, and other factors motivating and maintaining behavior of concern.

5. The Comprehensive Psychological Assessment included a functional behavioral assessment component that described what motivated and maintained the individual's behaviors and included data that summarized and displayed behavioral progress and trends. The CPA also included detailed summaries of previous treatment. This indicator was not applicable to Individual #5 and Individual #73 who did not exhibit challenging behaviors that warranted behavioral supports. The indicator was met for the other five individuals. The individuals in the review group did not require specialized behavioral supports beyond what existing behavioral and psychiatric supports were provided.

6. Functional hypotheses were generally derived from indirect assessment tools, such as the Contextual Assessment Inventory, the Questions About Behavioral Function, the Aberrant Behavior Checklist, and the Functional Assessment Interview. Although multiple tools were used to assess behavioral functions, the tools were indirect assessment methods that were typically completed by one staff member who answered assessment questions based on their knowledge of incidents and historical information. Assessments were not based on in vivo observations of the individual's behavior in the natural environment.

   The Settlement Agreement requires that functional hypotheses be derived from direct and indirect assessment methods. For all individuals in the review group, direct observations were not being documented and functional hypotheses were, therefore, not supported by direct observations of behavior. During the Monitoring visit, the Director of Psychology explained that direct observations were occurring although they were not being documented accordingly. The Director later submitted a copy of a recently updated CPA, for an individual who was not in the review group, which documented the use of direct observation for one of three functional assessment tools used. The Monitoring Team accepted the updated assessment as evidence of GRC's plan to include direct observations in the assessment of behavioral functions in the future. In general, CPAs did identify antecedents and consequences that were hypothesized to provoke or maintain target behaviors. The

assessments also identified behavioral functions. The assessments did not recommend counseling and other therapeutic interventions, though it was not evident that the individuals in the review group required interventions beyond what their current behavioral and psychiatric programming provided.

7. Five of the seven individuals in the review group engaged in behaviors that either posed a risk to their health and safety or impeded their growth and development. Each of the five individuals had a BSP that targeted maladaptive behaviors. For some individuals, challenging behaviors identified in their Comprehensive Functional Assessments were not included in BSPs and it was not clear that the information about these behaviors would be communicated to community providers upon transition. For example:
   - According to Individual #5's Comprehensive Functional Assessment, she engaged in aggressive behaviors that included grabbing, pinching, hitting, kicking, pushing, and scratching. She also engaged in inappropriate touching of others. She did not have a BSP, and it was not clear that the behaviors had been considered for inclusion in her transition plan.
   - Individual #54's Comprehensive Functional Assessment identified food stealing and excessive water consumption as areas of need. The behaviors were not included in her BSP, and it was not clear that the behaviors were included in historical information that would transition with her to the community.
   - Individual #76 engaged in aggression. According one incident report, he slapped a Treatment Program Manager (TPM) in the face, back, shoulder, arm, and back of the head, and spit in her face 25 times within a 1.5-hour period. During his ISP meeting, the Monitoring Team witnessed Individual #76 hitting and slapping the TPM approximately 20 times within a 30-minute period. When asked about the behavior, IDT members reported that it was playful in nature, but this was not clearly evident to the observer. This was concerning because the individual was scheduled to transition to the Woodward Resource Center where new and unfamiliar staff would likely not discriminate between aggression that was included in his behavior plan and "playful" aggression that was not included in his behavior plan. Given the likelihood that playful aggression could potentially lead to restrictive consequences, behavioral support and guidance were necessary to ensure staff responded appropriately to the behavior.
   - According to Individual #101's Comprehensive Functional Assessment, she engaged in self-stimulatory or repetitive behavior that interfered with functions of daily living. Self-stimulatory behavior was not included in her BSP.
   - Individual #102 engaged in excessive levels of spitting. The behavior posed a significant risk to others. Spitting was targeted for decrease in his BSP; however, interventions did not provide guidance about how to respond to the behavior. Spitting had historically been included as a topography of aggression. During the current ISP year, it was decided that spitting would be tracked independently. The BSP was not updated to reflect the change and did not include strategies to address the behavior.

8. Goals related to the reduction of problem behaviors were generally included in BSPs and were based on the Comprehensive Psychological Assessment. But as written, goals were not measurable because they did not include performance criteria or quantifiable measures to monitor progress. For example:
   - Individual #102 will engage in fewer episodes of aggression.
   - Individual #102 will engage in fewer episodes of property destruction.
   - Individual #102 will engage in fewer episodes of touching self.
   - Individual #102 will engage in fewer episodes of spitting.

- Individual #76 will engage in fewer instances of taking items.
- Individual #76 will engage in fewer episodes of self-injurious behavior.
- For Individual #68, behavioral goals targeted anxiety, auditory hallucinations and visual hallucinations that were beyond his control and not subject to behavioral supports or intervention.

Although the requirement for BSPs to identify and outline the use of replacement behaviors was discussed during previous monitoring visits, BSPs continued to lack this information and guidance about replacement behaviors or how these behaviors were taught or reinforced. Replacement behaviors taught through Individual Implementation Programs (IIPs) were not directly linked to problem behaviors that were targeted for reduction and were, therefore, not functionally equivalent. For some individuals, the performance criterion was not clear or measurable and it was not clear how staff were to teach the correct response. For example:

- Individual #54 will increase social skills (respond with an acceptable answer).
- When Individual #68 is feeling anxious, he will communicate his desires and problem solve on how to relax.
- Individual #76 will tell staff his wants/needs as an alternative to using inappropriate social skills and disruptive behavior.
- Individual #102 will redirect and deescalate following agitation.

Regarding reliability of data, GRC still had not implemented a system to assess reliability. Therefore, reliable data were not used to support or summarize individual progress.

9. Partial interval recording measures were generally used to determine behavioral levels from month to month. The Monitoring Team had previously recommended that GRC develop a system for assessing data reliability. This system was not in place during the current review. Reliability of data, therefore, remained questionable and individual progress towards goal achievement could not be confirmed. And moreover, although the data were not reliable, it indicated that individuals were not making progress towards achievement of behavioral objectives. Regarding behaviors targeted for decrease, data generally held steady above baseline, while other data showed increasing trends.

10. Data were not reliable and did not accurately display individual progress over time (see indicator #9). It was not evident that IDTs consistently responded to an individual's documented lack of progress in a timely and appropriate manner. For example:
    - Individual #101 exhibited aggression at levels that were well above baseline for seven consecutive months before the IDT discussed a plan for the nurse to assess the individual's g-tube that was believed to be causing discomfort and leading the individual to engage in aggression towards nursing staff. According to the MIR notes, the IDT was waiting for Individual #101 to adjust to the g-tube and anticipated that her behavioral levels would return to baseline. Although there was a gradual decrease in the level of aggression, it was not evident that she was offered additional nursing or habilitative supports to address the problem. It was also not evident that she was offered additional behavioral supports to address her response to the unwanted attention she received during g-tube feedings and maintenance.

- Individual #68 experienced a drastic increase in the levels of aggression and symptoms of anxiety over a four-month period. His behavioral data and lack of progress were shared with the IDT at MIR meetings. However, the IDT had not discussed a plan to address the behaviors.
- For Individual #76, levels of aggression steadily increased over a four-month period. He had been identified for transition to the Woodward Resource Center (WRC) and the IDT speculated that he was experiencing increased anxiety that was related to the move. His trends for property destruction and disruptive behaviors were also increasing. The IDT had not discussed the increasing trends or the need for additional supports to promote a successful transition.
- For Individual #76, the MIRs documented the BCBA's plan to complete a functional behavioral assessment and assess his environment for antecedents and other motivators of his behavior that was increasing from month to month. The same statement was documented in MIR notes from the October, November, December, and January meetings. As of the week of the onsite review, this had not been done. When asked by the Monitoring Team for a status update on the plan to complete the assessment, the BCBA said they planned to complete this prior to his transition to WRC. He was scheduled to transition the following month.
- Individual #102 was engaging in high levels of aggression, spitting, SIB, and property destruction. The trends for the behaviors were increasing. According to the MIR meeting notes for January 2024, the BCBA had planned to assess the functions of his behaviors. During the week of the onsite review, the BCBA said that they would complete the assessment in the next month. Individual #102 was scheduled to transition to WRC within the next month.

11. Behavior plans were required to be implemented within 14 days of Human Rights Committee review and after prior approval of the Peer Review Committee. Behavior plans were based on the results of the CPA, which means they were developed after the CPA. This provision of the Settlement Agreement was not applicable to Individual #5 and Individual #73 who did not exhibit behavioral challenges that warranted behavioral supports. Two individuals had behavior plans that were developed and implemented in accordance with required timelines. For three individuals, behavior plans were not developed and implemented as required. Findings included:
    - Individual #5: She did not exhibit challenging behaviors that warranted a behavior plan.
    - Individual #54: The behavior plan was developed before the psychological assessment was completed.
    - Individual #68: The behavior plan was developed and implemented according to required timelines.
    - Individual #73: He did not exhibit challenging behaviors that warranted a behavior plan.
    - Individual #76: The behavior plan was not implemented within 14 days of HRC approval.
    - Individual 101: The behavior plan was developed before the psychological assessment was completed.
    - Individual #102: The behavior plan was developed and implemented according to required timelines.
    - Individual #79: The behavior plan was implemented two months prior to HRC approval.

12. For the five individuals who engaged in behaviors requiring behavior plans, all behavior plans were current.

13. While behavior plans used objective, clear, and concise language that could be easily understood by direct support staff, they did not provide comprehensive guidance to help staff understand what motivated and maintained problem behaviors or how teaching functionally equivalent replacement behaviors could impact the behaviors of concern. Behavior plans included information about precursor behaviors, maladaptive behaviors, and antecedent and consequent strategies. Replacement

behaviors were outlined in IIPs. Replacement behaviors were not directly linked to problem behaviors, and it was not clear how replacement strategies worked to address behaviors of concern. For example:

- Individual #68 engaged in aggression that was motivated by his desire to escape aversive situations. The corresponding replacement behavior strategy taught him to communicate, and problem solve his feelings of anxiety and desire to relax. It was not clear what he was expected to do. It was also unlikely that the strategy would teach him to use prosocial behaviors to escape.
- Individual #76 engaged in aggression, SIB, and property destruction. The behaviors were maintained by multiple functions. There was an IIP to teach him to express his wants and needs. It was not clear what he was expected to do or how expressing his wants and needs would impact the behaviors of concern. Replacement behavior strategies were not directly linked to his maladaptive behaviors and IIP strategies did not include guidance for staff to support him to learn alternative prosocial behaviors.
- Individual #101 engaged in aggression that was motivated by her desire to escape aversive situations. According to staff report, the replacement behavior IIP taught her to focus on the present moment. The IIP was not identified as a behavioral goal and it was not linked to her behavior plan. It was also not clear how teaching her to focus on the present moment would impact her behavior.

Behavior plans generally included positive reinforcement strategies that were not individualized or person-centered and did not reflect the individual's personal preferences. Suggestions for positive reinforcement were vague and not linked to behavioral functions. Guidance to staff about how and when to provide positive reinforcement was not clear. Examples included:

- Individual #54: Provide verbal praise for requesting alternative activities.
- Individual #68: Provide verbal praise and positive interaction from staff.
- Individual #76: Provide verbal praise for completing tasks and resisting an opportunity to engage in taking items. Provide enthusiastic praise whenever he completes tasks and provide descriptive praise for behaviors that you want to see more of. Provide descriptive praise when he completes tasks without the display of target behaviors or precursors.
- Individual #102: Always give praise, compliments, and fist bumps for behaviors that you want to see more of.

Behavior plans that were developed for individuals who were identified for community transition were more thorough and informative. The plans were written by a BCBA after visiting the prospective residential site and determining the specific supports that would be needed after transition. The plans were comprehensive and easy to understand. But even so, they did not include replacement behavior strategies. The Monitoring Team reviewed seven transition BSPs (some of the plans were for individuals who were not in the review group and had already moved into the community). There was no standardized format used to develop the plans because they did not include the same information. Some plans included a description of historical behaviors the individual used to engage in, which offered more insight into the individual's history and prepared the prospective provider for the possibility that baseline behaviors might increase after transition. Some behavior plans included a crisis intervention plan. GRC was not working to standardize the behavior plan format to ensure providers received consistent information about the individuals and that all behavior plans contained the type and level of information needed to ensure successful community transitions, rather it was noted that GRC had been intentionally formatting each plan to mimic the format used by the respective agency to ensure that the provider staff has better familiarity with the format,

which, in turn, allows the agency and its staff more effective implementation and a higher level of care. The concern is that the information provided to the consumer was then limited to providers assessment and not effective of all the information available within the current GRC assessment.

17. GRC provided residents with individualized services and programs. Programs, however, did not fully address behavioral needs. Individuals were generally not making progress towards behavioral goals and objectives. It was not evident that disciplines were collaborating to identify barriers and develop appropriate supports to overcome them. Replacement behavior programs were not function-based and did not teach skills that addressed behaviors of concern (see comments for indicators #8 and #13).

19. GRC had not established a process for assessing interrater agreement for behavior and skill-acquisition programs. While it was good to see evidence of IDT discussions of data and behavior/skill acquisition progress, for individuals who were not making progress, IDTs were not discussing the need to revise programs and supports to promote goal achievement.

20. The Monitoring Team was still unable to find evidence of a policy outlining the acquisition and analysis of behavioral data.

21. Data and graphs were maintained within an electronic database and could be easily accessed by members of the individual's IDT. Data and graphs displayed the individual's progress and variability of behavioral incidents. Graphs did not display treatment effects. This could be captured by comparing graphs to the individual's Comprehensive Psychological Assessment that offered a cumulative history and timeline of interventions and supports. Graphs, in conjunction with the CPA, permitted ongoing clinical review of progress and the effectiveness of treatment. Graphs alone did not demonstrate treatment effects.

22. Behavioral graphs were simple, easy to interpret and displayed performance frequency, variability, and progress. Graphs did not highlight phase changes or the impact of interventions and modifications to behavioral supports. This information could be determined by comparing graphs to the timeline of supports included in the individual's Comprehensive Psychological Assessment.

23. Monthly Integrated Review (MIR) meetings were a forum for discussion about all aspects of the individual's treatment and supports. While it was good to see that behavioral data were shared across disciplines at MIR meetings, meeting minutes did not reflect a discussion about the individual's performance or progress. Minutes also did not reflect collaboration between disciplines to ensure supports were integrated and unmet support needs were addressed. For example:
    - Individual #76 had a history of meal refusals and weight fluctuations. He was followed by the nursing team for constipation and by the SLP for meal intake and weight monitoring. It was not evident that the two disciplines worked collaboratively along with the behavioral team to identify his needs and address the reason for his meal refusals.
    - Individual #101 had exhibited higher levels of aggression after her g-tube was placed. The IDT speculated that the aggression was due to unwanted attention she was receiving during medication administrations and g-tube maintenance because the behavior was generally directed towards the nursing staff during those periods. The IDT predicted that the behavioral levels would begin to decline as she adjusted to the g-tube. The behaviors continued for seven months. Individual #101 was also not making progress towards her goal of facilitating medication administration by lifting her

shirt to expose the g-tube. While January's MIR meeting minutes documented the nurse's plan to assess Individual #101 during the medication administration period to determine the source of the problem, February's MIR meeting minutes did not include evidence of follow-up. The minutes included the same prediction that the behavioral levels would decline as she adjusted to the g-tube. There did not appear to be any collaboration between nursing and behavioral health to identify the barrier and develop a plan to address it.

- Individual #102 was exhibiting high levels of spitting. According this the MIR notes from October's meeting, the BCBA planned to conduct a curriculum assessment to identify deficits in communication and socialization and develop corresponding goals to address the deficits. It was not clear that collaboration with the SLP or other disciplines had occurred. There was also a plan to conduct an FBA to determine the setting events, antecedents, and consequences maintaining the behavior. The Monitoring Team was unable to find evidence that these action steps had been completed. The Ongoing Assessment of Behavioral Management Need section of the MIR where the BCBA's plan was documented had not been updated in November, December, or January. For the months of October, December, and January, this section contained the same wording and data.
- ISP meetings were another forum for discussion and decision making regarding an individual's programming and supports at GRC. During the review week, the Monitoring Team observed an ISP meeting for Individual #76. During the meeting, each staff member in attendance spoke about the supports the individual was receiving at GRC with respect to the discipline they represented. Individual #76 had been identified for transition to the WRC the following month. The BCBA responsible for his transition planning did not attend the meeting and the upcoming transition was not discussed. It was also not evident that the disciplines had worked collaboratively to develop appropriate goals and supports to promote a successful transition.

24. Peer Review Committee (PRC) meetings took place after the development of the behavior plan and annually thereafter. PRC meetings were a forum for discussion about the overall quality of behavioral programming and supports and an opportunity to ensure plans aligned with GRC policies. The behavioral health team met to review assessments and plans and make recommendations to ensure they were effective and aligned with GRC policies and procedures. It was good to see evidence that behavioral health professionals reviewed plans and made recommendations to improve the quality of the plans. Action, however, was not taken to incorporate the recommendations into a plan or that follow-up had occurred. For example:
    - During a PRC meeting held on 10/25/23, the IDT discussed Individual #54's food stealing behavior that was identified as a barrier to her transition to the community. It was decided that data would be collected to determine the frequency of food stealing. The Monitoring Team was unable to find evidence that food stealing had been incorporated into her behavior plan or that food stealing episodes were being documented.

25. Behavioral and skill-acquisition data were recorded during each shift. Data were collected across settings; however, data did not indicate the individual's location when behavioral incidents or skill training occurred. Daily schedules varied for each individual and day/work attendance was not always consistent. Some individuals chose to remain at home on some days and not others. The individual's location when behavioral incidents occurred was an important environmental factor that informed the behavior plan as well as replacement behavior and skill-acquisition programming.

26. See #25 above.

27. These indicators were unmet because the GRC had not developed a system or process for assessing interobserver agreement or data reliability. As written, behavioral goals were not measurable and performance criteria were not quantified (see indicator #8). Behavioral goals did not include expectations for frequency or level and were, therefore, unachievable. Without reliability measures in place, it was not possible to confirm the accuracy of data or progress made towards goal achievement. Treatment integrity was assessed using Program Monitoring and Implementation (PIM) forms. During PIM sessions, a staff implemented a program and an independent observer provided feedback once the session was complete. The PIM process was an opportunity to ensure programs were being run as expected. At GRC, however, the form used to document PIM sessions was not comprehensive or individualized and did not effectively demonstrate staff competency (see indicator #31). The PIM process was not a reliability measure.

28. See #27 above.

29. See #27 above. Without proper reliability and fidelity measures in place, individuals were at risk for inconsistent and potentially improper interventions and responses to their behaviors. It was also likely that providers assuming responsibility for the individual after transition from GRC were not properly trained to respond to challenging behaviors.

31. The Program Implementation and Monitoring (PIM) remained the same across Monitoring reviews. PIM forms were used to assess staff knowledge and ability to implement behavior plans and skill-acquisition plans. PIM forms were not individualized, or competency based. They did not identify specific skills for staff to describe or demonstrate. It was not clear if the evaluator had completed the PIM form after interviewing the staff or observing the staff firsthand. If the staff did not accurately describe or demonstrate their knowledge of a particular section of the behavior plan, then the evaluator used the comments section of the PIM form to document the type of retraining provided. If there were significant deviations in implementation of an individual's behavior plan or skill acquisition program, the PIM form did not identify what specific skills or knowledge the staff was lacking. It was also not clear that deviations in implementation were reported to the assigned psychologist, BCBA, or administrator.

33. Training requirements remained the same across Monitoring reviews. All staff were required to complete Applied Behavior Analysis training in addition to a two-day training on the following topics:
    - Building healthy relationships.
    - Healthy communication.
    - Healthy conflict resolution.
    - Trauma-informed services.
    - Positive Behavioral Supports.
    - Intervention and restraint during emotionally escalated situations.

It was not evident that staff had received specialized training to understand the specific support needs of each individual. Findings included:

- When asked about training they had been provided to understand their roles and responsibilities, multiple staff commented about the lack of formal training and guidance and said that they had learned to complete their job duties by consulting and observing colleagues.
- Regarding behavior reduction and skill training programs, psychologists and BCBAs were no longer responsible for writing IIPs after a mandate was issued assigning the responsibility to Treatment Program Managers (TPMs). It was not evident that TPMs had received proper training and support to develop behavioral programs and guide staff to respond to behavioral episodes. It was also not evident that TPMs had received proper training and support to develop replacement behavior strategies. Without proper training for staff, individuals were at risk for inappropriate behavioral and skill-development supports.
- It was not evident that staff had been fully trained to interpret behavioral data. For Individual #76, the trends of his challenging behaviors had increased for several months. According to a staff who was interviewed, his behavior was stable and at low levels.

34. See #33 above.

35. The IIP monitoring protocol required Program Implementation Monitoring (PIM) to be completed monthly for each individual. Based upon documents that were submitted, GRC was not in compliance with this requirement because monitoring occurred once every two months.

36. Restrictive interventions were included in individual behavior plans. Restrictions were also included in Monthly Integrated Review (MIR) minutes, however, there was no evidence of a robust discussion or analysis of the procedures. During the review week, the Monitoring Team encountered several instances of restrictions being faded or discontinued when data and the individual's level of risk indicated the need for the restriction. Staff reported that the Department of Justice had issued a mandate that levels of supervision be lowered and that individuals transition towards general supervision (15-minute checks) despite high-risk behaviors that were well above baseline. It was not clear which mandate staff were referring to as DOJ has not issued a "mandate" to lower levels of supervision. The mandate in this case, which arises from the Consent Decree and not from DOJ, was to protect individuals from "unnecessary use of restrictive interventions," and ensure that restrictive interventions "are used only when needed. The supervision levels for nine individuals were changed during the meeting. The Monitoring Team requested a copy of the guidelines that were referenced in the PRC minutes. GRC did not produce the requested information.
    - Individual #102 engaged in high intensity/high frequency aggression. He had been assigned 1:1 supervision due to peer-to-peer aggression. Although the levels of aggression remained high and the trend was increasing, the IDT decided that during the hours of 9 am and 10 am, the level of supervision should be lowered to 10-minute visual checks. According to the PRC meeting minutes, Individual #102's peers were at work/day programming during that period. The Monitoring Team interviewed multiple staff who indicated the contrary and reported that Individual #102's housemates were typically home during the hours of 9 am to 10 am. Due to concerns about the safety of Individual #102's housemates during a time when staff were less able to intervene, the Monitoring Team alerted GRC administrators.

## Section D Restrictive Interventions (123-127)

Summary:
Overall, there was little change from the previous review (August 2023). There was no significant regression and limited improvement from previous issues. That is, restrictive interventions were not always consistent with current, generally accepted professional standards of care. While it was good to see that IDT disciplines were present to share and receive information, it was not evident that the disciplines discussed ways to ensure that the least intrusive, yet most effective restrictions were in place to protect the individuals, their peers, and their staff.

| # | Indicator | Over all Score |
|---|---|---|
| 1 | GRC shall provide residents with a safe and humane environment and ensure they are protected from harm, including the unnecessary use of restrictive interventions, consistent with current, generally accepted professional standards of care. (par. 123) | NC |
| 2 | All residents' restrictive interventions and alternative positive interventions shall be discussed at the monthly integrated reviews, to ensure that: a plan to implement the alternative interventions is being implemented, and to update or revise the plan to implement the alternative interventions as warranted. (par. 124) | NC |
| 3 | GRC's Psychology Department shall routinely collect, analyze, and act on valid and reliable data sufficient to ensure that the use of restrictive procedures at GRC is consistent with current, generally accepted professional standards and implemented in an appropriate manner. (par. 125) (par. 126) | NC |
| 4 | GRC's quality management system shall include processes to ensure that the use of restrictive procedures at GRC is consistent with current, generally accepted professional standards and implemented in an appropriate manner. The State shall ensure that the Psychology Department shares restrictive intervention data with GRC's Quality Management program, and that the data is valid, analyzed, and utilized for GRC's quality improvement, pursuant to the processes set forth in Section IV.K | SC |
| 5 | Whenever problems are identified under the processes set forth in Paragraphs 125-126, GRC shall develop and implement plans to remediate the problems. (par. 127) | SC |

Comments:

1. Restrictive interventions were not always consistent with current, generally accepted professional standards of care. For several individuals, some restrictions had been faded or discontinued despite the individual's level of risk. During the onsite week, the Monitoring Team found evidence of prematurely faded levels of supervision for a number of individuals whose challenging behaviors presented a substantial risk and need for increased monitoring. This was the result of changes made to the GRC supervision guidelines and guidance from the Human Rights Committee. The Monitoring Team was unable to find evidence of a thorough IDT discussion about the risks and benefits of increased supervision or less intrusive options that would still provide the level of protection needed.

2. Restrictive interventions were discussed during Monthly Integrated Review (MIR) meetings where IDT disciplines shared information and data about various aspects of the individual's programming and treatment. While it was good to see that IDT disciplines were present to share and receive information, it was not evident that the disciplines discussed ways to ensure that the least intrusive, yet most effective restrictions were in place to protect the individuals, their peers, and their staff. For example, several individuals were assigned 1:1 supervision status. Due to a change in the GRC supervision guidelines, IDTs

worked quickly to lower the levels of supervision even when an individual's levels of challenging and dangerous behaviors remained high and warranted the restriction for safety purposes. IDTs did not discuss supervision options or a planful way to gradually fade the levels of supervision to what was needed to protect the individual and others.

3. Reliability checks were not occurring for any of the individuals at the GRC and it was, therefore, not possible to confirm that the behavioral and skill-acquisition data were valid and accurate. This was also true for data regarding restrictive interventions. Restrictive interventions were discussed at HRC and MIR meetings, however, it was not clear that the IDT members who attended those meetings thoroughly discussed the risks and benefits of the restrictions and how to fade a restriction to a level that was least intrusive and most effective (see above).

4. GRC's quality management system included processes to ensure that the use of restrictive procedures at GRC was consistent with current, generally accepted professional standards and implemented in an appropriate manner.

5. Whenever problems were identified under the processes set forth in Paragraphs 125-126, GRC developed and implemented plans to remediate the problems.

| Section D.i Restraints (128-143) | | |
|---|---|---|
| Summary:<br>Overall, there was little change from the previous review (August 2023). That is, there was no significant regression and limited improvement from previous issues. This review looked at three of the four restraints. Two included unauthorized techniques or application. There were issues with nurse checks post-restraint for all three (two not within 30 minutes and one not checking vitals). Restraint forms did not have a data entry item for Level of Supervision so 1:1 requirement could not be validated. DCPs and a Restraint monitor were interviewed, were aware of restraint requirements, and were able to verbalize the correct way to do things. The Restraint Observer (monitor) was especially knowledgeable of restraint policies and procedures. | | |
| # | Indicator | Overall Score |
| 1 | GRC's restraint policies identify restraints that may be used and the criteria for their use and shall categorize permitted restraints by level of restriction. (par. 128) | LO |
| 2 | The resident posed an immediate and serious risk of harm to him- or herself or others. (par. 129) | SC |
| 3 | The restraint was the least restrictive intervention necessary. (par. 129) | PC<br>2/3<br>67% |
| 4 | The restraint was used as a last resort and after a graduated range of less restrictive measures were exhausted or considered in a clinically justifiable manner. (par. 129) | PC<br>2/3<br>67% |
| 5 | The restraint was applied in the least restrictive form and duration of restraint necessary and appropriate for the circumstances. (par. 129) | NC<br>1/3<br>33% |
| 6 | The restraint was applied in accordance with applicable written policies, procedures, and plans governing restraint use. (par. 129) | NC<br>0/3<br>0% |
| 7 | The restraint was not used for punishment, for convenience of staff, or in the absence of, or as an alternative to, treatment. (par. 130) | NC<br>0/3<br>0% |
| 8 | Prone restraint was not used. (par. 131) | LO |
| 9 | The restraint was terminated as soon as the resident was no longer a danger to him/herself or others. (par. 132) | SC<br>3/3<br>100% |
| 10 | The restraint was not prohibited by the individual's medical orders or ISP. (par. 133) | SC<br>3/3<br>100% |

| | | |
|---|---|---|
| 11 | If a medical restraint (for routine medical or dental care) the ISP included treatments or strategies to minimize or eliminate the need for restraint. (par. 133) | NA |
| 12 | Within 30 minutes after initiation of restraint, a physician, physician's assistant, nurse practitioner, or a Registered Nurse with training in application and assessment of restraint, conducted and documented a face-to-face examination of the resident, including a check for restraint-related injury. (par. 134) | NC<br>0/3<br>0% |
| 13 | Staff (who meet criteria) checked the resident as soon as possible but, in exceptional circumstances where restraints exceed 15 minutes, no later than 15 minutes from the start of the restraint, to review the application and consequence of restraint. (par. 135) | NC<br>1/3<br>33% |
| 14 | A registered nurse shall monitor and document vital signs and mental status of a resident in restraints at least every 30 minutes from the start of the restraint, and at the restraint's conclusion, (except for medical restraint pursuant to a physician's order. In each instance of a medical restraint, the physician shall specify the schedule and type of monitoring required). (par. 136) | NC<br>0/3<br>0% |
| 15 | Every resident in physical or medical mechanical restraint shall receive opportunities to exercise restrained limbs, to eat as near mealtimes as possible, to drink fluids, and to use a toilet or bed pan, consistent with generally accepted professional standards of care; and shall be under continuous one-to-one supervision. (par. 137) | NC<br>0/3<br>0% |
| 16 | Mechanical restraints were not used (other than as prescribed for necessary medical care). (par. 138) | NA |
| 17 | The restraint was documented consistent with generally accepted professional standards of care. (par. 139) | NC<br>0/3<br>0% |
| 18 | If there were three instances of restraint in 30 days (or an increasing trend in restraint data over the course of three months), the IDT examined and refined behavioral programming using data-based decision-making. (par. 140) | NA |
| 19 | GRC staff responsible for applying restraints have successfully completed competency-based training on applicable BSPs and safety plans; approved verbal intervention and redirection techniques; approved restraint techniques; and adequate supervision of any resident in restraint. (par. 141) | LO |
| 20 | GRC Behavioral Health Professionals shall be involved in the selection of any crisis management system used by GRC. All Behavioral Health Professionals at GRC shall have a high degree of expertise with the crisis management system. Training shall be conducted by certified trainers. (par. 142) | LO |
| 21 | The IDT reviewed the resident's BSP and ensured that it contained the objectively defined behavior that leads to use of the restraint and alternative, positive adaptive behaviors to be taught to the resident to replace the behavior that initiates the use of restraint, as well as other programs, where possible, to reduce or eliminate the use of such restraint. (par. 143) | SC |

Comments:

1. GRC's restraint policies identified restraints that may be used, the criteria for their use and categorized permitted restraints by level of restriction.

2. The restraints did not pose an immediate and serious risk of harm.

3. Two of three restraints were the least restrictive intervention necessary.
   - For Individual #87, the facility review determined this was an unauthorized restraint.

4. Two of three restraints were used as a last resort and after a graduated range of less restrictive measures were not exhausted or considered in a clinically justifiable manner.
    - For Individual #87, the facility review determined this was an unauthorized restraint.

5. One of three restraints were consistently applied in the least restrictive form and duration of restraint necessary and appropriate for the circumstances.
    - For Individual #2, staff action was determined by facility review to have been an inappropriate technique.
    - For Individual #87, the facility determined this was an unauthorized restraint.

6. The restraint was not applied in accordance with applicable written policies, procedures, and plans governing restraint use.
    - For Individual #2, the three-day debriefing report noted the technique used by the staff was not a type of hold authorized by MANDT. Additionally, there was no data entry on the Restraint Documentation and Initial Debriefing Report (RDIDR) for the query were restraints applied according to GRC Policy/Procedure/ Training.
    - For Individual #87, it was determined in review to be an unauthorized restraint and incident referred to QM dept for investigation.
    - For Individual #104, there was no data entry on the Restraint Documentation and Initial Debriefing Report (RDIDR) for the query were restraints applied according to GRC Policy/Procedure/ Training.

7. Zero of three restraint appeared to be used for punishment, for convenience of staff, or in the absence of, or as an alternative to, treatment.
    - For Individual #2, it could not be ruled out that the technique was being implemented for the convenience of staff, or in absence of, or as an alternative to, treatment. Additionally, there was no data entry on the Restraint Documentation and Initial Debriefing Report (RDIDR) for the query were restraints applied according to GRC Policy/Procedure/ Training. There was insufficient documentation to validate this Indicator.
    - Individual #87 had an unauthorized restraint with the technique likely being implemented for the convenience of staff, or in absence of, or as an alternative to, treatment.
    - For Individual #104, there was no data entry on the Restraint Documentation and Initial Debriefing Report (RDIDR) for the query were restraints applied according to GRC Policy/Procedure/ Training.

8. Prone restraint was not used at GRC.

9. Three of three restraints were terminated as soon as the resident was no longer a danger to him/herself or others.

10. Three of three restraints were not prohibited by the individual’s medical orders or ISP.

12. For zero of three individuals, within 30 minutes after initiation of restraint, a physician, physician's assistant, nurse practitioner, or a Registered Nurse with training in application and assessment of restraint, conducted and documented a face-to-face examination of the resident, including a check for restraint-related injury.

- For Individual #2, Nurse check was noted at +28 minutes. BP & Resp were noted as NA. There was no further explanation in any of the restraint review documents, such as something like being unable to check BP, individual uncooperative, will try again in 15 minutes.
- For Individual #87, a restraint was initiated at 1:05 pm, with a nursing check at 2:00 pm, which was not within 30 minutes.
- For Individual #104, a restraint was initiated at 4:53 pm, with a nurse check at 5:40 pm, which was not within 30 minutes.

13. One of three staff (who meet criteria) checked the resident as soon as possible, but in exceptional circumstances where restraints exceed 15 minutes, no later than 15 minutes from the start of the restraint, to review the application and consequence of restraint.
    - For Individual #2, the restraint observer was noted as the same staff who applied the restraint. This was not an acceptable practice.
    - For Individual #87, the restraint observer check was at +16 minutes.

14. On zero of three occurrences, a registered nurse monitored and documented vital signs and mental status of a resident in restraints at least every 30 minutes from the start of the restraint, and at the restraint's conclusion.
    - For Individual #2, a Nurse check was at +28 minutes post restraint with BP & Respiratory noted as N/A. There was no further explanation in any of the restraint review documents,
    - For Individual #87, a restraint was initiated at 1:06 pm, with a nursing check at 2:00 pm, which was not within 30 minutes.
    - For Individual #104, a restraint was initiated at 4:53 pm, with a nurse check at 5:40 pm, which was not within 30 minutes.

15. Zero of three residents in physical or medical mechanical restraint received opportunities to exercise restrained limbs, to eat as near mealtimes as possible, to drink fluids, and to use a toilet or bed pan, consistent with generally accepted professional standards of care; and shall be under continuous one-to-one supervision. There were no data on restraint forms or other documentation that noted or validated Level of Supervision while the Individual was in restraint. There was no documentation presented that addressed the Level of Supervision requirement.

17. Zero of three restraints were documented consistent with generally accepted professional standards of care. See indicators 12-15 above.

20. The IDT reviewed the resident's BSP and ensured that it contained the objectively defined behavior that leads to use of the restraint and alternative, positive adaptive behaviors to be taught to the resident to replace the behavior that initiates the use of restraint, as well as other programs, where possible, to reduce or eliminate the use of such restraint.

| **Section D.ii: Seclusion (144-149)** | | |
|---|---|---|
| Summary:<br>This Section was found previously to be in substantial compliance and has exited. GRC did not use the practice of seclusion. | | |
| # | Indicator | Overall Score |
| 1 | GRC shall eliminate, to the extent practicable, the use of seclusion. (par. 144) | LO |
| 2 | If seclusion was used,<br>• the resident posed an immediate and serious risk of harm to him/herself or others.<br>• only as a last resort and after a graduated range of less restrictive measures has been exhausted or considered in a clinically justifiable manner.<br>• only for reasons other than as punishment, for convenience of staff, or in the absence of or as an alternative to treatment; and only in accordance with applicable written policies, procedures, and plans governing seclusion.<br>(par. 145) | LO |
| 3 | Seclusion had a recommendation by the resident's assigned Behavioral Health Professional and was included in the resident's BSP, following a thorough assessment reliably identifying the causes and functions of, and precursors to, the behaviors leading to seclusion and a documented exhaustion of less restrictive interventions. Seclusion shall not be implemented for any resident without approval by the Human Rights Committee. (par. 146) | LO |
| 4 | The resident<br>• had a BSP, developed by the resident's Behavioral Health Professional and implemented by the resident's IDT, identifying the specific criteria for use and discontinuation of seclusion.<br>• Such a plan shall set forth specific steps to be taken by the resident's IDT and Behavioral Health Professional to address the behaviors that led to the resident's seclusion and to minimize and ultimately eliminate its use.<br>• Use of seclusion, and the corresponding behavioral interventions, shall be subject to the processes described in Paragraph 140<br>(par. 147) | LO |
| 5 | • Seclusion was not implemented until the resident's IDT, GRC's Human Rights Committee, and guardian approved the use of the seclusion following a thorough discussion of seclusion's likely consequences.<br>• Within seven days of the initiation of use of seclusion for a GRC resident, HHS Central Office shall review the use of seclusion and ensure that sufficient protections are in place.<br>• Seclusion shall not be approved in a resident's BSP for a period of more than 30 days at a time without reapproval by the resident's Behavioral Health Professional, the Director of Psychology, the resident's IDT, GRC's Human Rights Committee, the resident's guardian, and HHS Central Office.<br>(par. 148) | LO |
| 6 | No resident experiencing seclusion shall be denied access to typical items that a resident at GRC has access to, absent a well-defined treatment reason and approval from the resident's Behavioral Health Professional, guardian, and IDT; the Director of Psychology; and | LO |

| | | |
|---|---|---|
| | GRC's Human Rights Committee. If a resident is denied access to such items, GRC shall ensure that the resident's BSP provides a plan to return access and that such a plan is implemented. (par. 149) | |
| Comments:<br>This Section was found previously to be in substantial compliance and has exited due to all indicators within the section being found to be in substantial compliance for two reviews. GRC did not use the practice of seclusion. | | |

| **Section D.iii: Other Restrictive Interventions (150-154)** | | |
|---|---|---|
| Summary:<br>No inappropriate restrictive techniques were identified for the three individuals in the restraint review group. There may be issues related to this subject matter (other restrictive interventions) noted by the Monitoring Team in other sections of this report | | |
| # | Indicator | Overall Score |
| 1 | GRC shall ensure that other restrictive interventions are.<br>• used only as needed,<br>• in conjunction with positive behavioral interventions that address functionally equivalent replacement behaviors, and<br>• after a range of less restrictive measures have been exhausted.<br>• GRC shall ensure that any restrictive interventions are used only consistent with current, generally accepted professional standards of care. (par. 150) | SC |
| 2 | In the event of an imminent safety risk, brief restrictive interventions may be used for up to 15 minutes and may continue for up to 12 hours with the advance approval of the Administrator on Duty. (par. 151) | SC |
| 3 | Unless there is an imminent safety risk, no restrictive intervention shall be implemented until required actions are completed. (par. 152) | SC |
| 4 | After three instances of a restrictive intervention of a resident in 30 days (or an increasing trend in restrictive intervention data over the course of three months of a resident), the IDT shall examine and refine the resident's behavioral programming as set forth in Paragraph 140. (par. 153) | NA |
| 5 | Restrictive interventions shall not be approved in a resident's BSP for a period of more than 90 days at a time without reapproval by the resident's Behavioral Health Professional, the Director of Psychology, the resident's IDT, GRC's Human Rights Committee, and the resident's guardian. (par. 154) | SC |
| Comments:<br>1. No other restrictive interventions were identified by the Monitoring Team, however, the Monitoring Team reviewed four specific restraints involving three individuals.<br>2. In the event of an imminent safety risk, brief restrictive interventions used for up to 15 minutes and continuing for up to 12 hours had advance approval of the Administrator on Duty.<br>3. No other restrictive interventions were identified by the Monitoring Team.<br>4. There were no instances of three restrictive interventions being provided within 30 days.<br>5. Based on the document review, restrictive interventions were not approved in an individual's BSP for a period of more than 90 days at a time without reapproval by the resident's Behavioral Health Professional, the Director of Psychology, the resident's IDT, GRC's Human Rights Committee, and the resident's guardian. | | |

| Section E: Engagement and Skill Acquisition (155-163) | | |
|---|---|---|
| Summary:<br>Comprehensive Psychological Assessments (CPAs) were thorough and included required components. General CPAs focused on support the individual was already receiving at GRC, while Transition CPAs were supposed to support individuals who were identified for community transition. Even so, supports that were implemented were not always informed by the habilitative disciplines and it was not evident that IDTs worked collaboratively to integrate services and supports individuals received.<br><br>IIPs were in place for all individuals in the review group. Some IIPs taught meaningful and functional skills that were reflective of the individual's preferences. In general, progress could not be confirmed because IIP data were not shown to be reliable.<br><br>Staffing levels had stabilized and returned to appropriate levels since the previous Monitoring visit. While it was good to see that active treatment was still being assessed and monitored, engagement was still a challenge and none of the individuals in the review group were accessing the community for leisure activities or skill training.<br><br>It was still not evident that assessment results and data had been shared with the GRC Quality Management team, or that data were used to assist the Quality Management team to identify trends. For individuals who exhibited behaviors that were barriers to community transition, IDTs had not developed plans or strategies to minimize or overcome the barriers and there was no evidence of a formal community integration plan to minimize and/or overcome behavioral barriers. Training was an area that still needed attention as it was not evident that staff were developing a comprehensive set of competencies. | | |
| # | Indicator | Overall Score |
| 1 | An individual receives assessments in time for the annual ISP, or when based on change of healthcare status, as appropriate, an assessment is completed in accordance with the individual's needs. (par. 155) | PC<br>43%<br>3/7 |
| 2 | Individual receives a quality assessment including the following components:<br>i. Discussion of pertinent history<br>ii. Preferences and strengths<br>iii. Pertinent health risks<br>iv. Discussion of medications<br>v. Functional description<br>vi. Use and rationale for supportive equipment.<br>vii. Comparative analysis to previous assessments<br>viii. Effectiveness of supports.<br>ix. Recommendations for services<br>(par. 156) | SC |
| 3 | There is evidence that the measurable strategies and action plans included in the ISPs/ISPAs related to Hab supports are implemented. (par. 156) | NC |

| | | |
|---|---|---|
| 4 | Assistive/adaptive equipment identified in the individual's PNMP is clean. (par. 156) | LO |
| 5 | Assistive/adaptive equipment identified in the individual's PNMP is in proper working condition. (par. 156) | LO |
| 6 | Assistive/adaptive equipment identified in the individual's PNMP appears to be the proper fit for the individual. (par. 156) | LO |
| 7 | The individual has skill acquisition plans. (par. 157,159) | LO |
| 8 | The SAPs are measurable. (par. 157,159) | LO |
| 9 | The individual's SAPs were based on assessment results. (par. 157,159) | PC |
| 10 | SAPs are practical, functional, and meaningful. (par. 157,159) | PC |
| 11 | Reliable and valid data are available that report/summarize the individual's status and progress. (par. 157,161) | NC |
| 12 | The individual is progressing on his/her SAP. (par. 159) | NC |
| 13 | If the goal/objective was met, a new or updated goal/objective was introduced. (par. 159) | N/A |
| 14 | If the individual was not making progress, actions were taken. (par. 159) | NC |
| 15 | The individual is meaningfully engaged in residential and treatment sites (par. 157) | PC |
| 16 | The facility regularly measures engagement in all the individual's treatment sites. (par. 157) | SC |
| 17 | The day and treatment sites of the individual have goal engagement level scores. (par. 157) | NC |
| 18 | The facility's goal levels of engagement in the individual's day and treatment sites are achieved. (par. 157) | N/A |
| 19 | For the individual, goal frequencies of community recreational activities are (a) established and (b) achieved. (par. 157) | NC |
| 20 | For the individual, goal frequencies of SAP training in the community are (a) established and (b) achieved. (par. 157) | NC |
| 21 | GRC shall conduct annual assessments, with quarterly reviews, of residents' preferences, strengths, skills, needs, and barriers to community integration, in the areas of living, working, and engaging in leisure activities. For residents with behavioral barriers to community integration, the resident's Behavioral Health Professional shall assist with developing a Community Integration Plan to minimize the existence of behavioral barriers. (par. 158) | NC |
| 22 | GRC shall use the information gained from the assessment and review process to develop, integrate, and revise programs of training, education, and skill acquisition to address each resident's needs. (par. 159) | NC |
| 23 | The State shall ensure that all GRC direct care staff have successfully completed competency-based training on the implementation of the habilitation programs, including training, education, and skill acquisition programs, of the residents they work with, annually and every time a new habilitation program is implemented. (par. 160) | NC |

| | | |
|---|---|---|
| 24 | GRC's quality management system shall include processes to ensure that the habilitation, training, education, and skill acquisition programs provided to GRC residents are consistent with current, generally accepted professional standards and implemented in an appropriate manner. (par. 162) | NC |
| 25 | Whenever problems are identified under the processes set forth in Paragraphs 161-162, GRC shall develop and implement plans to remediate the problems. (par. 163) | NC |

Comments:

1. For the individuals in the review group, discipline assessments were required to be developed and submitted within 10 days prior to the ISP meeting allowing enough time to be reviewed and incorporated into the ISP. Regarding psychological and behavioral services, this portion of the indicator was met by three of the individuals in the review group. For the other four individuals, relevant assessments had not been submitted on time. Findings included:
   - Individual #54: The Comprehensive Psychological Assessment was completed after the ISP meeting.
   - Individual #68: The Comprehensive Psychological Assessment was completed on the day of the ISP meeting.
   - Individual #101: The Comprehensive Psychological Assessment was completed the day before the ISP meeting.
   - Individual #102: The Comprehensive Psychological Assessment was completed on the day of the ISP meeting.

2. As noted during the previous monitoring review, Comprehensive Psychological Assessments (CPAs) included diagnostic information, behavioral histories, and information about what motivated and maintained an individual's behaviors. CPAs were thorough and included required components. CPAs were either general or transition focused. General assessments were developed by the psychologist and outlined the individual's immediate needs at GRC. Transition assessments were developed by the BCBA and included the same information found in the general assessment with the addition of recommendations for community supports.

3. In general, there did not appear to be collaborative activities to ensure habilitative support needs were incorporated into skill-acquisition programming. Treatment Program Managers were responsible for developing IIPs and for the most part, they developed these programs with minimal support from other disciplines. Findings included:
   - Individual #73 had been assessed by the SLP who determined that he was not a candidate for AAC due to cognitive and physical limitations. Individual #73 had an IIP to use a communication button to request a head rub. According to staff who were interviewed and based on Monitoring Team observations, Individual #73 was not utilizing the device. Staff provided unsolicited head rubs throughout the day. Individual #73 did not have his device with him during one observation conducted at the day program. During a visit to the home, the device was found in his bedroom while he was located in another area of the home. The SLP recommended that he be taught to express his preference between two items to increase his expressive communication skills. The recommendation was not developed.
   - Individual #73 had an IIP to teach him to hold a washcloth. According to the OT assessment, he was unable to complete formal testing to assess his functional grasp and grip. It was not evident that the TPM had consulted the OT prior to developing the IIP for holding the washcloth or that the OT had been involved in developing a plan to improve his functional grasp.
   - For Individual #101, the SLP recommended visual supports and a communication board to increase her expressive communication abilities. The recommendations were not developed into skill-acquisition programs.

- On a positive note, Individual #5 used a Go-Talk device to participate in conversations with others. It was positive to see that the TPM had worked closely with the SLP to develop the program.

9. Regarding skill acquisition, IIPs were required to teach functional and meaningful skills and promote growth, development, and independence. IIPs were also required to incorporate assessment results. GRC achieved partial compliance for this indicator because criterion was met for some individuals and not others. For example:
   - The indicator was met for Individual #5 whose IIPs for brushing her hair, using her AAC device to communicate with others, and choosing her outfits taught skills that were functional, practical, and based on habilitative assessments as well as preferences identified in her ISP.
   - The indicator was not met for Individual #54 who was able to read and write, and enjoyed coffee, music/musicals, and community outings that included shopping, bowling, and eating at restaurants. She was described as outspoken and was able to advocate for herself. Her IIPs taught her to place her clothing protector in the laundry container, brush her gums, identify a coping skill, and visit peers in another home. The IIPs did not appear to be based on her preferences or reflect her strengths and skills.

10. See #9 above.

11. As was noted during the previous Monitoring visit, GRC had not developed a system to ensure data were valid and reliable. GRC also had not developed a process for assessing interrater agreement of an individual's performance during teaching trials.

12. Regarding replacement behaviors and skill-acquisition programs, progress could not be confirmed, because data were not reliable. Replacement behavior and skill-acquisition data documented the percentage of time the individual engaged in the task or activity at the designated prompt level. Data did not highlight aspects of the teaching program where the individual was making progress or regressing. Data also did not indicate if the individual was developing the skill.

13. This indicator was not met because data were not reliable and did not accurately demonstrate the individual's progress towards achievement of skill-acquisition objectives.

14. This indicator was not met because data were not reliable and did not accurately demonstrate the individual's progress towards achievement of skill-acquisition objectives. Despite the lack of reliable data, documentation indicated that the individuals were not making progress towards their goals. When an individual was not making progress, it was not evident that the IDT took appropriate action. For example:
   - Individual #68 refused to sleep in his bed. He preferred to sleep in a recliner in the common area of the home. The behavior was identified as a barrier to his community transition and the IDT developed a goal to support him to sleep in his bed. According to staff report, Individual #68 not only refused to sleep in his bed. He was generally fearful of spending time in his room and would become visibly distraught if prompted or supported to go to his room. The goal to support him to sleep in his bed was discontinued once he was identified for community transition and the prospective provider said he would be allowed to sleep in the common area of the home if he preferred to do so. Although this

resolved part of the problem, it did not address the cause of his distress when entering his bedroom. It was not evident that the IDT had worked to support him to overcome his fear and develop appropriate self-regulation and coping skills.

- Individual #76 was not making progress towards his toothbrushing goal. According to MIR minutes, after three months, the IDT decided to lower the performance criteria instead of assessing the barrier and supporting him to overcome it.
- Individual #101 had an IIP to teach her to lift her shirt to expose her g-tube during medication administration. According to the data, she was not making progress and her performance remained below baseline for five consecutive months. According to MIR notes, the IDT planned to consult the nurse to explore issues with the g-tube and what could be hindering the individual's progress. The Monitoring Team was unable to find evidence of follow-up or collaboration between disciplines to address the barrier.

15. The Monitoring Team visited Building #102 on several occasions to assess the levels of engagement and activities individuals were involved in. Building #102 continued to offer a wide array of options for meaningful engagement, learning, and skill-development. Findings included:
    - During one visit, two individuals (not in the review group) who required 1:1 supervision were the video gaming room with their respective staff. The staff were playing a video game together, while one individual sat in a chair and the other individual was searching through an open cabinet. Neither individual appeared to be interested or involved in the game.
    - During one visit, six individuals were in the arts/crafts room with four staff. Four of the individuals were actively engaged in a painting activity. Another individual sat watching a television show he appeared to enjoy. When approached, the individual indicated his preference to be left alone.
    - During one visit, six individuals were in the arts/crafts room. While staff were present, it was not clear that the individuals were actively engaged in a structured or meaningful activity.

    Regarding individuals in the review group, findings included:
    - Individual 73: During one visit to the day program, he was engaged in a craft activity with staff. During a visit to his home, he was being assisted with ADLs in preparation for dinner.
    - Individual #76: During one visit to his home, he was in his bedroom. He was lying in his bed, but it was not clear if he was asleep. His assigned 1:1 staff was with him. The Monitoring Team was also able to observe him during his ISP meeting where he was interactive and engaged with staff and actively participated in the discussion.
    - Individual #101: During a visit to the home, she was being assisted to a recliner. She was later assisted to her wheelchair and propelled herself to the kitchen area to wait for dinner.

16. Active Treatment Observation forms were still in use at GRC to assess the levels and types of activities individuals were engaged in. Active treatment was assessed on a weekly basis by various staff who documented the date, location, number of individuals present, and the activity individuals were engaged in. The form listed expectations for engagement and staff support, along with a place for the observer to respond positively or negatively indicating whether or not the expectations were met. Active treatment assessments were a standard practice at GRC.

17. It was still not evident that GRC had established goal levels for engagement or that active treatment evaluators had been trained to recognize and respond to low levels of engagement and active treatment.

18. See #17 above.

19. Skill-acquisition programs and recreational activities were not community-based and did not offer opportunities for individuals to develop skills needed to live and work successfully in the community. Programs also did not teach skills to prepare individuals to transition to the community. None of the IIPs for the seven individuals in the review group required or facilitated community access or integration.

20. See #19 above.

21. Strengths and deficits in the areas of self-help, domestics, eating, hygiene, communication, and social skills were reviewed annually ISP meetings. It was not evident, however, that IDTs engaged in robust discussions about an individual's barriers to community transition.

    For individuals who exhibited behaviors that were barriers to community transition, IDTs did not develop plans or strategies to minimize or overcome those barriers (see comments for indicator #14), and it was not evident that IDTs were reviewing and discussing formal community integration plans to minimize and/or overcome behavioral barriers as required by the Settlement Agreement. Transition CPAs and Transition BSPs that were developed to address the needs of individuals identified for community transition defined challenging behaviors and described consequent strategies in the same way general assessments and plans did. But the transition assessments and plans addressed the specific behavioral challenges that hindered community transition. For example:
    - Individual #68 refused to sleep in his bed. This behavior was identified as a barrier to his community transition. The behavior was not addressed and the goal to support him to sleep in his bed was subsequently discontinued (see comments for indicator #14).
    - Individual #102 engaged in aggression and spitting behaviors that were barriers to his community transition. His referrals to community providers had been denied due to his behavioral support needs. Spitting was not included in his behavior plan and the IDT had not developed strategies to address it.
    - See comments under Section C.vii indicator #23 for additional information.

22. Habilitative supports were in place, though they did not always include recommendations for skill-development or training. The indicator was met for Individual #5 whose communication assessment recommended that she utilize her AAC device to increase her ability to communicate. Although the assessment recommendation was vague and did not identify specific target skills, an IIP was developed to teach her to use a Go-Talk device. The indicator was not met for other individuals because assessment recommendations did not support or promote skill development. For example:
    - Individual #54: The communication assessment recommended that distractions be limited, one-step directions be provided, and that staff redirect her to an appropriate activity if she made statements that were untrue. The assessment recommendations provided guidance to staff and did not identify target skills for the individual.

- Individual #76: The communication assessment recommended supports and guidance for staff that promoted positive interactions. The recommendations did not support him to improve his functional communication skills. The OT assessment listed assistive/adaptive equipment and supports that were already in place.

Vocational recommendations did not promote the development of vocational skills or support individuals to develop skills needed for meaningful employment. For example:

- Individual #76: The vocational assessment recommended that he continue working at paper recycling and focus on attendance and work behavior. The assessment also described the types of supports he was already receiving at GRC. Day/recreation assessments were not person-centered and included the same recommendations across individuals. The recommendations were as follows:
  - Provide (individual) multiple opportunities within each month for structured therapeutic recreational programs.
  - Expand (individual's) recreational interest by offering a wider variety of activities within the community.
  - Work with staff to identify (individual's) recreational interests and enhance ways to support these interests.

23. It was not evident that staff had received specialized training to understand the specific support needs of an individual. When asked about training they had been provided to understand their roles and responsibilities, multiple staff commented about the lack of formal training and guidance and said that they had learned to complete their job duties by consulting and observing colleagues. It was not evident that training was standardized and that trainees had received support to develop a comprehensive set of competencies.

24. While there were processes in place to review and analyze the delivery of habilitation, training, education, and skill acquisition supports (see indicator #16 regarding Active Treatment Observations and section c-vii-indicator #31 regarding Program Implementation Monitoring), it was not evident that the results of data and findings were further reviewed and analyzed by the GRC Quality Management team. The Monitoring Team was also unable to find evidence that the GRC Quality Management team had established a system for review and analysis of behavioral and skill-acquisition data and trends.

25. See #24 above.

| Section F: Record Keeping (164-166) | | |
|---|---|---|
| Summary:<br>Records were not consistently updated when a change in event occurred or when a medical or behavioral plan of care was implemented. SAPs were often not clearly documented within the record or based upon meaningful data. | | |
| # | Indicator | Overall Score |
| 1 | GRC will maintain complete and accurate records. (par. 164) | PC |
| 2 | GRC shall ensure pertinent information about assessment, treatment, and diagnosis, including information justifying decisions not to treat or diagnose, is accurately and timely documented within the resident's integrated electronic health record. (par. 165) | PC |
| 3 | GRC shall maintain and produce records in a manner that clearly demonstrates:<br>a. The time and date when a particular record or entry was created or entered.<br>b. The identity and job title of the person creating or entering the record or entry.<br>c. The time and date to which the record or entry pertains.<br>d. Whether the record or entry was created or entered timely according to State policy; and<br>e. If a record or entry is subsequently changed:<br>-The time and date the change is made.<br>- The identity and job title of the person making the change.<br>-The reason for the change.<br>-The nature of the change; and<br>-A version of the record or entry as it existed before it was changed.<br>(par. 166) | LO |
| Comments:<br>1. ISPs, MIRs, and transition plans were inconsistent in the amount and quality of information they included. Multiple assessments were not signed and/or dated. Other areas that were lacking in clearly documenting clinical findings, assessments, or plans of care included nursing, psychiatry, and medicine.<br><br>The annual and quarterly nursing assessments did not meet standards as the primary documentation entitled Nursing Report was missing components. This was also noted with psychiatry and psychology-based assessments and plans.<br><br>2. See indicator 1 above. | | |

| **Section G. Incident Management (167-176)** | | |
|---|---|---|
| Summary:<br>State statute provided a two-hour window to report ANE. The Facility should consider a one-hour window, either by advocating for a change in statute or a legal opinion stating they can be more restrictive via policy. One hour is common throughout the country. Client protection can be compromised the more time lapse there was between an event occurring and when it is reported.<br><br>Documentation of client protection measures for Type 1 investigations appeared in several places in the investigation report. Having these in one entry would provide improved clarity. For example, for the specific data item Immediate protections implemented, the entry was almost always nurse/supervisor notified, which is not a client protection measure. Actual client protection measures (e.g., date/time of medical assessment, immediate actions taken with alleged perpetrators) are separate entries in the report.<br><br>The Facility is to be commended for identifying instances of events that should have been reported for ANE investigation and were not. However, there were too many (11 over the last two reviews). Most of this failure to report was by administrative and professional staff. Most, if not all, cases were that adminstrative/professional staff observed something, or heard about something, that should have been reported for investigation and was not. The consequences for the staff who failed to report did not appear to be sufficient to serve as a deterrent.<br><br>ANE Reporting Posters: the newer version of the poster was an improvement, particularly for anyone knowing how to access and use the QR code. However, they were not eye-catching and were likely viewed as just one more thing on a bulletin board. There was too much information on the poster, and it was not easy to determine what should be done, and which of these numbers should be called. They were likely not of much use to individuals, family members, guardians, and busy staff.<br><br>The Facility described a set of activities that were purported to represent an injury audit process. This was not sufficient as is. This needs to be more clearly defined, labeled, and documented as the Facility's Injury Audit Process, and supported with a policy.<br><br>Investigation content was, for the most part, very good, especially the narrative documenting interviews.<br><br>Timeliness of investigation completion (7 of 10, 70%) was much improved from that noted in the last review (2 of 10, 20%).<br><br>As noted in the last review, the Incident Review Committee included detailed discussion of each incident on the agenda. It was well attended with good participation by those in attendance.<br><br>Tracking and trending reports required by the Settlement Agreement were not provided. | | |
| # | Indicator | Overall Score |

| | | |
|---|---|---|
| 1 | GRC shall implement and maintain policies, procedures and practices that include a commitment that GRC shall Not tolerate abuse or Neglect of Individuals and that staff are required to report abuse or Neglect of Individuals. (par. 167) | NC |
| 2 | GRC policy Includes all the components of 168 a-j. (par. 168) | SC |
| 3 | GRC policy Includes all the Components of 169 a-k. (par. 169) | SC |
| 4 | For deaths, abuse, Neglect, and Exploitation: report was made to the Superintendent (or that official's designee) and such other officials and agencies as warranted, consistent with Iowa law. (par. 168a) | LO |
| 5 | For serious injuries and other serious Incidents, a report should be made to the Superintendent (or that official's designee). Staff shall report these and all other Unusual Incidents, using standardized reporting. (par. 168b) | LO |
| 6 | After the allegation or injury, the Center took immediate and appropriate action to protect the residents involved, including removing alleged perpetrators, if any, from direct contact with residents. (par. 168b) | PC<br>7/10<br>70% |
| 7 | Staff received competency-based training on recognizing and reporting potential signs and symptoms of abuse, neglect, and exploitation. (par. 168c) | LO |
| 8 | All staff persons who are mandatory reporters of abuse or neglect shall sign a statement that shall be kept at Glenwood evidencing their recognition of their reporting obligations. (par. 168d) | LO |
| 9 | Glenwood shall take appropriate personnel action in response to any mandatory reporter's failure to report abuse or neglect. (par 168d) | NC |
| 10 | The facility had taken steps to educate the Individual and primary correspondent (e.g., guardian) with respect to abuse/Neglect identifications and reporting.<br>1. Material provided to Individual and PC.<br>2. ISP review and discussion occurred.<br>3. 3. Individual's responses during Interview<br>4 Poster present in living area<br>(par, 168e, 168f) | NC |
| 11 | GRC had mechanisms for residents, visitors, and other persons to report anonymously allegations of abuse, neglect, exploitation, other possible violations of residents' rights, or other unusual incidents. (par. 168g) | SC |
| 12 | GRC had procedures for referring, as appropriate, allegations of abuse and/or Neglect to law enforcement. (par. 168h) | LO |
| 13 | If the Individual, any staff member, family member, or visitor was subject to or expressed concerns regarding retaliation, the facility took appropriate administrative action. (par. 168i) | NA |
| 14 | The facility conducted audit activity to ensure that all significant injuries for this Individual were reported for Investigation. (par. 168j) | NC |
| 15 | The Investigation was conducted by a qualified investigator. (par. 169a) | SC<br>100%<br>10/10 |
| 16 | Facility staff cooperated with the Investigation. (par. 169b, 169c) | LO |

| | | |
|---|---|---|
| 17 | The conclusions drawn from the investigation were not compromised due to improper safeguarding of evidence. (par. 169d) | LO |
| 18 | The investigation commenced within 24 hours of being reported. (par. 169e) | LO |
| 19 | The investigation was completed within 10 calendar days of when the incident was reported (unless a written extension documenting extraordinary circumstances was approved in writing). (par. 169f) | PC<br>70%<br>7/10 |
| 20 | HHS Central Office shall track and trend the number of extensions requested and take appropriate remedial action. (par. 169f) | NC |
| 21 | Required specific elements for the conduct of a complete and thorough investigation were present. A standardized format was utilized that set forth explicitly:<br>i. each serious incident or allegation of wrongdoing.<br>ii. the Name(s) of all witnesses.<br>iii. the Name(s) of all alleged victims and perpetrators.<br>iv. the Names of all the people Interviewed during the investigation.<br>v. for each person interviewed, an accurate summary of topics discussed, a recording of the witness interview or a summary of questions posed, and a summary of material statements made.<br>vi. all documents reviewed during the investigation; all sources of evidence considered, including previous investigations of serious incidents involving the alleged victim(s) and perpetrator(s) known to the Investigating agency.<br>vii. the investigator's findings; and the investigator's reasons for his/her conclusions.<br>(par. 169g) | SC<br>100%<br>10/10 |
| 22 | There was evidence that the investigation supervisor conducted a review of the investigation report to determine whether (1) the investigation was thorough and complete and (2) the report was accurate, complete, and coherent. (par. 169h) | SC<br>80%<br>8/10 |
| 23 | The supervisor review indicator above was also applied to any Investigation that was not deemed a serious Incident. (par. 169j) | LO |
| 24 | The Investigation included recommendations for corrective action that were related to the findings and addressed any concerns noted in the case. (par. 169j) | LO |
| 25 | If the investigation recommended disciplinary actions or other employee related actions, they occurred and they were taken timely. (par. 169j) | LO |
| 26 | If the investigation recommended programmatic and other actions, they occurred and they occurred timely.<br>(par. 169j) | LO |
| 27 | The format of the completed investigation was maintained in a manner that permits investigators and other appropriate personnel to easily access every investigation involving a particular staff member or Individual.<br>(par. 169k) | LO |
| 28 | If the incident met criteria for sentinel event: GRC conducted an effective root cause analysis of the Incident. | NA |

| | | |
|---|---|---|
| | • GRC implemented all recommendations identified by such an analysis (or documented a substantiated and compelling justification for not implementing a recommendation)<br>• GRC tracked the effectiveness of such recommendations (and, if such recommendations do not have their anticipated or intended effect, shall adjust such recommendations or their implementation).<br>(par. 170) | |
| 29 | If the investigation was deemed a preliminary assessment of an allegation, the following was in place: re: chronic callers.<br>• Within the previous six months, the resident made four or more allegations of abuse, Neglect, or exploitation, all of which were determined to be unfounded.<br>• The allegation fits the characteristics of the resident's previous allegations that were determined to be unfounded and was made within 30 days of such a previous allegation.<br>• An initial assessment shows No evidence (other than the resident's allegation) that the alleged conduct occurred.<br>• The resident has a BSP with components listed in the interpretive guidelines for this indicator.<br>(par. 171) | NA |
| 30 | If the investigation was deemed a preliminary assessment of an allegation, the following was in place:<br>Alleged perpetrator(s) were removed from contact with residents.<br>• until the full investigation is completed.<br>OR<br>Central Office determines that the risk to residents from contact with the alleged perpetrator(s) on the Center's grounds has been sufficiently minimized, at which time the Superintendent may allow the alleged perpetrator(s) to have continued on-campus client contact, but only with ongoing supervision (i.e., frequent, intermittent visual observation over the course of a person's shift) of the alleged perpetrator(s) by a supervisor.<br>(par, 172) | NA |
| 31 | Pending the full investigation's completion, the alleged perpetrator(s) did not have off-grounds contact with residents. (par. 173) | NC<br>0%<br>10/10 |
| 32 | If the Investigation was deemed a preliminary assessment of an allegation, the preliminary assessment:<br>• Did Not conflict or interfere with the concurrent full investigation conducted by GRC or State Investigators.<br>• Focused exclusively on determining the appropriate action to take regarding the work duty assignment of the alleged perpetrator(s).<br>• Where the preliminary assessment recommends allowing the alleged perpetrator to work in a resident contact position, provided the rationale for doing so; and<br>• Required the prior review and approval of the Superintendent or the Administrator on Duty.<br>(par. 174) | NA |
| 33 | For all categories of unusual incidents and investigations, the facility had a system that allowed tracking and trending by:<br>a. Type of incident.<br>b. Staff alleged to have caused the incident.<br>c. individuals directly involved. | NC |

| | | |
|---|---|---|
| | d. Location of incident.<br>e. Date and time of Incident.<br>f. Cause(s) of Incident; and<br>g. Outcome of Investigation.<br>(par. 175) | |
| 34 | Staff assigned to work with the Individual passed criminal background checks. (par. 176) | SC |

Comments:

1. GRC did not implement and maintain policies, procedures, and practices that included a commitment that GRC shall not tolerate abuse or neglect of individuals and that staff were required to report abuse or neglect of individuals.
   - GRC had a policy addressing this requirement, however, it was deficient. GRC policy provided for a two-hour window for staff to report abuse/neglect. This deviated from what was generally considered best practice and necessary to demonstrate a strong commitment to not tolerating abuse and neglect. A one-hour reporting requirement is the standard practice in most states. There did not appear to be any legitimate rationale for needing a two-hour window. GRC should change its reporting requirement to one hour to demonstrate a commitment that GRC shall not tolerate abuse or neglect.
   - For the nine investigations in this review, where the time of the alleged incident was known, there were five instances (55%) where the reporting occurred within one hour. There were two incidents that were not reported within the two-hour GRC policy requirement.

2. GRC policy included all the components of 168 a-j.

3. GRC Policy included all the Components of 169 a-k.

6. For seven of 10 individuals, after the allegation or injury, the Center took immediate and appropriate action to protect the residents involved, including removing alleged perpetrators, if any, from direct contact with residents. When allegations were reported to DIA (anonymously by someone, including staff), the Facility may not have received sufficient and timely information from DIA to initiate client protection measures required by this indicator. When interviewed, DIA reported it provided necessary information to the Facility if the nature of an allegation was viewed as credible. This can potentially create an issue for the Facility in meeting the requirements of this indicator. Additionally, for Individual #54 supervisor and nurse notification (notification is not by itself a client protection action) was the only action noted in the Investigative Report. Also, time of medical assessment was noted as 8 am, which was before the alleged incident occurred (9:33 am) and reported (9:52 am). For Individual #40 and Individual #77, supervisor and nurse notification was the only action noted in this section of the Investigative Report. There were typically other actions noted on the Investigative Report, but they were not noted under the immediate protections tab of the report. This can lead to either misunderstanding or confusion by a reviewer.

9. GRC did not take appropriate personnel action in response to any mandatory reporter's failure to report abuse or neglect. In this six-month review period five instances of failure to report were identified by the Center. An additional six were identified in the last review. The Center is to be commended for having a set of review activities that identified these reporting issues. For these 11 instances of failure to report staff noted to have failed to identify and report ANE included: RTW (DCP), RTS (front line supervisor(6x), Speech/Language Pathologist, Registered Nurse, Social Worker, Treatment Program Administrator,

and an ARNP (nurse practitioner). The majority, 10 of 11 (91%) of offenders were administrative and professional staff covering six different job titles. Follow-up personnel action take was minimal, usually retraining. This suggested a significant systemic issue requiring a more aggressive response from the Center, including more significant consequences for staff not identifying and reporting ANE.

10. The facility had not taken steps to educate individuals and primary correspondents (e.g., guardian) with respect to abuse/neglect identification and reporting. The Center did not have an informational pamphlet (or some other easy to understand document describing Individual rights, ANE reporting, etc.) that might be understandable and useful to individuals and guardians. There was no evidence that the subject of ANE and reporting was a specific discussion item at ISP meetings. The revised posters were an improvement from those noted in the last report. However, they were not eye-catching and were likely viewed as just one more thing on a bulletin board. There was too much information on the poster, and it was not easy to determine what should be done and which number to call. They were likely not of much use to individuals, family members, guardians, and busy staff.

11. GRC had mechanisms for residents, visitors, and other persons to report anonymously allegations of abuse, neglect, exploitation, other possible violations of residents' rights or other unusual incidents.

14. The facility failed to conduct audit activity to ensure that all significant injuries for individuals were reported for investigation. The Facility did not have a defined Injury Audit process. It was reported they did not feel a need to do this because of other oversight activities that were in place. Failure to have a clear process in place increases the likelihood of variance across staff and situation.

15. Ten of 10 investigations were conducted by a qualified investigator.

19. Seven of 10 investigations were completed within 10 calendar days of when the incident was reported.

20. HHS Central Office did not track and trend the number of extensions requested and take appropriate remedial action. The Facility did not produce a tracking and trending report addressing extensions for late investigation completion.

21. Required specific elements for the conduct of a complete and thorough investigation were present on 10/10 occasions. A standardized format was utilized that set forth explicitly.

22. There was evidence for eight of 10 occasions that the investigation supervisor conducted a review of the investigation report to determine whether (1) the investigation was thorough and complete and (2) the report was accurate, complete, and coherent.

31. Pending the full investigation's completion, the alleged perpetrator(s) did not have off-ground contact with residents. There was no notation in any Investigation Report that would note whether an AP had or did not have off-ground contact with an AV.

33. For all categories of unusual incidents and investigations, the facility did not have a system that allowed tracking and trending as no report was provided.

34. Staff assigned to work with the Individual passed criminal background checks.

## Section H. Individual Support Planning, Discharge Planning, and Transition from Resource Center (177-178)

Summary:
GRC had developed a process for ISP development, discharge planning, and transition. There was little evidence that individuals were given opportunities to make informed decisions regarding community placement due to a lack of exposure to available living options.

IDTs were not developing measurable action plans to support goal achievement and transition. Placement decisions were driven by what was available and whether a provider accepted an individual for services. It was not evident that the IDT considered working with providers to determine how support might be provided safely in the community. By working with provides, this allows the accepting staff to work with existing staff and access their increased knowledge of the individual.

| # | Indicator | Overall Score |
|---|---|---|
| 1 | The State shall develop and implement individual support planning, discharge planning, and transition processes at Glenwood. (par 177) | NC 57% 4/7 |
| 2 | The individual participated in their individual support planning, discharge planning, and transition planning to the maximum extent practicable, unless the individual chose not to participate. (par. 178,49) | SC 86% 5/7 |
| 3 | Individuals were supported to meaningfully participate in their annual ISP meeting. (par. 178) | NC 0% 0/7 |

Comments:

1. The State did not consistently develop and implemented individual support planning, discharge planning, and transition processes. While these processes were documented for every individual, the thoroughness in planning and documentation varied among individuals. Individuals lacked measurable action plans to ensure that processes were in place and monitored throughout the transition process. ISPs/transition plans should include measurable action plans to address identified barriers and supports needed to live successfully in the community.

   For the three who did not have the needed evidence, there was little evidence that there was thoughtful conversation regarding the least restrictive setting for individuals. Placement decisions were driven by what was available and whether a provider accepted an individual for services. It was not evident that the IDT considered working with providers to determine how support might be provided safely in the community. Two individuals (Individual # 102 and Individual #76) were transitioning to WRC. Referrals had been sent to multiple providers, but each provider declined to offer services based on their behavioral needs. It appeared both would benefit from a smaller, more structured environment that offered more opportunities to be engaged in activities of interest. Both IDTs documented that behavioral and psychiatric supports were their greatest barriers to living in the community, but neither team specifically defined supports needed. Without a clear definition of those supports, it was not possible to determine if those supports were available in the community. The

| Monitoring Team attended a transition meeting for Individual #76. Neither his BCBA nor his psychiatrist participated in the meeting, so again, the IDT was unable to discuss specific behavioral support needed.<br><br>2. Five of the seven individuals participated in their annual ISP meeting. Discharge planning and transition were discussed at each annual meeting. Individuals were encouraged to attend and participate in all meetings including annual ISP meetings and monthly review of service meetings.<br><br>3. All individuals were encouraged to attend their ISP and transition meetings, however, all lacked opportunities for exposure to new things so they could make informed choices. ISPs did not document how individuals participated in their meetings or whether accommodations were offered to ensure optimal input into decisions. For the meetings observed, individuals were present at their meetings, but little effort was made to include individuals in the discussion. Most of the individuals had lived at GRC for many years and had few opportunities to explore options available in the community. Without this exposure to other options, individuals were not able to make informed decisions regarding where they wanted to live, work, or spend their leisure time. |
|---|

| **Section H.i : Individual Support and Discharge Planning (179-188)** | | |
|---|---|---|
| Summary:<br>ISPs were still not focused on skills needed outside of GRC residences and day programs. IDTs were still not developing meaningful goals that would teach new skills or provide greater exposure to different options so that individuals could make meaningful choices about where they wanted to live and what they wanted to do during the day.<br><br>Vocational assessments did not provide opportunities to explore work or day options outside of what they were already doing. There was no exploration component and no attempt to determine what the individual would like to do after transition to the community.<br><br>There was minimal input from psychiatry and behavioral services towards ISP development or transition planning. Assessments were often submitted late and attendance at meetings was poor.<br><br>IDTs did not develop personal goals that addressed what the individual wanted to do in key life areas such as recreation, relationship, day programming, and living options. For the most part goals were broadly stated preferences without action plans to guide staff to support goal achievement. Although ISPs were reviewed monthly, there was no summary of progress towards goals.<br><br>Monthly IDT meetings regarding transition tended to be a cut and paste statement month after month, with no change even when the provider changed other than to note that the provider was now another agency. | | |
| # | Indicator | Overall Score |
| 1 | The individual has an ISP that was developed within 30 days of admission and revised at least annually or change in status that includes a discharge plan. (par. 179, 49) | LO |
| 2 | All relevant IDT members (including the resident) participated in the planning process and attended the annual meeting. (par. 49,51,183) | NC<br>0%<br>0/7 |
| 3 | The ISP included a description of the individual's preference for where to live and how that preference was determined by the IDT (e.g., communication style, responsiveness to educational activities). The determination was based on a thorough discussion of living options and informed consent by the individual and their guardians. (par. 180) | NC<br>0%<br>0/7 |
| 4 | IDTs created individualized measurable action plans to address individual or guardians' concerns and objections to community placement. (par. 188) | NC<br>0%<br>0/7 |
| 5 | IDTs created individualized, measurable, and comprehensive action plans to address any identified obstacles to referral or, if the individual was currently referred, to transition. (par. 180,186,50) | NC<br>0%<br>0/7 |
| 6 | The ISP defined individualized personal goals (such as community living, activities, employment, education, recreation, healthcare, and relationships). (par. 181,183) | NC<br>0% |

| | | |
|---|---|---|
| | | 0/7 |
| 7 | Personal goals are measurable. (par. 183) | NC<br>0%<br>0/7 |
| 8 | Assessments for all relevant disciplines submitted for the annual ISP were timely for IDT review prior to the annual meeting (par. 52, 183) | NC<br>0%<br>0/7 |
| 9 | Assessments for all relevant disciplines submitted for the annual ISP included recommendations for supports and services. (par. 52, 183) | SC<br>100%<br>7/7 |
| 10 | Assessments for all relevant disciplines submitted for the annual ISP were updated if there was a change in status identified. (par. 52, 183) | PC |
| 11 | The ISP integrated information from the behavior support plan; crisis plan; physical and nutritional management plan; clinical, medical, and nursing plans; skill acquisition programs; and other evaluations and assessments. (par. 49,182) | NC<br>0%<br>0/7 |
| 12 | The ISP identified the individual's strengths, needs and preferences. (par. 183) | LO |
| 13 | ISP action plans indicated how they would support the individual's overall enhanced independence. (par. 183) | LO |
| 14 | Action plans identify the amount, duration, and scope of all necessary services and supports to ensure consistent implementation, review, and monitoring including timeframes and responsible person. (par. 183) | NC<br>0%<br>0/7 |
| 15 | ISP action plans were written to be practical and functional both at the facility and in the community. (par. 181) | NC<br>0%<br>0/7 |

Comments:
To review this section of the Consent Decree, a set of ISPs was requested, along with sign-in sheets, assessments, PNMPs, PBSPs, Integrated Health Care Plans and/or risk action plans, implementation plans, monthly reviews, and the individual's daily schedule. Additionally, individuals, QIDPs and direct support were interviewed, and observations were made in both residences and day programs.

2. ISP signatures were reviewed to determine if relevant staff attended the meetings. All relevant IDT members did not attend ISP meetings for any of the individuals. The following is a summary of that review.

   See table below.

| IDT members not in attendance at the annual IDT meeting: | |
|---|---|
| Individual #5 | Individual, Guardian, PCP |
| Individual #101 | Guardian, PCP, psychiatry, day programming |
| Individual #54 | Individual, Guardian, PCP, psychiatry, day programming |

| Individual #102 | PCP, behavior, psychiatry, day programming |
|---|---|
| Individual #68 | Psychiatry |
| Individual #76 | Guardian, psychiatry |
| Individual #73 | Psychology, day programming |

3. All ISPs included a determination of where the individual would like to live based on known preferences. A more detailed description was included in the transition plans. However, individuals rarely had opportunities to explore options in a meaningful way, so determinations were largely based on staff input and that input was based on limited information about options that were available. Individuals generally had limited knowledge regarding what options were available since they had limited exposure to options. In some cases, providers were chosen for the individual without the individual ever visiting with the provider to provide feedback to the IDT. For example, the IDT was moving forward with transitioning Individual #76 to WRC. He had not visited prior to the decision being made.

   For no individuals, was the determination was based on a thorough discussion of living options and informed consent by the individual and their guardians.

   - On 1/10/24, the IDT for Individual #76 met to discuss transition and minutes documented that placement at WRC was being considered. On 3/19/24, the IDT met for his annual ISP meeting. That team confirmed the decision for transition to WRC. There was no further documentation that Individual #76 or his guardian were involved in the decision. Prior to this decision, there was documentation that the guardian had input regarding other providers being considered. The proposed placement at WRC did not align with his preferences to live in a house in the community with two to four peers around his age that were active.
   - For Individual #54, there was minimal documentation regarding input from her guardian on living options. The guardian did express concerns regarding transition, however, attempts to address those concerns were not documented. On 3/8/23, she was offered the opportunity to meet with a provider under consideration. Notes did not document if that meeting occurred or her response to discussions with the provider. At an IDT meeting on 1/29/24, it was noted that the guardian agreed to placement with another provider under consideration. There were no notes regarding visits that Individual #54 and/or her guardian made to the provider to make an informed decision.
   - For Individual #101, the ISP documented that information was sent to her guardian, however, her response to the documentation or any attempts to address concerns were not documented. Her guardian did participate in transition meetings and the IDT provided detailed information about her proposed placement and addressed concerns from the guardian.
   - For Individual #5, there was a note in the ISP that her guardian and family were agreeable to placement with Nishna in Red Oak. The note was not dated, and this was no longer the provider being considered. A note in her transition profile also confirmed that her guardian had chosen Nishna, but indicated that IDT agreement was for a home in Malvern. In December 2023, her health declined, and the IDT agreed that placement in the Nishna home was no longer appropriate. She had recently been accepted at Glenhaven for hospice support. IDT meeting minutes from 12/21/24 noted that her guardian had been contacted and agreed with placement at Glenhaven.
   - Individual #102's guardian was opposed to transition to the community. Notes in the ISP were brief and did not describe educational opportunities on living options other than mailing the guardian educational materials on some providers.

There were no visits to providers documented for Individual #102 or his guardian. His preferences for living options were not documented. According to his QIDP, the IDT was planning for him to transition to WRC in April 2024. It was not clear how the IDT reached consensus on this placement or whether/how Individual #102 and his guardian were involved in decision making. He had not yet visited WRC.

- Individual #68 transitioned to the community the week of the Monitoring Team's visit. His ISP noted that he and his guardian were involved in the transition process and agreed to placement with the chosen provider.
- For Individual #73, the ISP did not document involvement by the guardian in making decisions regarding placement. It was noted that the guardian had concerns, but not how those concerns were addressed. An IDT meeting on 2/27/24 noted that the social worker had been unable to reach the guardian to discuss placement. Visits to providers under consideration were not documented for Individual #73 or his guardian.

4. None of the IDTs created individualized, measurable action plans to address barriers identified to community transition.

5. IDTs were not creating individualized, measurable, and comprehensive action plans to address identified obstacles to referral or, if the individual was currently referred, to transition. There was minimal discussion of barriers to referral in the ISP. Needed support was identified in some assessments and pasted into the ISP, however, there was no discussion about how those supports might be obtained in the community.

6. Although all ISPs included a section labeled personal goals, listed goals did not address all major life areas, such as community living, employment/day activities, or recreational activities. None of the ISPs included personal goals related to work, volunteering, or other types of day programming.

   IDTs were still not writing measurable personal goals. Many goals were broad statements based on known preferences that did not include enough detail to determine what the individual wanted to accomplish. Goals should be worded in a way that the IDT can determine what specifically the individual wants to do using measurable terms, so that the IDT will know when the goal has been accomplished.

   Often the list of personal goals was not used to develop supports for the individual and there were no related action plans that described how the team would support the individual to achieve their goals.

   - Individual #5's personal goals were to continue to take part in activities in the community, continue to have family in her life, continue to work on her communication, and to get plenty of one-on-one time with those who support her. The IDT did not develop related action plans to describe how staff would support her to meet these goals or how they would know when a goal was achieved. She did have related communication strategies; other goals were not supported by action plans.
   - Individual #101's goals were to find a small home in the community, to see her sister more, to see an NFL game in person, to participate in her medication pass and feedings without getting upset, and to focus on the present moment during times when she was stressed. Again, there were no supporting action plans for all goals and no description of what supports were needed. The ISP should have included how often she would see her sister, where she would see her, what staff would schedule the visit, provide transportation, etc... Similar action plans should have been developed to support her to see an NFL game.

- Individual #54's goals were to have as many blankets as she can possibly have since she is always cold, to go out in the community more often, have more one-on-one time with staff, and to continue to advocate for herself by asking for things that she needed or wanted. These goals were not measurable. Her goals did not address major areas of her life, such as how she would like to spend her leisure time, what relationships she would like to build, and how she would spend her day if she had more options.
- Individual #102's goals were to drink pop and eat burritos all day, live in the community with very few demands, and go on more outings (out to eat, shopping). These described his preferences, but did not include goals to achieve in major life areas. His action plans supported greater independence, but did not describe support for the achievement of long-term goals in key life areas.
- Individual #68's goals were to remain in good health and work towards better health in the year ahead, to display more confidence in his abilities, to continue to have opportunities to remain close to his family and see them on a regular basis, to continue to enjoy good food and go out to eat, to try new cuisines, and to be well rested. Again, goals did not address key life areas. His assessments indicated that he would like to work and earn money, however, his goals did not address what he wanted to do during the day.
- Individual #76's goals were to be able to continue to enjoy his coffee and pop, to continue to remain healthy and not have another gastric issue, and to learn more about his money and get paid more. His goals did not address key life areas.
- Individual #73's goals were to increase his ability to communicate things he enjoyed, increase his hygiene skills, participate more, and do more activities, increase his ability to learn transition times for different activities, and live with his brother. The ISP did include action plans to increase his communication skills and brush his teeth, which supported his personal goals. Other goals were not addressed.

7. See #6

8. None of the individuals had all the relevant assessments completed within five days of the annual ISP meeting (and/or less than 30 days prior) as directed by GRC policy. This indicator evaluates the submission and timeliness of assessments. Section C of this report evaluates the quality of assessments. When assessments were not submitted prior to the annual ISP meeting, it was not possible to determine if all support needs and services were addressed in the ISP. This absence also impedes the ability of the accepting provider to plan for and ensure all supports are in place in a timely manner.

| Relevant assessments not submitted prior to the annual ISP meeting: | |
|---|---|
| Individual #5 | Nursing, SLP, OT, PT, Nutrition, Vocational/Day (undated) |
| Individual #101 | SLP, OT, Nutrition, Psychiatry, Vocational/Day, Behavioral |
| Individual #54 | OT, PT, Nursing, Nutrition, Psychiatry, Vocational/Day, Behavioral |
| Individual #102 | Psychiatry, Nursing, Nutrition, OT, PT, Behavioral |
| Individual #68 | Nursing, SLP, OT, PT, Psychiatry, Behavioral |
| Individual #76 | SLP, OT, PT, Nutrition, |
| Individual #73 | OT, PT, SLP, Psychiatry |

When assessments were available, skills assessed, and recommendations made were overwhelmingly focused on the individual's lifestyle and activities/engagement at GRC. Assessments did not include opportunities to assess functioning in the community or to try new things so that the individual could make informed choices when developing personal goals. Day and vocational assessments did not include recommendations for day or vocational activities in the community. Recommendations rarely considered what new skills the individual might learn to live and work in a less restrictive environment.

9. Most discipline assessment included some recommendations for support. As noted, assessments were not submitted in time for integration into the ISP. For those completed prior to the meeting, recommendations were included in the ISP.

10. Assessments were not always updated when there was a significant change of status. Often, GRC would monitor or initially document the issue , but would not offer a revised and updated assessment to reflects the new status. This was previously in less oversight but has now fallen to partial compliance. For example, Individual #5 was hospitalized and a g-tube was placed in April 2024. Her nursing assessment and care plans were not updated in a timely manner. January 2024 notes indicated that Individual #102 had increased meal refusals with lower intake at meals that were not refused. There was no documentation that the IDT considered updating his nutritional assessment or otherwise trying to determine the cause of his refusals. There was no further evaluation of his nutritional status.

    It was not possible to determine if IDTs were discussing a need for a change in support in most cases because the MIRs listed data and/or medical appointments with no commentary on the need for an updated assessment or revision of supports. See section C for further examples where assessments and support were not updated following a change of status.

11. ISPs included some information from the behavior support plan; crisis plan; physical and nutritional management plan; clinical, medical, and nursing plans; skill acquisition programs; and other evaluations and assessments. Often information was cut and pasted into the ISP document without evidence of integrated discussion. Without determining what the individual's long-term goals might be related to important aspects of their lives, recommendations were overwhelmingly focused on the individual's lifestyle and activities/engagement at GRC. Day and vocational assessments did not include recommendations for day or vocational activities in the community. Recommendations rarely considered what new skills the individual might learn to live and work in a less restrictive environment. Functional skills assessments noted areas for skill building, but there was no prioritization or recommendations regarding what skills the individual should work on.

13. All seven ISPs included training to support greater independence.
    - Individual #5 had action plans to choose her shirt and brush her hair which would increase her independence.
    - Individual #101 had action plans to choose her clothing and participate in medication administration by lifting her shirt.
    - Individual #54 had an action plan to put her clothing protector in the laundry.
    - Individual #102 had an action plan for doing laundry, unlocking/locking his locker, and assisting with housekeeping chores.
    - Individual #68 had action plans to obtain his own snack and wash his hands.
    - Individual #76 had action plans to place his laundry in a basket, identify money and brush his teeth.
    - Individual #73 had action plans to communicate a request for things he enjoyed,

14. ISPs included a list of action plans/training objectives; however, it was not clear how they supported personal goals achievement. Training strategies were included along with data to be collected, and responsible person for review, however, they did not include mastery criteria, so that the IDT could determine when a skill had been mastered.

15. Outcomes tended to focus on training to address skills identified through the assessment process and were generally basic skills that would be needed in the community; however, they were not prioritized based on long term outcomes that the individual wanted to achieve, and specific training strategies were not developed for training in the community.

**Section H.ii: In-reach and Community Engagement (189-192)**

Summary:
Individual's living options were discussed annually at their ISP meeting. There was no documentation that they received information regarding living options at least every six months. None of the individuals had documentation that they had visited residential or day programs in the community or had opportunities to meet with other individuals with IDD receiving services in an integrated setting.

| # | Indicator | Overall Score |
|---|---|---|
| 1 | a. Individuals receive information regarding community living options at least every six months.<br>b. had opportunities to visit community-based residential and vocational settings and meet with other individuals with IDD receiving services in integrated settings at least quarterly. (par. 189) | NC<br>0%<br>0/7 |
| 2 | All staff responsible for directing, managing, or coordinating discharge planning and other informational activities regarding community options have sufficient knowledge about community services and supports to propose appropriate options about how an individual's needs could be met in a more integrated setting. (par. 190) | LO |
| 3 | ISP action plans integrated opportunities for community participation and integration. (par. 192) | NC<br>0%<br>0/7 |

Comments:

1. Individual's living options were discussed annually at their ISP meeting. There was no documentation that they received information regarding living options at least every six months. None of the individuals had documentation that they had visited residential or day programs in the community or had opportunities to meet with other individuals with IDD receiving services in an integrated setting. IDTs sent information about individuals to various agencies providing services in the community and if accepted for services, individuals had opportunities to visit those providers, however, they did not routinely have opportunities to visit other residential and day providers prior to choosing a provider, so that they could make an informed decision about options available.

3. All ISPs included some general activities/outings that the individual enjoyed in the community, however, there were no outcomes developed to ensure that individuals had regular opportunities to participate in community activities based on their preferences or to receive supports and services in the community. There were no opportunities for integration prior to discharge from the facility.

   None of the individuals had action plans that offered opportunities to explore a wide range of community-based activities or engage in integrated activities in the community, such as banking, going to church, participating in retirement programs, joining community groups, attending classes, volunteering, etc., so that individuals were better able to make informed choices regarding what they wanted to do during the day and where they wanted to live.

| **Section H.iii: Transition Planning (193-200)** | | |
|---|---|---|
| Summary:<br>Transition plans did not always ensure assessments were adequate for planning to include necessary supports, such as behavior services, communication services, healthcare monitoring, etc. Nor did transition plans include recommendations with timeframes to obtain assessments or consultations with community-based providers. Transition plans lacked adequate and measurable pre- and post-transition supports with measurable expectations to monitor implementation of transition plans. Because of the lack of pre- and post-transition supports, post-move monitoring was broad, generic, and not based on assessing the adequacy of supports and services or the success of the transition. The Monitoring Team was aware that a more detailed post move monitoring checklist had been developed and implemented with the more recent transitions. Documentation from this revised process was more detailed and guided the social worker to monitor in a more concrete manner for implementation of services, supports, and expected outcomes. However, work remained to ensure pre- and post-move supports were adequately developed, were measurable, and reflected clear expectations for implementation. | | |
| # | Indicator | Overall Score |
| 1 | The individual is offered a meaningful choice of community providers consistent with identified needs and preferences. (par. 193) | NC<br>0%<br>0/5 |
| 2 | The IDT assisted the individual, and their authorized representative (where applicable) in choosing a provider. (par. 194) | NC<br>0%<br>0/5 |
| 3 | The selected provider was actively engaged in preparing for the individual's transition and actively participated in development of the transition plan. The individual had opportunities for meaningful experiences and visits that enabled the individual to become familiar and comfortable with the home. (par. 195) | SC<br>100%<br>5/5 |
| 4 | If requested, the individual has a right to return the agreement. (par. 196) | NC<br>0%<br>0/5 |
| 5 | If the individual requested to return to GRC:<br>a. GRC identified barriers to community placement.<br>b. GRC implemented strategies to resolve barriers.<br>c. GRC documented steps taken to resolve barriers to community placement.<br>(par. 196) | N/A |
| 6 | The transition occurred no longer than six weeks after the provider agreed to serve the individual. (par. 197) | LO |
| 7 | If transition did not occur within the planned timeframe,<br>a. the reasons it did not occur was documented, and<br>b. a new time frame for discharge was developed by the IDT. | N/A |

| | | |
|---|---|---|
| | (par. 197) | |
| 8 | The individual has a current transition plan, updated within 30 days prior to the discharge. (par. 198) | LO |
| 9 | The IDT identified in the transition plan the individual's preferences and desired outcomes, and all needed supports, protections, and services (including amount, duration, and scope) | NC<br>0%<br>0/5 |
| 10 | The transition plan identified training for the provider staff. (par. 199) | NC<br>0%<br>0/5 |
| 11 | The transition plan identified assistance to be provided by GRC staff to the receiving agency. (par. 199) | NC<br>0%<br>0/5 |
| 12 | The transition plan identified by name who would take specific action and when to deliver (or ensure delivery) all needed supports, protections, and services. (par. 199) | LO |
| 13 | All essential supports needed for transition were identified. (par. 200) | NC<br>0%<br>0/5 |
| 14 | All identified supports (including behavioral supports, crisis plan, provision for physical and mental health, etc.) were documented as in place prior to discharge. (par. 200) | NC<br>0%<br>0/5 |
| 15 | All non-essential supports were in place within 60 days of discharge. (par. 200) | LO |

Comments:

According to the Glenwood Resource Center Discharge and Transition Planning policy (dated 5/24/21, reviewed 4/25/22, revised 6/26/23): *The mission of the Glenwood Resource Center (GRC) is to support individuals to live in the community of their choice. GRC shall encourage and assist individuals to move to the most integrated setting consistent with the individual's professionally identified needs and individual preferences. In looking for places for the individual to live, the Interdisciplinary Team (IDT shall evaluate the type of setting most likely to ensure a successful transition (e.g., number of housemates; urban or rural; preferred geographical location; proximity to family) based on the individual's strengths, preferences, and needs. IDs shall assist the individual and their guardian in choosing a provider and ensure that providers are identified and engaged in preparing for the individual's transition. Individuals and their parents, guardians, and legal representatives or family will be encouraged to consider community options and work toward moving to the community when the move can be reasonably accommodated, taking into consideration the statutory authority of the state, the resources available to the state, and the needs of others with mental disabilities.*

1. Based on a review of transition plans for five individuals who had transitioned from the Center between March 2023 and January 2024, none had a transition plan that reflected meaningful choice of community providers or facilitated support by their IDTs in making an informed choice. From available documentation, it appeared that the social workers at GRC were submitting transition profiles to community providers for consideration as potential referrals. Therefore, choice rested with the provider who responded with an acceptance of the individual with guardians proceeding from that point forward.

2. See #1 above.

3. For the five individuals, documentation reflected that the selected provider was involved in communication and planning for their transition.

   For the five individuals, documentation was available that reflected all had engaged to varying degrees in visits to their prospective home prior to the actual move. For example:
   - Individual #12's transition plan reflected that he visited his new home one time on 8/2/22. It was after this visit and while active transition planning was occurring that the provider rescinded the acceptance. The provider was approached again and once again accepted Individual #12 for an opening in a home in Shenandoah near his mother. He visited this home on 9/21/23 and the transition process initiated. He moved on 1/3/24.
   - Individual #84's transition plan indicated he visited his new home a few times a week after transition meetings began.
   - Individual #86's transition plan indicated he visited his new home seven times between February 2023 and his move on 3/30/23.

4. For the five individuals who had transitioned from GRC between March 2023 and January 2024, there was documentation provided to indicate if any had requested Return Agreement.

   There was a provision in the Glenwood Resource Center Discharge and Transition Planning policy (dated 5/24/21, reviewed 4/25/22, revised 6/26/23) for a six-month return agreement. This provision indicated:

   *All individuals who transition from GRC to a more integrated setting shall have the right to a return agreement, which will guarantee a right to return to either State Resource Center [until such time as GRC does not have the capacity, then the return will be to Woodward Resource Center (WRC)], as long as the request is made within six months after the date of transition. Upon receiving a request to return GRC shall ensure:*
   - *The identification of barriers with regard to community placement.*
   - *Implementation of individualized strategies to resolve those barriers (including, as appropriate, strategies to support the community service provider's ability to care for and support the individual, and to thoroughly search for other community service options); and*
   - *Documentation of steps taken to resolve the barriers with regard to community placement.*
   - *If after two (2) months from the receipt of a request to return, the individual, or where applicable their guardian determines that the issues cannot be resolved, the individual will be permitted to return to either State Resource Center (until such time as GRC does not have the capacity, then the return will be to WRC).*

   It was unclear as to how individuals and guardians were presented with information about their right to request a return agreement and there was no documentation within the transition plan for Individual #107 to reflect the parameters for this agreement to be enacted if requested.

5. None of the five individuals had requested a return to GRC.

6. For the five individuals, none of the transition plans included a transition referral date. For all five individuals, transition planning did not appear to occur until a provider had actually accepted an individual from a referral. Once this acceptance occurred, transition planning was scheduled at a rapid pace usually culminating in a transition plan being finalized merely days prior to the individual's actual move.

   According to the transition plan document, development of the transition plan was to begin with the completion of the profile at the time of referral for community transition and continue past the transition date.
   - Individual #12: the profile date was 10/6/23; transition meetings were held 10/17/23, 12/12/23, 12/27/23, 1/2/24, and he moved 1/3/24.
   - Individual #17: the profile date was 8/8/23; transition meetings were held 8/11/23, 9/7/23, 9/18/23, and he moved 9/20/23.
   - Individual #84: the profile date was 6/14/23; a transition meeting was held 6/16/23 and he moved 7/18/23.
   - Individual #86: the profile date was 2/15/23; transition meetings were held 2/21/23, 3/13/23, 3/29/23, and he moved 3/30/23.
   - Individual #107: the profile date was 2/23/23; transition meetings were held 3/3/23, 3/20/23, 4/4/23, and she moved 4/6/23.
   - Individual #93: no profile date was indicated; a transition meeting was held 3/14/23 and she moved 3/23/23.

7. Transition planning was not initiated until a provider had actually accepted an individual from a referral. Transition profiles were not part of the transition plan itself, so it was difficult to determine what information was sent to providers about the individuals and how providers decided from the profile and referral.

9. None of the five individuals had a transition plan that fully reflected the individual's preferences and desired outcomes, supports, protections, and services (including amount, duration, and scope). Goals and habilitation training that were in place at GRC were not carried into the transition plans to continue after the move. Transition plans indicated that outcomes and goals would be developed at the 30-day meeting. Therefore, IDTs did not sufficiently identify desired outcomes for incorporation into transition plans to ensure consistency for a successful transition.

10. None of the five individuals had a transition plan that identified the required competency training the provider staff should receive prior to transition and none of the assessments incorporated into the transition plans provided expectations for competency training. Trainings were being conducted mostly at GRC through demonstration of supports (e.g., dining, personal care, mobility, etc..) and of provider staff shadowing or observing the individual and GRC staff. These trainings were typically a half day and sometimes a few hours on additional days if necessary or scheduling required. For example:
    - For Individual #12 the transition plan described staff training as: On 12/8/23 GRC staff trained on supports for Individual #12. Provider staff comprised of direct care and management were all trained. GRC OT trained on wheelchair, program for BUE stretching (why, how, what happens if program not implemented), splint (cleaning, donning, indication for use). GRC SLP's trained in diet and consistency and provided staff with PNM card, ISDDI Level 5 and IDDSI level 2 training sheets. GRC PT trained on EZ-way dependent mechanical lift, sling use (including laundering/care, features, correct use), alternate positioning options, range of motion maintenance program, compression stockings (wear schedule and laundering/care).

- For Individual #17, the transition plan described training as occurring when he visited the host home prior to his transition:
  - Visited new residence on 8/10/23 with OT for home evaluation and training on communication strategies.
  - Visited new residence on 8/31/23 with SLP and focused again on communication strategies and training.
  - Visited new residence on 9/8/23 with OT for PNM training and diet modification/intervention for safe intake.
  - Visited new residence on 9/10/23 with SLP, ongoing training occurred on communication strategies.
  - Completed training on diabetes management and how to administer insulin on 9/19/23 at 7 am.
  - Host Home provider trained by GRC psychologist on current BSP on 9/15/23.

- For Individual #84, the transition plan described staff training as: PNMP and BSP trainings were completed before transition.

- For Individual #86, the transition plan described staff training as: PNMP training with provider staff on 2/14/23. BSP training with provider staff on 2/14/23. Provider staff shadowed GRC staff and Individual #ER at GRC on 2/6/23 from 4pm-6pm; 2/7/23 from 11am-1pm and 4pm-6pm; 2/9/23 from 1pm-3pm; 2/10/23 from 7:30am-9am; 2/13/23 from 11am-1pm; 2/15/23 from 11am-3pm; and 2/16/23 from 7:30am-9am.

- For Individual #93, the transition plan described staff training as: Clinicians provided trainings for LTC on the supports for Individual #93. Clinicians attended meetings to learn about the support Individual # 93 receives.

11. None of the individuals had a transition plan that identified the specific assistance to be provided by GRC staff to the receiving agency. Transition plans were formatted with prompts to describe facility collaboration with community clinicians, clinician assessment of settings, and facility and provider staff activities, such as spending time at the provider or the receiving staff at GRC. However, the narrative provided for these prompts was most often generic statements, such as clinicians assisted in providing reports for the transition plan, along with training when needed, and facility clinicians did assessments of the new home and current supports.

13. Essential supports needed for transition were identified, but did not always include measurable identifiers for ensuring coordination and implementation. Therefore, post-move monitoring documentation did not provide substantive commentary on implementation of identified support needs for the transition. See Section H.iv. below for additional information relative to post-move monitoring.
    - For Individual #86, documentation in his transition plan indicated he had a history of elevated PSA levels with results from 11/3/22 of 9.17 and from 11/8/22 of 10.8. The normal range for a person his age was 2.5 to 4.5.The transition plan further reflected that on 1/13/23, the GRC consulting urologist from UMMC noted that he had been referred secondary to persistent mildly elevated PSA levels and enuresis, but did not recommend further evaluation or workup unless PSA is significantly elevated. He transitioned on 3/30/23 yet his transition plan did not include expectations for frequency of monitoring PSA levels or for scheduling an appointment with a community urologist. In August 2023 he was seen by a urologist and was noted to have very high PSA levels that suggested cancer. The guardians refused a biopsy procedure. At the time of the Monitoring Team's visit, Individual #86 had metastasized cancer and was receiving hospice services.

- Individual #17 transitioned from GRC to a host home provider on 9/20/23. Pre-move/essential supports were not sufficiently developed to ensure a referral for behavioral services was in place prior to his move. Although the host home provider received training from the GRC psychologist on 9/15/23, historical behaviors emerged upon his transition that the provider was not prepared to manage. Continuity of behavior services were necessary to ensure he experienced a successful transition. Because there was no recommendation for community-based behavioral services prior to his move, there was a delay in obtaining the services eventually led to the host home provider issuing a 90-day notice of discharge and he moved to a HCBS group home operated by Nishna on 3/1/24. This home was to be a temporary residence while final construction was completed on a home operated by Nishna where he would be moving in April 2024. As GRC has agreed to follow the individuals for 365 days post transition, there should have been complete and thorough transition planning for his move from the host home to the HCBS provider, including clinicians and staff from GRC in the development of adequate essential pre-move and post-move supports, competency training, development of necessary support plans such as a BSP, sign language/communication plan, etc.

14. Identified supports (e.g., behavioral supports, crisis plans, provision for physical and mental health, etc.) were not always documented as in place prior to discharge. For the most part, transition plans identified the primary care provider, psychiatrist, pharmacy, hospital, and other medical providers. However, transition plans did not always ensure adequate carry-over of necessary supports, such as behavior services, communication services, etc. Nor did transition plans include recommendations with timeframes to obtain assessments or consultations with community-based providers, such as behavior services, OT, SLP, etc. For individuals who had identified support needs in these areas, it was reported during interviews with the providers and MFP and MCO case managers during the Monitoring Team's visit that those services could be accessed through community case management if needed. See indicator 13 above, Section H.i. and H.ii. as well as Section C for additional information.

15. See #14 above.

| **Section H.iv: Community Integration Management (201-211)** | | |
|---|---|---|
| Summary:<br>The Community Integration Manager was a strong asset to support GRC in moving forward with transitions and facility closure. However, additional staff were needed to work under the direction of the CIM and although this was identified over six months ago, there had been no movement or action in procuring and hiring of these positions. Additionally, the CIM needed direct authority within HHS to make decisions and corrective actions as needed to ensure safe and successful transitions. The hiring of the four additional CIM positions were in progress, but they were not hired/in place. During interviews, there was no mention of when it was anticipated the positions would be in place. Conversations with the CIM did not reveal that there was an awareness of when the positions would be in place and filled. According to the comment from GRC, the budget which included funding for the positions was approved in April 2024 and hiring was in process. During the Monitoring Team's visit as in March 2024, the additional CIM staff were not present and did not participate in the review. It was not until April 2024 that the Monitoring Team began to see new CIM staff present at transition planning meetings.<br>While GRC staff were meeting regularly to discuss barriers to transition, there were few actions developed to meaningfully address barriers. For individuals whose guardians had chosen WRC, there was no documentation to reflect they were offered a meaningful choice of alternate providers. The post-transition monitoring had recently been revised to include individualized and measurable pre- and post-move supports., but implementation and quality remained sa work in progress that required additional attention to ensure timely and successful implementation of supports and services that were recommended for each individual's transition. As noted in previous reports, including reports from interim monitoring reviews, case management services to monitor services, progress, and general well-being was a critical component of the transition process that still required structure and correction. | | |
| # | Indicator | Overall Score |
| 1 | The Community Integration Manager provides oversight of transition activities. (par. 201) | PC |
| 2 | The Community Integration Manager is engaged in addressing barriers to placement, if applicable. (par. 202) | SC |
| 3 | If an IDT recommended maintaining a placement at GRC or placement in a congregate setting with five or more individuals, the barriers to placement in a more integrated setting, and the steps the team will take to address the barriers were documented. (par. 203,204) | NC |
| 4 | If Woodward was the chosen provider, the individual was offered a meaningful choice of providers consistent with their identified needs and preferences. (par, 205) | PC |
| 5 | The State maintains public reports that identify monthly data regarding:<br>a. status of GRC's community integration efforts<br>b. number of residents in each stage of transition planning<br>c. number of transitions<br>d. types of placements<br>e. number of individuals recommended to remain at GRC.<br>(par. 206) | PC |

| | | |
|---|---|---|
| 6 | Information about barriers to discharge from involved providers, IDT members, and individuals' ISPs is collected from GRC and is aggregated and analyzed for ongoing quality improvement, discharge planning, and development of community-based services. (par. 207) | PC |
| 7 | The State shall develop and implement quality assurance processes to ensure that ISPs, discharge plans, and transition plans are developed and implemented, in a documented manner, consistent with the terms of this Agreement. These quality assurance processes shall be sufficient to show whether the objectives of this Agreement are being advanced. Whenever problems are identified, the State shall develop and implement plans to remedy the problems. | NC |
| 8 | GRC staff conducted monitoring visits seven, 30-, 60- and 90-days following transition. (par. 209) | SC<br>100%<br>5/5 |
| 9 | For each visit, a checklist was completed that included all areas of the transition plan to ensure all supports and services were in place. (par. 209) | NC<br>0%<br>0/5 |
| 10 | Individuals who had transitioned to the community had a current ISP in place. (par. 209) | LO |
| 11 | Staff conducting post transition monitoring received adequate training and have been assessed for reliability of the process. (par. 209) | CND |
| 12 | The individual has received ongoing community case management services at the frequency required based on the individual's needs and preferences. (par. 210) | PC |
| 13 | The case manager met with the individual face to face at least every 30 days; at least one such visit every 2 months in the individual's residence. (par. 210) | NC<br>0%<br>0/5 |
| 14 | The case manager:<br>a. observed the individual.<br>b. assessed the environment.<br>c. assessed the status of identified risks, injuries, needs or other changes in status.<br>d. assessed implementation of the ISP.<br>e. assessed appropriateness of the ISP.<br>f. assessed the implementation of all supports and services.<br>(par. 210) | NC<br>0%<br>0/5 |
| 15 | The case manager documented any issues/concerns noted from monitoring visits, convened the IDT to address noted issues/concerns, and documented resolution. (par. 210) | NC<br>0%<br>0/5 |
| 16 | The case manager followed any identified issues to resolution. (par. 210) | NC<br>0%<br>0/5 |
| 17 | The State implemented a system to identify and monitor individuals in the Target Population who transition from Glenwood Resource Center (for at least 365 days following transition) to another placement. (par. 211) | PC |
| Comments: | | |

1. A Community Integration Manager (CIM) position was created as required under H.iv.201 of the Consent Decree. The CIM had been refining her role of transition activity oversight and was actively involved in identification of needed actions to address shortcomings of the discharge and transition planning process at Glenwood Resource Center as well as systemic community barriers.. The CIM met regularly with the IDT to discuss barriers and transition planning. When the CIM identified barriers, the CIM followed up with resolution."
2. The CIM reported that she had been working with the MCO and MFP case managers to identify what was needed for each individual transition. The CIM had been attending transition meetings and providing feedback to the social workers for improvement and as needed to resolve issues and barriers with transitions. As noted in the August 2023 report, the CIM reported that the Iowa HHS would be hiring regional Community Integration Managers to support transition and integration efforts, but these positions had not been hired as of the Monitoring Team's March 2024 review.

3. See indicator 1 above. Additionally, the CIM lacked the needed authority to effectively address issues. The CIM would often have to outreach her superior in order to have an impact. The CIM should have the authority to directly intervene without additional and to make immediate decisions on transitions and placement.

3. Individual support and discharge plans did not reflect whether IDTs had recommended maintaining placement at GRC or other congregate setting and did not include clear justification for the decision, the barriers to placement in a more integrated setting, and actions the IDT would take to address the barriers. For Individual #93, the process had begun for her to be transitioned to a community HCBS provider. According to documentation in the transition plan, following the initial community PCP appointment, the PCP did not feel the agency would be able to support her and she needed a higher level of care. The agency, therefore, declined her referral. Individual #93's guardians met with a nursing home in Villisca and asked if they would meet her and determine if she could be supported in the nursing home. The nursing home accepted her, and the guardians agreed to move forward with her transition as it would also be closer to where they lived and where her father lived. She moved from GRC on 3/3/23. Documentation was provided that indicated the GRC Assistant Superintendent sent an email to the Community Integration Manager on 3/1/23 informing that per the Consent Decree, GRC was to notify the CIM of any individual who would be transitioning to a congregate setting. The documentation also indicated that GRC would provide notification sooner going forward with future transitions to congregate settings as the CIM was to review these transitions. There was no documentation to reflect the CIM had reviewed or addressed barriers to the nursing home placement.

4. There was no prohibition in the Consent Decree for individuals to transfer to Woodward Resource Center unless an informed decision was documented for the individual to continue to receive services in a Resource Center. It was evident there was no robust development of resources and incentives for HCBS providers to accept individuals with high support needs. See Indicator 6 below for additional information. Post review, it was stated that the State used AARPA grants to provide monetary bonuses for employee retention for HCBS providers, in addition to grants to aid in the use of upgrading HCBS providers technology use, as well as to build out infrastructure with an emphasis of the importance of providers to support the folks transitioning from GRC.

5. The State developed a dashboard for reporting data to the public on the census by facility, number of individuals per transition stage category, among other data points. (https://app.powerbigov.us/view?r=eyJrIjoiOGIyOTIxODUtZDQwNy00NjM5LTkyNzMtMTUxZTE5MWM2YzZhIiwidCI6IjhkMmM3YjRkLTA4NWEtNDYxNy04NTM2LTM4YTc2ZDE5YjBkYSJ9)

   The public dashboard did not, however, provide an assessment of GRC's community integration efforts, the number of transitions accomplished, and whether the State was on track to accomplish the timeframes set forth in the Consent Decree, the types of placements where individuals transitioned (e.g., HCBS waiver group homes and size of homes, ICF/IID homes and size of homes, preferred geographic location), or recommendations that individuals remain at GRC or be transferred to Woodward Resource Center (as GRC will be closing) and if community integration efforts had impacted those recommendations. See Section K below for additional information.

6. According to the Barriers to Community Placement report dated 3/7/24, there were two individuals with identified barriers to community transition. This report tracked, among other things, provider agencies to whom the individuals were referred, which agencies denied the referral, guardian preference, IDT identified barriers, and MCO/MFP engagement and action to address identified barriers.

   This spreadsheet of individuals and identified barriers did not include an analysis for ongoing quality improvement, discharge planning, and development of community-based services as contemplated in the Consent Decree.

   According to the Acceptance Timeline Status report, 16 individuals were identified as accepted by a provider with target move dates for March and April of 2024, including one individual who was being transferred to Woodward Resource Center and one individual who was transitioning to a WRC waiver home. Of the remaining 14 individuals, two were noted as waiting on home modifications. So, while these individuals may be classified as having a tentative move date, the actual projected date of transition was dependent on completion of construction.

   This report also reflected nine individuals who had been accepted by a provider, but their status was noted as being with movement. The first transition meeting for four of these individuals had been held in August 2023. One individual was awaiting a Supports Intensity Scale (SIS) assessment before transition meetings could be scheduled. One individual had an initial transition meeting on 7/20/23, but was awaiting modifications and it was documented that the provider was having a difficult time obtaining quotes from contractors for the renovations. Therefore, further transition planning for that individual was technically on hold. Similarly, another individual was awaiting renovation to the home but had a status of scheduling meetings noted along with another individual whose status also indicated scheduling meetings.

   The remaining 26 individuals in this report were classified as Provider Accepted. There were varying rationales for their current status, including awaiting purchase/build of a home, awaiting renovations, host home staff wanting to wait until GRC closure to being providing services, and awaiting guardian decision.

GRC provided a document to the Monitoring Team on 4/30/24 that reflected each individual who transitioned from the facility since 1/11/23. According to this document 81 individuals were discharged or transitioned from GRC. Of these:

- 44 transitioned to HCBS waiver services.
- 9 transitioned to a host home setting.
- 12 transitioned to a ICF/ID setting (including 1 who was transferred to WRC); and
- 6 were placed in skilled, nursing, Hospice, or long-term care facilities.

Of the individuals who transitioned to HCBS waiver services, three were returned to GRC:

- One individual was discharged on 3/15/23 to a HCBS Waiver group home operated by AmeriServe and returned to GRC less than two months later in May 2023.
- One individual was discharged on 7/24/23 to a HCBS Waiver group home operated by Balance Autism and returned to GRC less than two months later in September 2023.
- One individual was discharged on 10/26/23 to a HCBS Waiver group home and returned to GRC less than two months later in December 2023.

Additionally, this report reflected that six individuals had passed away after discharge from GRC:

- One individual was discharged on 3/16/23 to a Hospice facility and died eight days later on 3/24/23.
- One individual was discharged to WRC on 3/29/23 and died approximately seven months later on 11/16/23.
- One individual was discharged to a nursing home on 4/11/23 and died 13 days later on 4/24/23.
- One individual was discharged to a Hospice facility on 4/12/23 and died 26 days later on 5/8/23.
- One individual was discharged to a host home provider on 6/23/23 and died 10/11/23.
- One individual was discharged to a Hospice facility on 7/15/23 and died 7 days later on 7/22/23.

One individual died while residing at GRC.

For the three individuals who returned to GRC from community placement, documentation was not provided that described the circumstances that led to the failed placements or if alternative options were sought in lieu of a return to the facility. Nor was there documentation to reflect their IDT had fully assessed the transition to identify shortcomings in the planning or identified actions through post-move monitoring to ensure necessary provision of supports that would have reduced the negative event occurring.

7. Quality assurance processes were not in place to ensure that ISPs, discharge plans, and transition plans were developed and implemented, in a documented manner, consistent with the terms of this Agreement. See section K.

8. The Center provided a policy titled Post-Transition Follow-up Protocol (effective 6/2/23) that outlined the expected implementation of post-transition monitoring at 7, 14, 30, and 60 days to be completed by the GRC social work department.

Additional monthly follow-up monitoring was identified through 365 days post transition. Expectations for onsite monitoring were identified for the 30-day or 60-day visits and at least one additional visit during the 365 days of monitoring.

Documentation of these visits was to be captured on a standard checklist that was purported to encompass all areas of the transition plan and address whether all supports and services were in place, including that the new provider had a current person-centered individual support plan in place, as contemplated in the Consent Decree. For individuals who transitioned in 2023, documentation reflected that GRC social work staff had conducted monitoring visits following transition as required.

However, the standardized checklist developed for post-transition monitoring (Transition Provider Follow-up Questions) was comprised of general domains of medical, behavioral, health, and environmental. Within these domains were several broad questions that were not tailored to the specific pre- and post-move supports and services identified in each individual's transition plan. Therefore, monitoring of transitions was not individualized and did not measure the timely and successful implementation of supports and services that were recommended for each individual's transition and in turn, did not guide the post move monitoring to identify potential events that could be disruptive to a successful transition or prompt the social worker and case managers to develop corrective measures.

The Monitoring Team is aware that a more detailed post move monitoring checklist was developed and implemented with the more recent transitions. Documentation from this revised process was more detailed and may very well guide the social worker to monitor in a more concrete manner for implementation of services, supports, and expected outcomes. However, work remained to ensure pre- and post-move supports were adequately developed, were measurable, and reflected clear expectations for implementation. For example, pre-move supports were not always individual specific but were more of a list of tasks to be completed including documents given to new provider, new items purchased, training of new provider staff, 30-day medications ordered, and ensuring that adaptive equipment will be in place at the new provider prior to the pre-move site visit.

Post-move supports include ensuring individuals have access to their communication device and use it on community outings, individual-specific monitoring related to health risks and supports, identification of frequency for necessary medical consultations, behavioral supports, and ambulation/transfer supports. However, post-move supports were oftentimes reflective of lengthy and multi-step or multiple component expectations of interventions and recommendations from disciplines rather than expectations for how the provider would ensure implementation of said interventions/recommendations including documentation and review. Pre-Move and Post-Move supports should be designed to set forth expectations of implementation and to allow for effective post-move monitoring for ensuring implementation.

Per the CIM, the CIM does provide follow up visits when possible. A more defined protocol will be put in place when the additional CIMs have been hired.

9. See indicator 8.

10. Four of the five individuals who had transitioned to the community had a current Individual Support Plan. These plans varied in format and content. None of their ISPs included meaningful goals or action plans that, if implemented, would lead toward achievement of their personal goals. For example, none of the individuals had goals designed to support community participation and integration, work, or volunteer opportunities, or gaining skills to increase their independence in daily life activities. For one individual who had transitioned to a nursing facility, an individualized treatment plan had been developed and was in place.

11. There was no documentation reflecting that staff conducting post transition monitoring had received adequate training and had been assessed for reliability of the process. The Monitoring Team conducted a training session on transition planning and post-move monitoring on 2/21/24 with social workers and other team members from GRC involved in the transition process.

12. (Indicators 12-16) These indicators monitor whether the individual received ongoing community case management services at the frequency required based on the individual's needs and preferences.

    Four of the five individuals who had transitioned from GRC had a primary case manager through Money Follows the Person (MFP) for the first year after transition as well as a Targeted Case Manager through the Managed Care Organization who was involved in the transition and attended meetings and provided support to the MFP case manager as needed. At the end of the MFP year, the MCO case manager would become the primary service. One individual did not have an MFP case manager as she was residing in a nursing facility and did not qualify for the service. She had active case management services through the MCO.

    For the five individuals who had transitioned from GRC, the Monitoring Team reviewed visit, contact, and monitoring notes from the assigned MFP and MCO case managers. Both MFP and MCO case managers were meeting with the individuals monthly and some of the meetings were virtual. But the case management activity notes did not reflect that case managers were reviewing data and documentation to assess ISP implementation, stability of the transition, and implementation of all supports and services. Case management notes reflected visits with the individuals and broadly stated observations from the visit. The case note format did not provide comprehensive prompts to gather substantive information based on review of documents and interview of provider staff and the individual to identify potential or emerging problems with the transition or to identify areas of needed follow-up with development of adequate correction actions.

    As noted in the Monitoring Team's Baseline Report, case management services to monitor services, progress, and general wellbeing was a critical component of the transition process that needed immediate correction. This was also noted in the Department of Justice Investigation of Glenwood and Woodward Resource Centers report issued 12/8/21:

    > *A lack of role clarity regarding key aspects of transition planning further impedes the process. Social workers, MCO case managers, and, in some instances, MFP staff share responsibility for engaging with residents and guardians about community services, identifying options, and planning for transition. State officials acknowledge that the responsibilities of each remain unclear. The lack of coordination contributes to deficient information sharing and support planning.*

17. As noted in indicators 8-9 above, the State had implemented a system to identify and monitor individuals who transition from Glenwood Resource Center (for at least 365 days following transition). However, as reported in Section K of this report below,

| |
|---|
| this system was in process of redesigning its system for review of transition plans and post-move monitoring, but there was no system in place to identify trends of issues across providers or of certain diagnoses or plans to remedy system problems. |

| Section I: State Staff (212-215) | | |
|---|---|---|
| Summary:<br>GRC continued to face multiple challenges in recruiting and maintaining staffing, but was able to do so and with the closure of one of the homes reached the 1.8 relief factor identified in the Consent Decree. The professional area lacking was in the area pf psychiatry where staffing levels did not meet the needs of the individuals as evidenced by lack of active participation in the transition of individuals out of GRC. | | |
| # | Indicator | Overall Score |
| 1 | GRC shall maintain appropriate and adequate staffing by ensuring:<br>i. Retention of sufficient residential treatment workers per resident to safely staff GRC always.<br>ii. Retention of an adequate number of supervisory staff, and GRC leadership<br>iii. Retention of demonstrably competent, appropriately trained, and credentialed, staff and facility leadership<br>iv. Responsibilities and workloads are appropriate.<br>v. Any hiring or firing of leadership is approved by HHS Central Office.<br>(par. 212,215) | PC |
| 2 | GRC will have a performance evaluation process for all GRC staff.<br>i. Will occur annually.<br>ii. Be conducted by someone of the same specialty.<br>(par. 213) | LO |
| 3 | GRC will have a system in place to ensure complaints regarding GRC staff are investigated to ensure needed actions are completed. (par. 214,221) | SC |
| Comments:<br>1. GRC continued to face multiple challenges in recruiting and maintaining staffing, but was able to do so and with the closure of a home reached the 1.8 relief factor identified in the Consent Decree. A relief factor multiplier formula of 1.8 (meaning there will be 1.8 residential treatment workers filled and budgeted for every residential treatment worker needed on shift) or more if necessary to account for staff vacancies and leave. The professional area lacking was in the area pf psychiatry where staffing levels did not meet the needs of the individual as evidenced by lack of active participation in the transition of individuals out of GRC.<br><br>3. The Center was asked to provide a policy for the training of staff on how to report concerns as well as the methods in which staff can report such concerns, but no documentation was provided. When there was a complaint, the policy was followed, and investigations occurred timely. | | |

## Section J: Organizational Accountability (216-228)

Summary:
Glenwood Resource Center had a full leadership team that consisted of the below professionals. In addition, GRC was supported by Kelly Garcia-Director of Iowa Health and Human Services and Cory Turner-Division Administrator of Iowa Human Services. Complaints were responded to in a timely manner. As part of the HHS website, there was access to multiple Consent Decree pages that explain the case and the process for GRC to close.

| # | Indicator | Overall Score |
|---|---|---|
| 1 | HHS Staff has been identified to oversee operations at GRC. They will have oversight to ensure compliance with SA provisions. (par. 216,217) | PC |
| 2 | The State shall engage with Stakeholders to ID concerns, goals, and recommendations regarding the CD. (par. 218) | LO |
| 3 | HHS Central Office conducts regular in person visit at GRC. (par. 219) | LO |
| 4 | The State developed and trained staff in methods to report complaints with one method being anonymous. (par. 220) | LO |
| 5 | State shall implement timely and effective investigations into reported concern. (par 221) | SC |
| 6 | The State shall provide reporting GRC staff with a substantive response concerning the outcome of the investigation. (par. 222) | N/A |
| 7 | GRC and HHS Central Office develop and implement effective mechanisms for identifying, tracking, and addressing trends regarding resident care and health outcomes. (par. 223) | PC |
| 8 | The State shall establish reliable measures to evaluate GRC's organizational accountability for resident well-being, and shall ensure regular reporting, analysis and, when necessary, corrective actions by GRC and HHS Central Office. (par. 217, 225) | PC |
| 9 | The State shall establish a Resident Council to enable GRC residents to make recommendations and provide information to the GRC Superintendent (par. 225) | NC |
| 10 | State shall establish a reliable method of public reporting that includes QM reporting (Section K) (par. 226) | PC |
| 11 | HHS Central Office shall review and approve all policies, and amendments to them. (par 226) | LO |

Comments:

1. Glenwood Resource Center had a full leadership team that consisted of the below professionals. In addition, GRC was supported by Kelly Garcia-Director of Iowa Health and Human Services and Cory Turner-Division Administrator of Iowa Human Services.

   Cory Turner served as the Director for all State-Operated Facilities and reported directly to the HHS Director. Per his position description, he was directly responsible for the oversight of the six HHS 24/7 facilities.

| NAME | TITLE |
|---|---|
| Angel, Jose | CHIEF MEDICAL OFFICER |
| Baggett, Karen | TREATMENT PROGRAM ADMINISTRATOR - AREA 2 |
| Darrow, Charles | PSYCHOLOGY ADMINISTRATOR |
| Edgington, Marsha | SUPERINTENDENT |
| Heiman, Cara | ADMINISTRATOR OF NURSING |
| Hunter, Daniel | DAY SERVICES DIRECTOR |

| | |
|---|---|
| Chris Olson | ASSISTANT SUPERINTENDENT OF INTEGRATED SERVICES |
| Konfrst, Scott | INFORMATION TECHNOLOGY ADMINISTRATOR |
| Landeen, Dax | ASSISTANT SUPERINTENDENT OF TREATMENT SUPPORT SERVICES |
| Lovato, Darlene | QUALITY MANAGEMENT DIRECTOR |
| Katie Jo Lawton | TREATMENT THERAPY SERVICES DIRECTOR |
| Lisa Olsen | Interim SOCIAL WORK ADMINISTRATOR |
| Sayers, Heath | ASSISTANT SUPERINTENDENT TREATMENT PROGRAM SVCS. |

5. The State implemented timely and effective investigations into reported concerns and provided reporting GRC staff with a substantive response concerning the outcome of the investigation.

6. See #5 above.

7. See Section K indicator #3.

8. See Section K indicator #3.

9. There was no resident council in place that enabled GRC individuals to make recommendations regarding topics of interest.

10. The State developed a GRC Public Reporting Dashboard that generally aligns with the requirements in the consent decree. In many cases, the data were presented as a rate (percentage of individuals, percentage of days served, etc.). This was useful for trending data as the GRC census reduces. The domains in the GRC Public Reporting Dashboard were consistent with the consent decree requirements for the Quality Management program with the following exceptions:

    The domains of staff capacity (including caseloads by discipline, training, staff turnover and competency) and compliance with policies and procedures (including timely provision of appropriate medical care) were not included in the dashboard.

    For the domains that were represented in the dashboard, the following data were absent:

    - physical health and well-being: disease and wound management, incidence of physical health crises, and access to and receipt of timely preventative interventions in response to changes in status.
    - behavioral health and well-being: incidents of behavioral health crises (only data on aggression is included).
    - choice and self-determination: self-direction of services and meaningful and informed choices regarding community-based services and providers.
    - community inclusion: relationships with non-paid individuals.

    Data required for risk management was present, however, it is recommended that the category terms critical, high, and moderate be defined.

Although much of the data were adjusted by population to support accurate analysis and trending, there were some data points that were not presented as a rate and would be helpful to do so: emergency room and hospital admissions by month, psychotropic medication use by month, persons with restrictive interventions by month, and incidents and interventions by month.

| **Section K: Effective Quality Management (229-235)** | | |
|---|---|---|
| Summary:<br>The Monthly Quality Council had improved. Details of discussion and analysis of data, and follow-up actions were now documented in the minutes. GRC developed a Public Reporting Dashboard that included many of the QM domains and indicators. The data contained within the dashboard reported data as frequencies and rates, whereas the quality data reviewed as part of the council were reported as frequencies (count) rather than relative to census, thus, preventing the reader from being able to compare trends and offer true analysis.<br><br>Only three of the nine domains required in the Consent Decree were fully included in the monthly quality management data. Two of the nine were partially addressed and four of the nine required domains were not included. For those domains that were partially or not at all included in the quality management system, there may be processes for which trended data could be generated, or the data exist in another format, but were not currently part of the monthly quality management data. Plans and practices were reportedly initiated and under development to increase State HHS direction and monitoring of implementation and effectiveness of corrective actions and performance improvement initiatives, but these procedures and practices were not yet been fully documented. | | |
| # | Indicator | Overall Score |
| 1 | GRC's quality management system shall include processes to ensure that the provision of clinical care and services at GRC are consistent with current, generally accepted professional standards and implemented in an appropriate manner. The State shall ensure data related to the provision of clinical care and services is shared with GRC's Quality Management program and that the data is valid, dependable, analyzed, and utilized for GRC's quality improvement, pursuant to the processes set forth in Section IV.K. (par. 66) | NC |
| 2 | Quality Management process and procedures are consistent with current, generally accepted professional standards of care. These processes timely and effectively detect problems and ensure appropriate corrective steps are implemented. (par. 229) | NC |
| 3 | GRC's quality management program shall effectively collect and evaluate valid and reliable data, including data pertaining to the domains and topics listed below, sufficient to implement an effective continuous quality improvement cycle.<br>GRC's quality management program shall use this data in a continuous quality improvement cycle to develop sufficient reliable measures relating to the following domains, with corresponding goals and timelines for expected positive outcomes, and triggers for negative outcomes.<br><br>A Quality Management program shall collect, report on, and analyze valid and reliable data regarding GRC sufficient to identify overall trends in the following domains:<br>i. Safety and freedom from harm<br>ii. Physical health and well-being<br>iii. Beh health and well-being<br>iv. Engagement and skill acquisition<br>v. Choice/self-determination<br>vi. Risk management.<br>vii. Staff capacity<br>viii. Compliance with policies and procedures<br>ix. Referrals/transitions to other providers<br>(par. 66,102,211,223,230,231) | PC |

| | | |
|---|---|---|
| 4 | The IDT utilizes the data provided through the QM process to drive the decision-making process. (par. 232) | SC |
| 5 | HHS reviews the routine QM reporting (par. 233) | |
| 6 | HHS Central Office shall routinely monitor the quality and effectiveness of GRC's Quality Management program and take action to improve the Quality Management program when necessary.<br><br>The State shall effectively identify the need for and shall direct and monitor the implementation and effectiveness of needed corrective actions and performance improvement initiatives at GRC.<br>(par. 234,235) | NC |
| 7 | Ensuring accurate, effective, and timely documentation, reporting, investigation, analyses, and appropriate remedial action regarding potential and actual medication variances.<br>i. Potential and actual medication variances shall be reviewed by the Medication Variance Committee. The Committee shall include at least one staff member from the GRC Quality Management Department, and all Committee members shall have received training in Quality Management.<br>ii. The Committee shall address potential and actual medication variances using a continuous quality improvement model.<br>(par. 102c i,ii) | SC |
| 8 | GRC's quality management system shall include processes to ensure that the use of restrictive procedures at GRC is consistent with current, generally accepted professional standards and implemented in an appropriate manner. The State shall ensure that the Psychology Department shares restrictive intervention data with GRC's Quality Management program, and that the data is valid, analyzed, and utilized for GRC's quality improvement, pursuant to the processes set forth in Section IV.K. (par. 126) | SC |
| 9 | GRC's quality management system shall include processes to ensure that the habilitation, training, education, and skill acquisition programs provided to GRC residents are consistent with current, generally accepted professional standards and implemented in an appropriate manner. The State shall ensure that data related to such programs is shared with GRC's Quality Management program and that the data is valid, analyzed, and utilized for GRC's quality improvement, pursuant to the processes set forth in Section IV.K. (par. 162) | NC |
| 10 | The State shall develop and implement quality assurance processes to ensure that ISPs, discharge plans, and transition plans are developed and implemented, in a documented manner, consistent with the terms of this Agreement. These quality assurance processes shall be sufficient to show whether the objectives of this Agreement are being advanced. Whenever problems are identified, the State shall develop and implement plans to remedy the problems. (par. 208) | NC |

Comments:

1. GRC submitted documentation of the Medical Quality Council dated 11/13/23, 12/14/23, 1/18/24, and 2/13/24. Health care indicators reviewed each month were in the areas of infection control, falls, nursing/medical quality, and medication variance. There were also sections for seizures and chemical restraints, but these were not discussed during the meetings listed previously. The nursing/medical quality indicators included aspiration pneumonia, dehydration, bowel obstruction/ileus, respiratory infections, urinary tract infections, health care related infections, ER visits/on campus transfers/hospitalizations, skin breakdown, lacerations requiring closure with sutures or Dermabond, underweight status, obese status, and unplanned significant weight change. The Quality Council Meeting report and minutes provided evidence these medical department data were shared with the GRC Quality Management program.

   The clinical care data were reported on a frequency (count) basis only and did not provide relative metrics based on number of persons served, service days, etc. In some cases, the total for the past 12 months was also reported. Data reported on a frequency basis makes it

challenging to assess whether changes in the data require action or if they are simply a result of fluctuations in census (the number of people being tracked).

Occasionally when there were increases from month to month and the total for a month exceeded the monthly average, there were no action plans, recommendations/actions, responsible parties, follow-up dates, and dates resolved even though the Medical Quality Council minutes included columns for this information. For example, aspiration pneumonia increased by one each of the months of November and December 2023, but no action plans were identified. The Quality Council minutes dated 1/23/24 included discussion about the cases of pneumonia from December 2023, but no action plans were documented. One individual with recurring aspiration pneumonia (also in August and November 2023) included mention of possibly following-up with ENT for recommendations, but this was not documented as an action plan with responsible party, follow-up date, and date resolved.

2. The quality management process and procedures were minimally consistent with current, generally accepted professional standards of care. GRC's practices fall short of industry benchmarks or best practices in the following areas:
   - Data Reporting: Data were reported on a frequency (count) basis, which made it challenging to assess whether changes in the data required action or if they were simply a result of fluctuations in census (the number of people being tracked). For example, in the 12/19/23 Quality Council meeting minutes it was documented in response to a query about the reduced number of employed individuals (reduced by seven) that the only reason people were no longer employed was because they were no longer here at GRC. This then accounted for the difference from 33 to 26. Reporting data as a count may not provide sufficient context for meaningful analysis. Although much of these data was presented as a rate in the GRC Public Dashboard, this information was not integrated into the monthly quality management process.
   - Timely Problem Detection: The inability to accurately compare data over time made it difficult to determine if problems were being detected in a timely manner. This implied that GRC may struggle to identify issues promptly and take appropriate corrective actions.

   It is recommended that GRC enhance its quality management processes and data reporting practices to facilitate better analysis and decision-making by implementing a methodology for normalizing the data, reporting it as a rate rather than, or in addition to, a count. Normalization allows for meaningful comparisons over time and across different contexts, potentially improving the accuracy of data analysis.

3. GRC's quality management program collected data and maintained a process for reviewing monthly. The monthly Glenwood Resource Center Quality Indicator Report included data for 249 outcome and performance measures, and they were defined. However, there was no indication that all these data items were reviewed and acted upon regularly. A subset of the quality indicator data w evaluated in greater detail in each month's Quality Council report and discussed during the monthly Quality Council meetings.

   A review of minutes from the Quality Council meetings dated 8/15/23, 9/19/23, 10/17/23, 11/28/23, 12/19/23 and 1/23/24 resulted in the following observations:
   - The minutes included recommended actions, responsible party, follow-up date, and date resolved or if there was no follow-up action plan, these sections were marked no action or "N/A.
   - Pharmacy data was made available and reviewed during all referenced meetings of the Quality Council. This information and data were not provided nor reviewed at previous Quality Council meetings.

- Extensive analysis of medication variances was included in all the referenced minutes, along with remediation actions planned and/or implemented.

The vast majority of issues reviewed were responded with "No Action" by the QA council , but did note what was occurring at the home level and their IDT. If there was a need to provide recommendations, those appeared to be offered.
A review of these same Quality Council Meeting minutes revealed areas of improvement needed:

- Data for each indicator was shown as compared to the previous month and several of the health care indicators included a 12-month total, but there was no indication of trends over time.
- The Facility Practices section of the minutes included the number of Type 1 investigations and of those, the number that were completed in five business days, as required by the Abuse and Incident Management policy, dated 4/28/20; 10/13/20, revised 3/28/21, and reviewed 3/28/22.
  Although all were not completed within five business days some months, there were no recommended action identified. For example, the 1/23/24 minutes indicated there were 11 Type 1 investigations for the month of December 2023, but only seven were completed within five business days. However, it was documented no action for the recommended actions.
- Information about types of community outings completed by recreation staff was included in the minutes from the 8/15/23 and 9/19/23 Quality Council meetings, however, this detail had not been included in the minutes for the October 2023, November 2023, December 2023, and January 2024 meetings.

For the domains specified in the Consent Decree, the Quality Management data did not include the following:

- Engagement and skill acquisition.
- Choice and self-determination (including individual service plans developed through a person-centered planning process, inclusion of the resident in the planning process, individualized goals, self-direction of services and meaningful and informed choices regarding community-based service providers).
- Community inclusion (including relationships with non-paid individuals).
- Staff capacity (including caseloads by discipline, training, staff turnover, and competency).
- Compliance with policies and procedures (including timely incident reporting and timely provision of appropriate medical care).
- Referrals / transitions to other providers (referral to, admission and readmission to, diversion from, and length of stay in GRC; discharges and transitions from GRC and related planning; and barrier to serving individuals in more integrated settings).

Data and information on these topics may be included in other reports (examples: employee vacancy and staff assignment reports, Glenwood Resource Center Transition and Discharge Monitoring, Glenwood Resource Center Transition Barrier and Guardian Preference Report, GRC Public Reporting Dashboard) or compiled through other processes (examples: Individual Implementation Program Monitoring Procedure, ISP reviews, Active Treatment Observations, etc.), but these data were not included in the Quality Management data.

The Monitoring Team attended the Quality Council meeting on 3/19/24 and during that meeting, the GRC Superintendent indicated that the missing domains will be added to future Quality Management data and meetings. She also requested that all the 249 quality indicators be addressed during the monthly Quality Council meetings.

4. Multiple entries in the Quality Council Meeting Minutes indicated that quality management data were used by the IDTs to drive decision making. For example, in the minutes for the meeting on 9/19/23, there were references to IDT review for an individual with an incident of aspiration pneumonia and an individual with skin breakdown. There was documentation in these same minutes that all individuals' shoe sizes would be assessed to verify the exact right fit. This was prompted by recognition of an individual with frequent falls resulting from incorrect shoe size.

5. Review of minutes from the Quality Council meetings dated 8/15/23, 9/19/23, 10/17/23, 11/28/23, 12/19/23, and 1/23/24 indicated the HHS Director of State-Operated Facilities reviewed the quality data in advance of the meeting. The minutes included comments/questions and responses within the relevant topic and also in a section at the end of the minutes titled HHS Oversight. Additionally, the HHS Central Office Management Analyst III consistently participated in the Quality Council meetings.

6. Although there had been progress with the State directing and monitoring implementation and effectiveness of corrective actions and performance improvement initiatives at GRC, sufficient time had not passed to evaluate whether the strategies were effective. Documentation of follow-up activities were not consistently observed.

   When interviewed, the HHS Director of State Operated Facilities stated that an expectation for frequency of visits to GRC had been identified for each HHS Central Office staff who did not office at GRC. The intended schedule was contained in job descriptions and visits were recorded on a spreadsheet. However, this documentation did not include recommended actions and results of those recommendations. It was noted that HHS Central Office Management Analyst III had responsibilities for monitoring consent decree compliance. Although specific details of these duties were outlined verbally, there was no documentation of actions taken.

   It is recommended that a formal schedule and procedure be developed, documented, and implemented to clearly outline HHS responsibilities for this oversight, the frequency of review, required documentation, and expected actions.

7. Medication variance reports for September 2023 to December 2023 and January 2024 were provided, along with a spreadsheet listing all the actual and potential medication variances for this same time period. Medication Variance Meeting Minutes for weekly meetings were made available. In addition to listing the medication variances by date, the minutes included a summary of the discussion, action needed, responsible party, date due, and date resolved. The minutes also included number of Nurse and Certified Medication Aides (CMA) audits and the number of monitoring activities completed by QIDPs at each house.

   The Quality Management Director chaired the Medication Variance Committee. Evidence of training in Quality Management for all Medication Variance Committee members was not observed.

   The Medication Variance Committee continued to meet weekly rather than monthly (if a medication variance occurred), allowing for timely responses to occur, including planning, and tracking corrective actions (retraining, formal counseling and HR/administrative actions as indicated). The focus was on variances level 3-9 (reached the individuals). The use of CMAs had been reduced significantly and actual administration of medications and treatments were primarily being completed by licensed nurses (LPNs, RNs).

Minutes from the Quality Council meetings on 8/15/23, 9/19/23, 10/17/23, 11/28/23, 12/19/23, and 1/23/24 included an analysis of types of actual and potential variances each month. Minutes from all these meetings (except the one held on 9/19/23, which included data on medication variances that occurred in August) included data on the total number of doses administered each month and the error rate for the month. During the timeframe reviewed, the error rate ranged from a high in July of 1.14% to a low in September of 0.05%. Rates from October 2023 through January 2024 were consistently below 1%. Note that the minutes for the 10/17/23, 11/28/23, 12/19/23, and 1/23/24 all stated Error rate in July even though the data were for the month prior to the month of each meeting. It is recommended to correct this in Quality Council Meeting Minutes going forward. The Quality Council Meeting minutes included remediation activities and results of remediation.

8. Restrictive interventions, specifically the number of individuals with any type of restrictive intervention and number of individuals with restrictive intervention(s) based on a peer's identified needs, was included in the Quality Council data. Restrictive interventions were reviewed during the peer review meetings and representatives from the Psychology Department participated in those meetings. The restrictive intervention data for the monthly Quality Council meetings included information from the peer review meetings. Data on the number of programs with restrictive interventions that were submitted and that were approved by the Human Rights Committee each month was also part of the Quality Council data. In addition, each month's report contained a detailed analysis of restraint use and whether the GRC restraint benchmarks were met for the month.

   Based on a review of the restrictive intervention data documented in the Quality Council Meeting minutes for 8/15/23, 9/19/23, 10/17/23, 11/28/23, 12/19/23, and 1/23/24, remediation plans were not needed. In fact, the restraint use reduced to 0 during the month of August 2023, so the GRC restraint benchmarks were reduced accordingly.

9. GRC engaged in several processes designed to evaluate habilitation, training, education, and skill acquisition programs. An example included QIDPs and supervisors completing Active Treatment Observation forms, varying the day of the week and time of observations. In response to discussion from the previous monitoring visit in August 2023, the Active Treatment Observation form was revised to include observable and measurable definitions for activities. The supervisor also completed the Unannounced Rounds Tool at least weekly at each program.

   The documentation maintained for the processes was on a case-by-case basis. There was no mention of aggregate data analysis, validation, or utilization of data as part of the Quality Management program. It is recommended to include these aggregated data or other data on habilitation, training, education, and skill acquisition programs to gain insights, identify trends, and make informed decisions.

   A GRC Quality Management Coordinator completed reviews of individual service plans. Although the completed checklists (QA audits) were requested (e.g., the document titled ISP Performance Measures for Compliance–2023 Format) for December 2023, January 2024, and February 2024, they were not provided. Only the blank form was provided, which included the minimum standard for each section of the ISP and best practice standard for many of the ISP sections. A summary of findings from the December 2023, January 2024, February 2024 reviews was provided. The summary document included issues, questions, etc. from eight reviews. This document included the name of each individual and did not indicate when the ISP review was completed, nor the date of the ISP document that was reviewed. These reviews appeared very thorough and provided guidance for developing a more complete, detailed ISP.

The documentation maintained for the above processes was also on a case-by-case basis. There was no mention of aggregate data analysis or utilization of these data as part of the Quality Management program. It is recommended to include this aggregated data to support decision making.

10. GRC maintained a monthly report titled Glenwood Resource Center Transition and Discharge Monitoring. This report included a listing of individuals who were discharged from GRC and narrative of any follow-up since discharge. A spreadsheet listing all individuals, discharge date, provider, and follow-up activity was also maintained.

HHS Central Office Management Analyst 3 indicated the State was in the process of developing a more robust system for monitoring transition plans and post move monitoring documents, including developing a procedure and checklist to support this quality management activity. HHS staff and a GRC Quality Management Coordinator had already been involved and will continue to be, but in interview with the HHS Central Office Management Analyst III, it was communicated that there was not a formal process. Necessary revisions identified through the review were communicated via email and an updated document was returned with changes tracked. The HHS Central Office Management Analyst III then reviewed the revised document to verify all changes were completed correctly. A sample of eight emails and updated post move monitoring documents were provided for the monitoring review. There was no indication that the State had, or was in the process of developing, a system to identify trends of issues and any plans to remedy system problems. It is recommended that this be considered.

The State, including representatives from GRC, developed a Post Move Monitor (PMM) Community Thresholds Clinical Pathways Procedure, dated 2/9/24, that directed monitoring activities when individuals were discharged into the community. This procedure outlined the incidents that must be reported to GRC and then those incidents were entered into a SharePoint site. The SharePoint database supported managing and tracking these incidents.

A memorandum, dated 12/6/23, was sent to community providers, managed care organization case managers and Money Follows the Person transition specialists to communicate the expectations for reporting critical incidents and post move monitor community thresholds. The memorandum stated that incidents must be reported immediately and documented in the individual's record in IPR. However, it is recommended that it be immediately defined. Further, when an incident was reported, the procedure stated that specifically, the HHS Central Office Management Analyst 3 and the HHS Community Integration Manager, along with GRC positions, were responsible for addressing within 24 hours, but no later than the next business day, incidents that met any of the thresholds. In interview, the HHS Central Office Management Analyst 3 indicated that incidents that were reported, but did not meet threshold criteria, were also followed-up. However, there was no documentation of actions taken in those situations.